JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gregory V. Manco, Ph.D.

## DEFENDANTS

St. Joseph's University, Hadassah Colbert, Kiernan Loue etc

**(b)** County of Residence of First Listed Plaintiff  Marlton, New Jersey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Zarwin Baum DeVito Kaplan Schaer & Toddy, P.C.; 2005 Market Street, 16th Floor, Phila, Pa 19103; 267-765-9684

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [x] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### PRISONER PETITIONS

**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Civil Rights Act of 1866, as amended, 42 U.S.C. §1981

Brief description of cause:
Discrimination and retaliation because of race

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   1.21.2022

SIGNATURE OF ATTORNEY OF RECORD   *Zachary A. Silverstein*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 51 Elmgate Road, Marlton, New Jersey 08053 _____

Address of Defendant: _____ 5600 City Avenue, Philadelphia, PA 19131 _____

Place of Accident, Incident or Transaction: _____ 5600 City Avenue, Philadelphia, PA 19131 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | | |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☐ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☐ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☐ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☐ |

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 01/21/2022 _____ *Zachary A. Silverstein* _____ 316491

*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify): _____*

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify): _____*
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify): _____*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Zachary A. Silverstein _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 01/21/2022 _____ *Zachary A. Silverstein* _____ 316491

*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY V. MANCO, Ph.D.,                    :
51 Elmgate Road                             :
Marlton, New Jersey 08053                   :
                                            :
            Plaintiff,                      :
      v.                                    :  CIVIL ACTION NO.
                                            :
ST. JOSEPH'S UNIVERSITY                     :
5600 City Avenue                            :
Philadelphia, Pennsylvania 19131            :
                                            :
and                                         : JURY TRIAL DEMANDED
                                            :
HADASSAH COLBERT                            :
319 S. Rockford Road                        :
Mountville, Pennsylvania 17554              :
                                            :
and                                         :
                                            :
KIERNAN LOUE                                :
86 Greenfield Avenue                        :
Ardmore, Pennsylvania 19003                 :
                                            :
and                                         :
                                            :
LYNLY CARMAN                                :
9 Drexel Avenue                             :
Stratford, New Jersey 08084                 :
                                            :
and                                         :
                                            :
DR. SUSAN LIEBELL                           :
113 Johnson Street                          :
Highland Park, New Jersey 08904             :
                                            :
and                                         :
                                            :
KARLEIGH LOPEZ                              :
2139 Columbia Avenue                        :
Atco, New Jersey 08004                      :
                                            :
and                                         :
                                            :

1

ERIN FAHEY                                         :
205 Kenmore Drive                                  :
Williamstown, New Jersey 08094                     :
                                                   :
            Defendants.                            :
                                                   :
                                                   :

## COMPLAINT[1]

Professor Gregory Manco ("Plaintiff" or "Dr. Manco") through his undersigned counsel, files this Complaint against defendants St. Joseph's University ("St. Joseph's"), Hadassah Colbert ("Colbert"), Kiernan Loue ("Loue"), Lynly Carman ("Carman"), Erin Fahey ("Fahey"), Dr. Susan Liebell ("Dr. Liebell"), and Karleigh Lopez ("Lopez") and, in support thereof, avers as follows:

## I.      NATURE OF THE ACTION

1.      Dr. Manco, a Caucasian former Visiting Assistant Professor of Mathematics at St. Joseph's seeks damages from St. Joseph's as it is responsible for the actions of a small group of administrators when they purported to give credence to completely false, unsupported, undocumented, and implausible allegations of racial bias, and then used those allegations to justify an investigation, suspension and non-renewal of his contract as a Visiting Professor of Mathematics, despite his dedication and excellent performance. In doing so, St. Joseph's, violated its legal duty by discriminating against him, on the basis of his race, and breached its contractual and other legal obligations to him.

---

[1] Please note that Dr. Manco will amend his complaint to include claims for violations of VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 ("PFPO") once the EEOC issues its Right to Sue Letter.

2.      More specifically, Dr. Manco was subjected to discrimination and retaliation because of his race in violation Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("Section 1981").

3.      Dr. Manco seeks damages, including economic, including back-pay and front-pay, compensatory, and punitive damages, and all other relief under applicable federal and state law as the Court deems appropriate.

4.      Dr. Manco also seeks damages from St. Joseph's, Colbert, Loue, Carman, Fahey, Lopez, and Dr. Liebell, for defaming him, putting him in a false light, and for civil conspiracy.

5.      Dr. Manco also seeks damages from Lopez, Colbert, Loue, Carman, and Fahey for tortiously interfering with his employment contract with St. Joseph's.

6.      Based on the actions described herein, it is clear that all of the defendants acted to "cancel" Dr. Manco. In other words, defendants' actions consisted of the social phenomenon of "cancel culture," which is widespread, has ruined lives, damaged reputations, and jeopardized the futures of individuals. This is exactly what defendants attempted to accomplish by their actions, and for which they were successful.

## II.      THE PARTIES

7.      Dr. Manco is an adult individual and a resident of New Jersey residing at 51 Elmgate Road in Marlton, New Jersey.

8.      St. Joseph's is a nonprofit corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 5600 City Avenue, Philadelphia, Pennsylvania, 19131.

9.      At all times material hereto, Dr. Manco was an employee of St. Joseph's within the meaning of the statutes that form the basis of this matter.

3

10.     At all times material hereto, St. Joseph's was an employer of Dr. Manco within the meaning of the statutes that form the basis of this matter.

11.     At all times material hereto, St. Joseph's employed more than fifteen (15) people.

12.     At all times material hereto, St. Joseph's acted by and through its authorized agents, servants, workmen, and/or employees within the course and scope of their employment with St. Joseph's and in furtherance of St. Joseph's business.

13.     Hadassah Colbert is an adult individual and resident of Pennsylvania residing at 319 S. Rockford Road in Mountville, Pennsylvania 17554.

14.     Kiernan Loue is an adult individual and resident of Pennsylvania residing at 86 Greenfield Avenue in Ardmore, Pennsylvania.

15.     Lynly Carman is an adult individual and resident of New Jersey residing at 9 Drexel Avenue in Stratford, New Jersey

16.     Erin Fahey is an adult individual and resident of New Jersey residing at 205 Kenmore Drive in Williamstown, New Jersey.

17.     Dr. Susan Liebell is an adult individual and resident of New Jersey residing at 113 Johnson Street in Highland Park, New Jersey.

18.     Karleigh Lopez is an adult individual and resident of New Jersey residing at 2139 Columbia Avenue in Atco, New Jersey.

### III.     JURISDICTION AND VENUE

20.     The causes of action set forth in this Complaint arise under Section 1981 and other various state law claims.

21.     The District Court has subject matter jurisdiction over Section 1981 pursuant to 28 U.S.C. § 1331.

22.     The District Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is proper under 28 U.S.C. § 1391(b).

### IV.     STATEMENT OF FACTS

24.     In 1992, Dr. Manco graduated with a Bachelor of the Arts in Mathematics and Statistics from Rutgers University.

25.     Dr. Manco continued his education with Rutgers University, and obtained his Masters in Statistics in 1994 and his Ph.D., in Statistics in 1997.

26.     Prior to joining St. Joseph's, Dr. Manco taught for Rutgers University, University of the Sciences in Philadelphia, and Rowan University.

27.     Dr. Manco first joined St. Joseph's in 2005 as an Adjunct Professor.

28.     In 2007, Dr. Manco was hired as Visiting Assistant Professor of Mathematics ("Visiting Professor") and was in this position until wrongfully denied equitable treatment, wrongfully investigated, wrongfully suspended, wrongfully removed, and denied due process, all of which give rise to this lawsuit.

29.     After becoming a Visiting Professor, Dr. Manco would teach approximately 8 courses and approximately 230 students per year.

30.     Moreover, over the course of his career in academia, Dr. Manco published scholarly works, including journal articles, and books, including two (2) textbooks and an article entitled "Inadmissibility of the studentized likelihood ratio test for testing order-restricted normal means", which was published in Statistics and Decisions, 20 in 2002.

31.     Dr. Manco performed his job duties in a highly competent manner and routinely received positive feedback on his performance.

32.     Dr. Manco received a Teaching Merit Award from St. Joseph's in 2012, for his creation of a new course in combinatorics and probability.

33.     Moreover, in 2020, Kristopher Tapp, Ph.D., Professor and Chair of Mathematics, wrote to Dr. Manco and stated[2]:

Hi Greg,

I hope you're staying healthy and enjoying the start of summer.

Your course evaluations look great!  I'm surprised that I have access to them, since I thought my access was supposed to be blocked this semester.  But I am able to see the quantitative (not the qualitative) like usual.

From past semesters, I've kept a running record for all math faculty of the avg student responses to the two most relevant questions: "explains clearly" and "overall rate professor excellent".  Your numbers this semester are very strong (4.5, 4.67, 4.44, 4.11 for "explains clearly" and 3.83, 4.5, 4.0, 4.44 for "excellent").  Your numbers from past semesters were similarly strong (and with higher response rates).

34.     In addition, from approximately 2004 through 2021 (except from Fall 2012 through Spring 2015), Dr. Manco was involved with St. Joseph's Division 1 Intercollegiate baseball team as both a paid and volunteer assistant baseball coach and as the volunteer director of baseball operations.

35.     Dr. Manco was removed from his role as a volunteer assistant  coach with the baseball team as a result of defendants' unlawful actions and the tortious conduct, as more fully described below.

36.     St. Joseph's was founded in 1851 and says it embraces the "the Jesuit educational model" which means that the school recognizes that an individual is multidimensional "who needs the freedom and encouragement to grow mentally, spiritually, personally and creatively."

---

[2] Moreover, Dr. Tapp was in the process of nominating Dr. Manco for another Teaching Merit Award until the events of February 19, 2021

37.     St. Joseph's also represents that it is an "inclusive and diverse community that educates and care for the whole person."

38.     St. Joseph's failed to follow its own mission statement in this matter.

39.     On or before January 22, 2021, Colbert, a former student at St. Joseph's, learned of Dr. Manco's Twitter account, which was anonymous and not affiliated with St. Joseph's, and began to view his tweets.

40.     Colbert was a student of Dr. Manco, in the Spring of 2017, receiving a final grade of F.

41.     Colbert never complained about any type of bias or discrimination by Dr. Manco while a student of his, or at any time during her enrollment at St. Joseph's. Additionally, no students ever accused Dr. Manco of bias or discrimination in their end-of-semester student evaluations.

42.     On January 22, 2021, Colbert submitted an email to Nicole Stokes, Ph.D., St. Joseph's Associate Provost for Diversity, Equity, and Inclusion, Shaily Menon, Ph.D., the Dean of the College of Arts and Sciences, and Dr. Tapp, accusing Dr. Manco of being racist and transphobic.

43.     Colbert included selected screenshots of tweets of Dr. Manco as supposed evidence to support her claims, adding that Dr. Manco discriminated against her in class and fostered a hostile learning environment four (4) years earlier, in Spring of 2017.  Colbert stated that Dr. Manco should not be allowed to coach or teach students.

44.     On January 26, 2021, Colbert met with Title IX Coordinator Lexi Morrison[3], Intake Officer Taba Pickard, and Tenisha McDowell from Human Resources. Ms. Morrison

---

[3] Ms. Morrison was involved in at least one Title IX lawsuit, *see Harris Fogel v. University of the Arts*, et. al., United States District Court for the Eastern District of Pennsylvania, Docket No.: 18-5137.

identified this meeting as the "consultation process" as outlined in St. Joseph's Interim Policy on Discrimination, Harassment, and Retaliation ("Interim Policy").[4]

45.     During this "consultation process," Ms. Morrison broke with procedure and conspired with Colbert by advising her to find others to support her experience with Dr. Manco, and to get them to reach out to her.

46.     Dr. Manco was completely unaware of the email and the "consultation process" meeting.

47.     Four weeks later, on February 19, 2021, Colbert followed Ms. Morrison's advice by using her Instagram account to spread "selected" screenshots of selected tweets of Dr. Manco with her added defamatory comments, while encouraging others to report him to the University so that he would lose his job.

48.     Karleigh Lopez ("Lopez"), another St. Joseph's graduate, who was never taught by Dr. Manco, and did not know him personally, saw Colbert's posts, and joined in the public campaign to have him terminated. This included her creation of a Tik Tok video which included screenshots of Dr. Manco's tweets and a link to the bias reporting form, a plea to her followers to "flood" the school with complaints, and a public tweet to St. Joseph's with "selected" screenshots of Dr. Manco's tweets and Colbert's added commentary:

---

[4] A true and correct copy of the Interim Policy is submitted hereto as Exhibit "A."



7:59    ·ıll LTE

AA        🔒 tiktok.com        ↻

Tweets    Tweets & replies    Media    Lik

South Jersey Giants @... · 1d ···
Suppose your great-great-
grandfather murdered someone.
The victim's great-great-
grandson knocks on your door,
shows you the newspaper
clipping from 1905, and
demands compensation from
you. Your response?

Now get this racist reparation
bullshit out of your head for
good.

these racist tweets are
from saint josephs
university math
professor and baseball
greg manco

@karleighlopez
pls report this mans disgusting racist twe
ets to any of the emails,phone numbers I
ncluded in this video or submit a report in
the link in my bio #fyp

♫    The Creator) - Brent Faiyaz & DJ Dah

🏠 Trending videos picked for you





49.     As a result of Ms. Morrison's advice, Colbert's execution, and Lopez' assistance, St. Joseph's began to receive complaints about Dr. Manco through the online bias reporting form.

50.     On the afternoon of February 19, 2021, only a few hours after Lopez's public tweet to St. Joseph's, and after the school received three anonymous bias reports about Dr. Manco's Twitter posts, Dr. Tapp asked Dr. Manco to join a Zoom meeting at 5:00 pm.

51.     Dr. Tapp, Dr. Menon, and Zenobia Hargust, St. Joseph's Chief Human Resources Officer, attended the meeting on behalf of St. Joseph's. At the meeting, Dr. Manco was informed that he was being placed on administrative leave immediately, without any due process, and that the complaints against him would be investigated by an external reviewer. After the meeting, Ms. Hargust sent Dr. Manco an email at 5:19 pm wherein Ms. Hargust unilaterally declared Dr. Manco's tweets to be "of a biased or discriminatory nature" and stated that the investigation would be conducted specifically to "gather facts" associated with his tweets.

52.     The conditions required for placing a faculty member on immediate leave for alleged violations of St. Joseph's Interim Policy are spelled out by the policy itself. These conditions were not met. *See* Exhibit A, p., 18-19.

53.     On February 22, 2021, Dr. Tapp informed Dr. Manco's students that he would not be returning for the remainder of the semester on the first school day after Dr. Manco was placed on leave:

Hi Greg,

When I introduced the instructors stepping into your classes, I announced to the students that the change would be for the rest of the semester.  I'm sorry that I didn't communicate to you directly this decision or its rationale.  This decision hadn't yet been made when I spoke with you last Friday, and then it slipped through the cracks.

The decision was informed by considerations including the unknown amount of time that may be needed for the investigation to conclude and the need to provide appropriate direction for the interim instructional coverage. Ultimately, the goal is to limit disruption in the classroom and offer as much continuity for students as possible.

54. Moreover, in response to question from the "Hawk" (St. Joseph's student newspaper), Gail Benner, the interim chief marketing and communication officers and director of PR and Media stated that Dr. Manco "will not be in the classroom or in a coaching role while the investigation is conducted."

55. This was prior to any investigation, and without the required due process related to the continuation of the immediate administrative leave, proving that St. Joseph's intended to reach a premature outcome. *See* Exhibit A.

56. Pursuant to the Interim Policy, St. Joseph's Provost Dr. Cheryl McConnell was required to meet with Dr. Manco within three (3) days of being placed on leave, specifically to determine if the immediate measure of administrative leave should continue. St. Joseph's failed to meet this requirement. *See* Exhibit A, p., 18-19.

57. On the morning of February 22, 2021, within the aforementioned three-day period when continuation of his leave should have been reviewed, Dr. Manco emailed Dr. Stokes, Dr. Menon, and Ms. Morrison with proof that the complaints levied against him were not made in good faith, referencing Colbert's failing grade in his class and providing evidence of her tweeting racial animus towards "several [of her] white professors".

58. Dr. Manco also provided evidence in the email that Colbert and Lopez were no longer enrolled at the school and that he was being defamed on social media.

59. On February 25, 2021, Ms. Morrison presented Dr. Manco with the bias reports that were received between February 19th and February 23rd. This included Colbert's email from January 22nd, but Ms. Morrison deliberately did not disclose the date of the complaint as she knew that St. Joseph's already violated its Interim Policy. *See* Exhibit A.

60.     It was during the investigation, on March 22, 2021, in his follow-up meeting with the investigator, that Dr. Manco learned that the initial email allegation from Colbert was not made on or after February 19th as Ms. Morrison led him to believe, but four (4) weeks earlier on January 22nd. He also learned, for the first time, of the January 26, 2021 "consultation process" involving Colbert and three administrators. This information had been deliberately kept from Dr. Manco until it was revealed by Colbert herself in her written response to the investigator.

61.     St. Joseph's investigation concluded on May 12, 2021, exonerating Dr. Manco on all counts.

62.     St. Joseph's outside investigator wrote a ten (10) page summary, finding that Dr. Manco's tweets were not in violation of Joseph's policy and that "there [was] no evidence" of racial bias in his classroom towards Colbert nor towards any other students.

63.     Inexplicably St. Joseph's decided to tell the public a different story, releasing a statement that stated, "[i]n this case, a definitive determination could not be made due to insufficient evidence."

64.     St. Joseph's statement to the public was malicious, defamatory, and false.

65.     St. Joseph knew it statement to the public was false.

66.     The malicious, defamatory, and false statement can be understood and interpreted by a reasonable person to be assertions of fact, not opinion.

67.     By publishing the malicious, defamatory, and false statements, St. Joseph's placed Dr. Manco in a false light, in a manner that would be highly offensive to a reasonable person, and which caused and continues to cause serious damage to Dr. Manco's professional and personal reputations.

68.    Although Dr. Manco was cleared of any wrongdoing and St. Joseph's baseball season was still in progress at the time Dr. Manco's administrative leave ended, the Head Baseball Coach instructed Manco to not return for the remainder of the season.

69.    Prior to defendants' unlawful and tortious conduct, Dr. Manco was listed on the Fall 2021 scheduled as professor for four (4) classes, per the usual workload for his fulltime visiting position.

70.    However, despite being cleared by St. Joseph's external investigator, on June 10, 2021, Dr. Manco was informed by, Dr. James Carter, the Interim Dean of St. Joseph's College of Arts and Sciences ("Dr. Carter"), that the school made the decision to not renew his "Visiting Faculty annual contract."

71.    On the same date above, Interim Mathematics Chairperson Samuel Smith agreed to keep Dr. Manco as the professor for two (2) of his four (4) classes while hiring him as a part-time adjunct professor for the Fall 2021 semester.

72.    On or about July 29, 2021, as a result of the June 10th letter, Dr. Manco filed an appeal with St. Joseph's as a result of the non-renewal of his fulltime visiting contract.

73.    On August 16, 2021, St. Joseph's locked Dr. Manco out of its online network.

74.    On August 18, 2021, St. Joseph's returned Dr. Manco to the network. Dr. Manco was informed by Ms. Hargust in a phone call that the administration was unaware that Dr. Smith had hired him as an adjunct professor and had considered him to no longer be an employee of the school.

75.    On October 11, 2021, St. Joseph's denied Dr. Manco's appeal.

76.    It is clear based on the above that Dr. Manco was not afforded the contractual protections of academic freedom nor due process.

77.     St. Joseph's Interim Policy states that each individual is entitled to basic

protections such as

> 1) Freedom from unlawful Discrimination, Harassment, and Retaliation of any
> type;
>
> 2) Freedom to be heard without fear of reprisal;
>
> 3) The expectation of confidentiality to the extent that is possible;
>
> 4) The assurance of a prompt and equitable investigation and resolution of all
> allegations of Discrimination, Harassment or Retaliation; and
>
> 5) For non-student respondents only: During a formal process, the opportunity of
> the Respondent and Complainant to be presented with all relevant information in
> a timely manner, and to respond.

*See* Exhibit A, p., 3.

78.     In addition, the Interim Policy prohibits discrimination on the basis of race. *See*

Exhibit A, p., 3.

79.     Moreover, the Interim Policy specifically provides that St. Joseph's is "committed

to the principles of academic freedom. Vigorous discussion and debate, even of controversial

matters, are an integral part of the educational enterprise." *See* Exhibit A, p., 3.

80.     Further, the Interim Policy adopts the American Association of University

Professors' 1940 Statement and affirms that St. Joseph's strongly supports and protects the

principle of academic freedom. *See* Exhibit A. The Interim Policy also states that "[t]his Policy

shall not be construed or applied to restrict academic freedom at the University, nor shall it be

construed to restrict constitutionally protected expression …"[5] *See* Exhibit A, p., 5.

---

[5] Dr. Manco's Twitter posts were clearly protected by academic freedom, which therefore rendered his investigation
and suspension illegitimate.

81.    As outlined above and more fully in Exhibit A, St. Joseph's has made clear commitments to faculty freedom of expression and academic freedom. These commitments form a legal obligation.

82.    St. Joseph's actions violated its Interim Policy, including but not limited to Section I, II, IV, VII, VIII, IX, and XI. *See* Exhibit A.

83.    After Dr. Manco was illegally suspended and then terminated, Colbert reveled in her "accomplishment":





AA oxtail_princez 6h google.com ... ↻ ✕

≡ 🔍 **The Inquirer** SIGN IN / SIGN UP

In a letter delivered to university leaders at an alumni luncheon, the six alumni, spanning the graduating classes of 1968 to 1973, cited "the creeping illness that seems to be taking over the college where we learned important Jesuit values of being men for others."

I'M HOLLERING

They were particularly upset that the university removed Gregory Manco, a visiting assistant math professor and assistant baseball coach, from the classroom after his anonymous posts on social media in February against reparations for slavery and race and bias training. The university ultimately did not renew his contract, even though an investigation found there was insufficient evidence to conclude definitively that bias was shown.

Collectively, the withheld donations of the six alumni are in the six-figure range, said James A. Henwood, 72, a retired Philadelphia city police lieutenant who graduated from St. Joe's in 1971. Henwood declined to say how much he was

Send Message 📤 📖







84.     Through the period described above, Colbert, Lopez, Carman, Loue, Fahey, and Dr. Liebell all communicated false statements about Dr. Manco.

85.     More specifically, on February 19, 2021, while trying to convince others to report Dr. Manco, Colbert posted on her Instagram account a screenshot of a tweet of Dr. Manco with added commentary at the bottom:



86.     Colbert's allegation was a lie, and in fact, Dr. Manco, tweeted from the very same account on February 2, 2021, during the period that Colbert is known to have been following his Twitter, that Supreme Court Justice Clarence Thomas and Jackie Robinson were among his heroes:



87.     Both Colbert and Lopez were "doxing" Dr. Manco by revealing and spreading this information on social media platforms that he did not utilize.



88.     Moreover, while Colbert was Dr. Manco's student, Dr. Manco was accommodating and respectful towards her, and concerned for her well-being, as evident in a text

conversation with her in the last week of the semester when he granted her a makeup exam after a head injury:



89.    Despite Colbert's knowledge that Dr. Manco showed no bias towards her or any other student, she continued to lie about him in public statements.

90.    Colbert told St. Joseph's, in her January 26, 2021 "consultation process" that Dr. Manco would not "work with her" when she requested to take her final exam late due to her head injury. To the contrary, Dr. Manco granted Colbert permission to makeup two (2) different

exams, including the final exam. In addition to granting Colbert a makeup exam in their text message conversation, he granted her a makeup for the final exam by allowing her to pick the date and time her email request to Dr. Manco to take the exam late:



91.    Colbert told St. Joseph's in her initial January 22, 2021 email, that Dr. Manco "purposely made a hard quiz" the day President Joseph R. Biden, then former Vice President,

came to St. Joseph's on April 24, 2018, so "that students could not miss [the quiz]…" and therefore would have to miss the speech.

92. Colbert knew this was a lie as she was previously in Dr. Manco's class, and she knew all quizzes counted as extra credit. Moreover, Joe Biden's visit and speech was deliberately scheduled to begin at 11:00 am when no classes were held on campus. In addition, despite having no obligation to do so, Dr. Manco accommodated students in his 9:30 - 10:45 am class who wanted to arrive to the Joe Biden visit early to get a good seat:

---

1 message

**Gregory Manco** <gmanco@sju.edu>                                    Fri, Apr 20, 2018 at 10:56 AM
To: Nico Dennis <nd681883@sju.edu>

You got the last spot!  Must be there for full class.  See ya

GM

On Fri, Apr 20, 2018 at 10:32 AM, Nico Dennis <nd681883@sju.edu> wrote:
     Dr. Manco,

     I was wondering if there was still a spot for me in the 8:00 class. I am really interested in going to the guest speaking, and would like
     to get there earlier than 10:45. If not, I understand, but I am reaching out to see if there is still a spot in that class. If you could let me
     know, that would be much appreciated.

     Best

     Nico Dennis

     On Thu, Apr 19, 2018 at 12:23 PM, Gregory Manco <gmanco@sju.edu> wrote:
          Okay .... um ... so there's apparently a demand for this unnamed guest speaker coming to campus ... and ... um .... this is tough ...
          (really biting my tongue now) .... but .... okay, okay, okay.  I will make a limited amount of room for those of you who wish to get a
          good seat to hear this person .... ugh .... speak.  There isn't enough room in which to squeeze both sections together into one, but I
          can grant this for, let's say, FIVE of you (first come, first serve ... you MUST email me to confirm, and I will take the first five who
          respond.)  You will come to the entire 8:00 section, you can't just roll in for the quiz.

          And if you miss out, you can still go to this thing, it's not like you get locked out of the building.

          See ya

          Dr. Manco

          "Capitalism is not a system of the past; it is the system of the future - if mankind is to have a future."
          - Ayn Rand

---

**Gregory Manco** <gmanco@sju.edu>                                          Thu, Apr 19, 2018 at 3:23 PM
To: Corinne McGrath <cm616351@sju.edu>

You're on time so you're good but please be reminded that you must be in class for the full duration. Got it? 😊

On Thu, Apr 19, 2018 at 3:22 PM Corinne McGrath <cm616351@sju.edu> wrote:
Figure I'm probably seeing this late, but I would like to take the quiz in the 8 AM class period.

Thanks,
Corinne

On Thu, Apr 19, 2018 at 12:23 PM, Gregory Manco <gmanco@sju.edu> wrote:
Okay .... um ... so there's apparently a demand for this unnamed guest speaker coming to campus ... and ... um .... this is tough ...
(really biting my tongue now) .... but .... okay, okay, okay.  I will make a limited amount of room for those of you who wish to get a
good seat to hear this person .... ugh .... speak.  There isn't enough room in which to squeeze both sections together into one, but I
can grant this for, let's say, FIVE of you (first come, first serve ... you MUST email me to confirm, and I will take the first five who
respond.)  You will come to the entire 8:00 section, you can't just roll in for the quiz.

And if you miss out, you can still go to this thing, it's not like you get locked out of the building.

See ya

Dr. Manco

"Capitalism is not a system of the past; it is the system of the future - if mankind is to have a future."
- Ayn Rand

93.     On February 21, 2021, with bias reports still being submitted to St. Joseph's about

Dr. Manco, Colbert tweeted that Dr. Manco "[allowed] his followers to send literal death threats

to college students."

94.     This was a lie, and Colbert knew it to be a lie.

95.     This lie was then picked up and repeated in a February 23, 2021, article in St.

Joseph's student newspaper "The Hawk", specifically that as a result of Dr. Manco's tweets there

were "ongoing" death threats being sent to students.

96.     The authors of the article knew the statement to be false.  This false statement,

which severely impugns Dr. Manco's professionalism, was repeated by other St. Joseph's faculty

members over the course of the rest of the semester.

97.     St. Joseph's is a private university with a clear agency relationship with its student newspaper, and is therefore liable for its defamatory acts.

98.     Also on February 21, 2021, Colbert tweeted that Dr. Manco told a narcoleptic student that they had to sit in the back of the classroom, which if true would be a violation of law and school policy:



99.     Colbert was provided this information from Lopez, after Lopez received it from Carman in a Direct Message conversation and Lopez then submitted the message to St. Joseph's.

100.    Both Colbert and Carman's statements were lies.

101.    Dr. Manco was never told by St. Joseph's or Carman that she had narcolepsy or any disability, and Dr. Manco never made Carman sit in the back of his classroom:

## Re: Math 128 Statistics

1 message

**Gregory Manco** <gmanco@sju.edu>                                    Mon, Oct 1, 2018 at 8:54 AM
To: Lynly Carman <lc675757@sju.edu>

No worries, I know you are of strong character! I also know you don't mean any harm. Sorry to hear you have sleep difficulties! See you in a bit

GM

On Mon, Oct 1, 2018 at 8:09 AM Lynly Carman <lc675757@sju.edu> wrote:
> Dr. Manco,
>
> I'm very sorry about this. I have sleep problems and fall asleep often thought the day.
>
> I'll do my best to curb it, and move myself accordingly if I cannot. I'm and very sorry if I offended you or impacted the quality of class participation. I also thank you for being so understanding.
>
> I hope that this hasn't reflected poorly on my character. I do take my classwork seriously, and I have never intended to be disrespectful.
>
> My sincerest apologies,
> Lynly Carman
>
>
> On Mon, Oct 1, 2018, 6:16 AM Gregory Manco <gmanco@sju.edu> wrote:
>> Hello Lynly,
>>
>> I need a favor from you. Please do not fall asleep during class. Or, if you wish to do so, please sit in the back corner of the room, way out of sight. It is difficult to have any enthusiasm with someone front and center with their head down, paying little to no attention. You are often like this before I even start lecturing. Obviously you're very intelligent and I suspect that the class comes easy to you and that you can afford to do this. But for others this class is a challenge. I need to be on point with the lecture and, while I typically can overlook these things, the fact that this is a constant issue makes me need to reach out. Some teachers get angry and will even ask students to leave - I'm not upset and I don't think that's necessary but I do respectfully ask you to please consider my wishes.
>>
>> Thank you in advance. Please reply to confirm that you are good with this. Take care,
>>
>> Dr. Manco

## Re: class
1 message

Gregory Manco <gmanco@sju.edu>                                    Fri, Oct 26, 2018 at 8:54 AM
To: Lynly Carman <lc675757@sju.edu>

Oh, well I surely don't want you to fail!  You are on of the top students in the class and so I want you to get the A that you deserve!

See you in a bit, and thank you!

Dr. Manco

On Fri, Oct 26, 2018 at 8:22 AM Lynly Carman <lc675757@sju.edu> wrote:
I will try harder, and if in this class I still struggle, I will move. I appreciateyour understanding, and moreover, I appreciate your request. Other teachers typically ignore it, and I think that they're hoping that I will fail. Others, I know more personally, and they know the context of the behavior. Your attention to this matter is just a reminder of how much you care about your students and the quality of the class for everyone.

Thank you again for being so understanding. If my difficulty continues, I will move. I apologized again for any disturbance.

Lynly Carman

On Fri, Oct 26, 2018, 7:09 AM Gregory Manco <gmanco@sju.edu> wrote:
Hi Lynly,

I need for you again to make a better effort to not fall asleep in class, again because you are right in front of me and it brings me down a little.  I understand that it may be a medical condition but if you think it can or will happen again then I'd appreciate it if you could situate yourself in the back somewhere.  I am not angry or anything so there's no need to apologize ... in fact I'd think that some of your other teachers would be less understanding.  (Do you fall asleep in your other classes and, if so, do your teachers tolerate it?)  I can tell that you are trying, and it isn't as bad as it was, but still I need you to try harder.

You seem like a really nice person, please don't think I am upset with you.  I am just respectfully asking this favor of you so that I can be in the best frame of mind while I lecture.

Thank you!

Dr. Manco

102.    Fahey told Lopez that Dr. Manco thought "mental health is a joke", that "his classroom is not a safe space" and that "he almost made [her] drop out of school." Lopez sent a screenshot of her Direct Message conversation with Fahey to the school.

103.    Fahey also submitted a bias report to St. Joseph's, repeating the "mental health" allegations, and misrepresenting the extent of her absence and the reason she gave Dr. Manco for the absences, and falsely stating that Dr. Manco would not work with her nor take her seriously.

104.    To the contrary, Dr. Manco was never told, by Fahey or St. Joseph's that her absences were due to mental health issues. Furthermore, Dr. Manco expressed concern for

Fahey's health and well-being and allowed her to make up an exam in the last week of the semester after she missed it without prior warning nor notification:

**Re: Erin fahey**
1 message

Gregory Manco <gmanco@sju.edu>                                          Tue, Oct 18, 2016 at 6:36 AM
To: ef642883 <ef642883@sju.edu>

Hi Erin, sorry to hear ... nothing new that we learn today will be on the exam.  Exam is entirely Ch 3.  Get well soon!!!

Dr. Manco

**From:** "ef642883" <ef642883@sju.edu>
**To:** "gmanco" <gmanco@sju.edu>
**Sent:** Tuesday, October 18, 2016 5:34:03 AM
**Subject:** Erin fahey

Dr.Manco
I will not be in class today. I am home sick. I have a doctors note that I will give you a copy of when I return back to school. I am just wondering if anything we learn today will be on the exam? I know you said all of chapter3 I believe it is.

Thank you
Erin fahey

On Oct 14, 2016, at 7:54 AM, Gregory Manco <gmanco@sju.edu> wrote:

Hey everyone ... I forgot to assign homework ... please do #47,48.  Thanks!  Have a great weekend!

GM

--
Dr. Gregory V. Manco
Visiting Assistant Professor of Mathematics
Saint Joseph's University
215-834-5355
www.sju.edu

## Re: Erin Fahey

1 message

**Gregory Manco** <gmanco@sju.edu>                                                           Thu, Dec 8, 2016 at 8:35 PM
To: ef642883 <ef642883@sju.edu>

You can still take the exam tomorrow at 6:30am just have them fax the note saying you were at the doctor's this morning. Fax is 610-660-3082.

GM


Sent from my iPhone

On Dec 8, 2016, at 6:14 PM, ef642883@sju.edu wrote:

> I forgot to get a physical note from them. However, they said they can fax one in the morning because they are not allowed to email them. Would that be okay, or would you need it when I come to your office to take it? I know this is very irresponsible of me and I am very sorry. If it is not possible with these circumstances I will just rely on the final. Thank you for trying to be very accommodating.
>
> On Dec 8, 2016, at 11:34 AM, Gregory Manco <gmanco@sju.edu> wrote:
>
>> Erin, with a doctor's note you can take the exam tomorrow morning if you wish ... 6:30-7:45am at my office. You've been missing quite a bit, even besides the last few weeks, and I haven't heard from you, that's the bigger concern ... so let me know. Of course I hope you get well soon, that's most important. Take care
>>
>> GM
>>
>> ---
>>
>> **From:** "ef642883" <ef642883@sju.edu>
>> **To:** "gmanco" <gmanco@sju.edu>
>> **Sent:** Thursday, December 8, 2016 11:19:46 AM
>> **Subject:** Erin Fahey
>>
>> Dr. Manco,
>> I have had quite a few medical problems these past few weeks. I know that I have not been in class. However I was intending to take the exam this morning. I am currently at a doctors office because I cannot swallow. I was wondering if there is any way I can still take the exam before the final? If not I understand because I know this is a huge inconvenience.
>>
>> Thank you
>> Erin fahey
>>
>> --
>> Dr. Gregory V. Manco
>> Visiting Assistant Professor of Mathematics
>> Saint Joseph's University
>> 215-834-5355
>> www.sju.edu

105.    On February 25, 2021, Loue tweeted at St. Joseph's and accused Dr. Manco of violating the law. St. Joseph's even responded to Loue's defamatory tweet.:



106.    Loue was never a student of Dr. Manco and knew this tweet to be false.

107.    Additionally, after Dr. Manco was cleared of any wrongdoing, Dr. Liebell tweeted that Dr. Manco was guilty of professional misconduct, specifically that he does not treat his students with equal respect:



108.    Colbert replied to Dr. Liebell repeating the debunked falsehoods that Dr. Manco was guilty of racism and that he had bullied a disabled student by making her sit in the corner. Dr. Liebell responded that due to privacy issues, other alumni, students, and faculty did not know these supposed facts about Dr. Manco[6]:



109.    Colbert, Loue, Carman, Fahey, and Dr. Liebell statements were malicious, defamatory, and false.

110.    Colbert, Loue, Carman, Fahey, and Dr. Liebell knew their statements were false.

111.    The malicious, defamatory, and false statement can be understood and interpreted by a reasonable person to be assertions of fact, not opinion.

---

[6] Dr. Liebell is the "life partner" of Dr. Carter, and upon information and belief, Dr. Liebell and Dr. Carter live together

112.    By publishing the malicious, defamatory, and false statements placed Dr. Manco in a false light before the world-at-large, in a manner that would be highly offensive to a reasonable person and has caused serious damage to Dr. Manco's professional and personal reputations.

113.    As described above, St. Joseph's and the individual defendants, knowingly participated in a plan to defame Dr. Manco, place him in a false light, and discriminate against him.

114.    Further, Colbert, Loue, Carman, Fahey, and Lopez all intentionally interfered with Dr. Manco's employment contract with St. Joseph's by providing false information to the school and/or defaming him.

115.    As a direct and proximate result of the discriminatory conduct, the breach of contract, defamation, and tortious interference with a contract, Dr. Manco has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

116.    The conduct of all defendants, as set forth above, was outrageous under the circumstances and warrants the imposition of punitive damages.

117.    Dr. Manco is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of all defendants conduct unless and until the Court granted the relief requested herein.

## VI. CAUSES OF ACTION

### COUNT I
<u>Violation of Section 1981 (Against St. Joseph's)</u>

118.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

119.    By committing the foregoing acts of discrimination, and retaliation against Dr. Manco, on the basis of his race, St. Joseph's has violated Section 1981.

120.    Said violations were intentional and willful and warrant the imposition of punitive damages.

121.    As a direct and proximate result of St. Joseph's violation of Section 1981, Dr. Manco has suffered the damages and losses set forth herein.

122.    Dr. Manco is now suffering and will continue to suffer irreparable injury and monetary damages as a result of St. Joseph's discriminatory acts unless and until the Court grants the relief requested herein.

123.    No previous application has been made for the relief requested herein.

### COUNT II
<u>Breach of Contract (Against St. Joseph's)</u>

124.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

125.    At all times relevant hereto, a contractual relationship existed between St. Joseph's and Dr. Manco through, inter alia, St. Joseph's written policies and handbooks regarding discrimination complaints, investigations, and discipline of faculty members.

126.    As outlined above, St. Joseph's breached its agreements with Dr. Manco in relation to the Interim Policy.

127.    As a direct, proximate, and foreseeable consequence of St. Joseph's numerous material breaches, Dr. Manco has sustained significant damages including, but not limited to loss of his professorship, and as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, pain and suffering, and other direct and consequential damages.

128.    Dr. Manco is entitled to recover damages for St. Joseph's breach of its contractual obligations and duties including specific performance of the contract.

COUNT III
Negligence (Against St. Joseph's)

129.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

130.    In the event the Court were to find that no contracts exist between Dr. Manco and St. Joseph's, St. Joseph's owed duties of care to Dr. Manco independent of any contractual duties including, but not limited to an academic environment free of race discrimination where discrimination misconduct policies and procedures were fair and reasonable, including providing Dr. Manco with support through trained and non-biased administrators.

131.    Based on the aforementioned facts and circumstances, St. Joseph's has breached its duties of care owed to Dr. Manco

132.    As a direct, proximate, and readily foreseeable consequence of St. Joseph's aforementioned conduct, Dr. Manco has sustained significant damages including, but not limited to monetary damages, emotional distress, and other direct and circumstantial damages.

COUNT IV
Defamation (Against All Defendants)

133.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

134.     As outlined above, all defendants made public statements that were malicious, defamatory, and false.

135.     Such statements were related to Dr. Manco and were intended to harm him.

136.     Defendants knew that the statements were false at the time they made them.

137.     As a result of defendants' malicious, defamatory, and false statements, Dr. Manco has lost credibility within his community.

138.     Defendants defamed Dr. Manco and proximately caused injury to Dr. Manco's personal reputation, professional reputation and/or credibility as a person or otherwise.

139.     Specifically, the statements have caused Dr. Manco to suffer damages and harm including, but not limited to the following:

a. Loss of his personal and professional reputation;

b. Loss of business opportunities and potential and/or existing customers;

c. Limitations in future business prospects;

d. Being subjected to unwanted negative attention, negative public attention, and negative reviews;

e. Having dishonesty and immorality imputed to their personal and professional character;

f. Being subject to suggestions that he engages in unethical, or immoral business and/or personal practices; and

g. Emotional distress, embarrassment, mental anguish, and personal humiliation.

140.     The actions of defendants have damaged significant and long-lasting damage to the professional reputation to the reputation of Dr. Manco and virtually eliminated the possibility that he will ever again find an equivalent position in higher education in his chose field.

COUNT V
False Light (Against All Defendants)

141.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

142.     Defendants' statements were false statements of fact and imputes to Dr. Manco's statements of fact all of which placed Dr. Manco in a false light before the public.

143.     The false statements constitute false light invasion of privacy in that the same has subjected Dr. Manco to unreasonable and high objectional publicity by attributing his characteristics, conduct, practices, endorsements, or beliefs which are false, thereby placing Dr. Manco in a false light before the public.

144.     The false light in which Dr. Manco has been placed due to the publication of the false and defamatory statements would be highly offensive to a reasonable person.

145.     Defendants acted with actual knowledge of the false and defamatory nature of the statements.

146.     The false and defamatory tweets have placed Dr. Manco in a false light before the public in that, on its face, it reflects upon Dr. Manco's reputation and character in a manner that: 1) injures Dr. Manco's reputation and subjects Dr. Manco to public hatred, ridicule, shame, or disgrace; and 2) adversely affects Dr. Manco's trade, profession and/or business.

147.     In the alternative, the false and defamatory tweet have placed Dr. Manco in a false light before the public in that it is capable of being interpreted as reflecting upon Dr. Manco's reputation and/or character in a manner that: 1) injures Dr. Manco's reputation and/or exposes

Dr. Manco to public hatred, ridicule, shame, or disgrace; and 2) adversely affects Dr. Manco's trade, profession and/or business.

148.    Defendants placed Dr. Manco in a false light before the public and proximately caused injury to Dr. Manco's personal reputation, professional reputation and/or credibility as a person or otherwise.

149.    Specifically, the statements have caused Dr. Manco to suffer damages and harm including, but not limited to the following:

a. Loss of his personal and professional reputation;

b. Loss of business opportunities and potential and/or existing customers;

c. Limitations in future business prospects;

d. Being subjected to unwanted negative attention, negative public attention, and negative reviews;

e. Having dishonesty and immorality imputed to their personal and professional character;

f. Being subject to suggestions that he engages in unethical, or immoral business and/or personal practices; and

g. Emotional distress, embarrassment, mental anguish, and personal humiliation.

## COUNT VI
### Civil Conspiracy (Against All Defendants)

150.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

151.    The defendants unlawfully planned and acted together to destroy Dr. Manco's reputation and to present him in a false light and interfere with his employment contract as a way to retaliate against him in violation of Pennsylvania tort law.

152.     Defendants' actions caused injury to Dr. Manco's personal reputation, professional reputation, and/or credibility as a person or otherwise, and caused economic damages.

153.     Specifically, the statements have caused Dr. Manco to suffer damages and harm including, but not limited to the following:

a. Loss of his personal and professional reputation;

b. Loss of business opportunities and potential and/or existing customers;

c. Limitations in future business prospects;

d. Being subjected to unwanted negative attention, negative public attention, and negative reviews;

e. Having dishonesty and immorality imputed to their personal and professional character;

f. Being subject to suggestions that he engages in unethical, or immoral business and/or personal practices; and

g. Emotional distress, embarrassment, mental anguish, and personal humiliation.

COUNT VII
Tortious Interference with Contract (Against All Individual Defendants (except Dr. Liebell)

154.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

155.     Dr. Manco had a contractual relationship with St. Joseph's.

156.     During the existence of the contractual relationship, Lopez, Colbert, Loue, Carman, and Fahey, engaged in activities, as described above, to have Dr. Manco suspended and his contract terminated.

157.     Lopez, Colbert, Loue, Carman, and Fahey, engaged in this activity with the specific intent to harm Dr. Manco's relationship with St. Joseph's.

158.    Lopez, Colbert, Loue, Carman, and Fahey were neither privileged nor justified in acting in this manner.

159.    As a direct and proximate result of Lopez, Colbert, Loue, Carman, and Fahey's actions, St. Joseph's suspended Dr. Manco and elected not to renew his contract.

## V.    RELIEF

WHEREFORE, Dr. Manco respectfully requests that this Court enter judgment in his, and against defendants:

a) declaring the acts and practices complained of herein to be in violation of Title VII;

b) declaring the acts and practices complained of herein to be in violation of the PHRA;

c) declaring the acts and practices complained of herein to be in violation of the PFPO;

d) enjoining and restraining permanently the violations alleged herein;

e) awarding damages to Dr. Manco for the past and future economic losses that he has suffered;

f) awarding compensatory damages to Dr. Manco for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures, and pain and suffering;

g) awarding punitive damages to Dr. Manco;

h) awarding Dr. Manco the costs of this action, together with reasonable attorney's fees;

i) granting such other and further relief as this Court deems appropriate.

Respectfully submitted,

ZARWIN, BAUM, DeVITO,
KAPLAN, SCHAER & TODDY, P.C.

_____/s/_____
JOSEPH M. TODDY
ZACHARY A. SILVERSTEIN
2005 Market Street, 16th Floor
Philadelphia, PA  19103
215.569.2800; Fax  215.569.1606
Attorneys for Plaintiff
jmtoddy@zarwin.com
zsilverstein@zarwin.com

Dated:  January 21, 2022

EXHIBIT A

1 | Page                                          Saint Joseph's University

# Interim Policy Prohibiting
# Discrimination, Harassment and Retaliation

If you believe you are the victim of Sexual Misconduct, please immediately go to Section III of this document for resources and reporting information.

A comprehensive listing of on-campus and off-campus resources can be found at https://sites.sju.edu/support/resources/.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

Saint Joseph's University

| TABLE OF CONTENTS | | *page* |
|---|---|---|
| **I.** | **Preface** | 3 |
| **II.** | **Purpose** | 3 |
| **III.** | **Interaction of This Policy with the University's Interim Title IX Grievance Policy and Interim Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking** | 4 |
| **IV.** | **Definitions** | 4 |
| | A.   Protected Category(ies) | 4 |
| | B.   Discrimination | 5 |
| | C.   Harassment | 5 |
| | D.   Sexual Harassment | 5 |
| | E.   Retaliation | 6 |
| | F.   Complainant | 6 |
| | G.   Respondent | 6 |
| | H.   Examples of Conduct That Can Constitute Discrimination or Harassment | 6 |
| **V.** | **Consensual Romantic and/or Sexual Relationships** | 6 |
| **VI.** | **Academic Freedom** | 7 |
| **VII.** | **Processing Discrimination, Harassment and Retaliation Reports and Complaints** | 7 |
| | A.   General Provisions | 7 |
| | B.   Where to Report Alleged Discrimination, Harassment or Retaliation | 9 |
| | C.   Who May Serve as a Consultant | 10 |
| **VIII.** | **Procedures** | 11 |
| | A.   Consulting Procedure | 11 |
| | B.   Mediation Procedure | 12 |
| | C.   Complaint Procedure | 13 |
| **IX.** | **Interim Measures** | 18 |
| **X.** | **Good Faith Complaints** | 19 |
| **XI.** | **Other Rights and Responsibilities** | 20 |
| **XII.** | **Education** | 20 |
| **XIII.** | **Records** | 22 |
| **XIV.** | **Revisions** | 22 |

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

## I.        Preface

In keeping with Saint Joseph's University's ("Saint Joseph's" or "University") mission as a Catholic, Jesuit University and a formal and informal community of faith, we must hold ourselves to a high standard of respect and fairness in our personal conduct and interactions. As such a community, we espouse that each individual is entitled to certain basic protections. These protections include, but are not limited to:

- Freedom from unlawful Discrimination, Harassment, and Retaliation of any type.

- Freedom to be heard without fear of reprisal.

- The expectation of confidentiality to the extent that is possible.

- The assurance of a prompt and equitable investigation and resolution of all allegations of Discrimination, Harassment or Retaliation.

- For non-student respondents only: During a formal process, the opportunity of the Respondent and Complainant to be presented with all relevant information in a timely manner, and to respond.

At the same time, the University is committed to the principles of academic freedom. Vigorous discussion and debate, even of controversial matters, are an integral part of the educational enterprise.

## II.        Purpose

As a Catholic, Jesuit University, Saint Joseph's is committed to the just and respectful treatment of students, faculty, and staff. To this end, Saint Joseph's prohibits unlawful discrimination against, and harassment of, its employees, students, or applicants for employment or admission on the basis of any characteristic protected by state or federal law. The prohibition extends to discrimination, harassment and retaliation by third parties visiting campus or participating in University-sponsored activities.

The University's *Interim Policy Prohibiting Discrimination, Harassment and Retaliation* ("Policy") is designed to educate members of the University community about discrimination, harassment and retaliation and provide clear procedures when a violation of this Policy occurs. It is the University's hope that through continued education, and appropriate action upon receipt of reports and complaints of conduct that may be a violation of the Policy, the University can eliminate discrimination, harassment and retaliation within the Saint Joseph's community.

This Policy applies to alleged conduct by Saint Joseph's University students, faculty, staff (union and non-union employees), volunteers, administrators, independent contractors, Trustees or third parties ("Covered Individuals").

**III.** **Interaction of This Policy with the University's Interim Title IX Grievance Policy and Interim Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking**

The University has an Interim Title IX Grievance Policy, which addresses supportive measures, formal complaints, investigations, hearings and appeals for matters involving Title IX sexual harassment. As stated in the Interim Title IX Grievance Policy, that policy also applies to sexual harassment as defined in this Policy.

*Therefore, please refer to the Interim Title IX Grievance Policy  for information on filing a formal complaint, investigations, hearings and appeals for all matters involving sexual harassment as defined in this Policy.*

The University also has an Interim Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking (the "Sexual Misconduct Policy"). The Sexual Misconduct Policy can be found by clicking on the policy title above. *Most complaints or matters that would typically fall under the Sexual Misconduct Policy, or that would typically fall under both this Policy and the Sexual Misconduct Policy, are now covered by the Interim Title IX Grievance Policy.* However, if for any reason a complaint or matter is not covered by the Interim Title IX Grievance Policy, and if particular conduct by a Covered Individual would be prohibited by both the Sexual Misconduct Policy and this Policy, then the Sexual Misconduct Policy controls for all Covered Individuals, with one exception. Sexual Harassment (as defined below) falls into conduct prohibited by both this Policy and the Sexual Misconduct Policy.

For incidents of alleged sexual harassment, the Sexual Misconduct Policy's protections and procedures with regard to on- and off-campus reporting resources, information on medical and psychological resources, and the availability of interim and remedial measures shall apply.

The grievance process forconduct prohibited by this Policy which does not include an allegation of sexual harassmentis as follows:

1. *For student Respondents:* Any discipline/resolution of such conduct is controlled by the Community Standards process (see Student Handbook at www.sju.edu/studenthandbook).

2. *For non-student Respondents:* Any discipline/resolution of such conduct is controlled by Sections VII-IX of this Policy.

**IV.** **Definitions**

A. **Protected Category(ies):** The law prohibits Discrimination and Harassment on the basis of sex/gender, race, age, color, religion, national origin, ethnic origin, sexual orientation, gender identity, disability, genetic information, marital status, and military and military veteran status. These are Protected Categories under the law.

**B.**    **Discrimination:** Any unlawful distinction, preference, or detriment to an individual as compared to others in the terms or conditions of his or her employment or education on the basis of his or her Protected Category status. To request a reasonable accommodation for a disability(ies), students should contact Office of Student Disabilities Services (Dr. Christine Mecke) at 610-660-1774 and non-students should contact the EEO Officer (Zenobia Hargust) at 610-660-3336.

**C.**    **Harassment:** Verbal, written, visual, or physical conduct directed toward an individual due to that individual's Protected Category status that has the purpose or effect of unreasonably interfering with the individual's work or academic performance, or otherwise creating an intimidating, hostile, or offensive working or learning environment.[1]

**D.**    **Sexual Harassment:** Unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic, or physical conduct of a sexual nature, when: (1) submission to or rejection of such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement (quid pro quo); or (2) such conduct creates a hostile environment (defined below). This Policy shall not be construed or applied to restrict academic freedom at the University, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful.

*Unwelcome verbal or physical conduct of a sexual nature creates a Hostile Environment* when it (a) is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or creates a hostile or abusive educational environment, or (b) explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive environment. In determining whether harassment has created a hostile environment, consideration will be made not only as to whether the conduct was unwelcome to the person who feels harassed, but also whether a reasonable person in a similar situation would have perceived the conduct as objectively offensive.

Individuals who experience unwelcome conduct of a sexual nature that they reasonably perceive to be harassing, but may or may not meet the Sexual Harassment definition outlined in this Policy, are encouraged to report the behaviors so that the University can take proactive steps to prevent the behaviors from continuing and perhaps escalating and to protect or otherwise assist the Complainant(s).

---

[1]    This Policy shall not be construed or applied to restrict academic freedom at the University, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

E. **Retaliation:** Any act(s) or attempted act(s) to seek retribution against anyone who has reported an alleged violation of this Policy or against anyone who has participated in an investigation or related proceeding under this Policy. Prohibited retaliatory acts include, but are not limited to, intimidation, threats, coercion, or discrimination.

F. **Complainant**: The person alleged to have been subjected to conduct in violation of this Policy.

G. **Respondent**: An individual accused of conduct that might be a violation of this Policy.

H. **Examples of Conduct That Can Constitute Discrimination or Harassment**

1. Examples of discriminatory conduct include decisions based on stereotypes or assumptions about the abilities, traits, or performance of individuals because of their Protected Category status listed in Section IV. A, above.

2. Conduct that can constitute Harassment includes, but is not limited to:

    a. Epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to the Protected Categories,

    b. Placing on walls, bulletin boards, email, or elsewhere on the University's premises graphic material that shows hostility or aversion to an individual or group that relate to the Protected Categories,

    c. Sexually explicit, graphic, abusive, degrading, intimidating, or offensive jokes, comments, remarks or gestures;

    d. Sexual advances, propositions, flirtations, requests or pressure of any kind for sexual favors;

    e. Physical contact or intimidation.

## V. Consensual Romantic and/or Sexual Relationships

Romantic/sexual relationships between employees (including faculty and athletic staff) and students with whom they also have an academic, supervisory or evaluative relationship, or between an employee and his or her subordinate, are fraught with the potential for exploitation and may compromise the University's ability to enforce its policy against sexual harassment. Employees must be mindful that the authority that they exercise in their interactions with students and subordinates may affect the decision of a student or a subordinate to enter into or end a romantic or sexual relationship. Even when both parties have initially consented, the development of a sexual relationship renders both the employee and the institution vulnerable to possible later allegations of sexual harassment, in light of the significant power differential that exists between faculty members and students, athletic staff members and student athletes, or supervisors and

subordinates. Such relationships can also become the basis for a complaint of harassment or discrimination by a colleague who is adversely affected by them.

As a result, the University prohibits all faculty and staff from engaging in or pursuing romantic/sexual relationships with students whom they are currently supervising, teaching, advising, or providing services to. Moreover, anyone involved in such a relationship with someone – other than a student -- over whom they have supervisory power must recuse themself from decisions that affect the compensation, evaluation, employment conditions, instruction and/or academic status of the subordinate involved. Such relationships should be reported to both persons' immediate supervisors in a timely fashion.

## VI.   Academic Freedom

The American Association of University Professors Joint Statement on the Freedoms and Rights of Students (1967, revised in 1990, 91, and 92) articulates that: "The freedom to learn depends upon appropriate opportunities and conditions in the classroom, on the campus, and in the larger community. The responsibility to secure and to respect general conditions conducive to the freedom to learn is shared by all members of the academic community."  Saint Joseph's strongly supports and protects the principle of academic freedom. All members of the University community have a right to use the academic forum, provided by the University, to discuss controversial subjects and to express ideas that some or most of the members of the community strongly oppose. Harassment is not about voicing unpopular ideas. It is one form of intimidation.

In its 1940 Statement on Tenure AAUP states that "Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning". In an instructional context, wide latitude is required for professional judgment in determining appropriate content and presentation of academic material, provided this material is germane to the subject matter of the course.  In its policy statement on sexual harassment, the AAUP further states: "Intimidation and harassment are inconsistent with the maintenance of academic freedom on campus. This statement is no less germane if one is being made unwelcome because of sex, rather than unwelcome because of race, religion, politics, or professional interests." *Academe*, September-October 1990, pp. 42-43.

## VII.   Processing Discrimination, Harassment and Retaliation Reports and Complaints

### A.   General Provisions

1.   The procedures set forth below are internal administrative procedures of the University. As to those forms of Discrimination or Harassment that also violate state or federal law, an aggrieved party may also file a complaint with the appropriate local, state, or federal agency, and in a court with jurisdiction. Both the Complainant and the Respondent may have an advisor from the Saint Joseph's University community, who is not a family member

Saint Joseph's University

or attorney[2], accompany  them during any of the procedures in this section. The advisor acts in a support role only, and not as an advocate or spokesperson. The advisor has the same obligations of confidentiality as all other participants in the proceedings.

2.     Reports and complaints of Discrimination and Harassment should be made as soon as possible after the incident(s) occurs. All reports and complaints will be investigated promptly and appropriate action will be taken as expeditiously as possible under the circumstances presented. The University will respect the privacy of the Complainant, the Respondent, and the witnesses, if any, in a manner consistent with the University's obligations (legal or under this Policy) to investigate the matter, protect the individuals involved, take appropriate remedial action, and comply with any discovery or disclosure obligations required by law. This means that, although confidentiality will be respected, it cannot be guaranteed.

3.     The University may investigate a report or complaint of Discrimination or Harassment regardless of whether the Complainant desires the University to pursue the report or complaint, if the University has cause to believe that the action reported or complained of constitutes a violation of this Policy, breach of applicable law or a threat to the University community.

4.     All students and employees should report any Discrimination or Harassment, experienced by themselves or another, to the appropriate University officer described in Section VII. B below. No student or employee should assume that the University already knows about a particular situation or event.

5.     **Non-Retaliation Statement:** The University prohibits Retaliation against any individual who complains of a violation of this Policy or assists in providing information about a complaint of a violation of this Policy. Anyone who believes they have been retaliated against for participating in this process in any capacity should report the matter promptly. Reports and complaints of Retaliation will be investigated and dealt with as any other report and complaint brought under this Policy.

---

[2]     The advisor may be someone who holds a J.D., so long as the person holding the J.D. is not then engaged in the active practice of law *and* discloses and affirms these circumstances to the Intake Officer *prior to* attending any meetings in this capacity with the advisee party.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

Saint Joseph's University

**B.**     **Where to Report Alleged Discrimination, Harassment or Retaliation**

1.     Reports of Discrimination, Harassment or Retaliation should be made to the Intake Officer identified below:

a.     **Student Respondents**: Complaints of Discrimination, Harassment or Retaliation where the Respondent is a student shall be reported to the following individuals:

**Nicole R. Stokes, Ph.D.**
Associate Provost for Diversity, Equity & Inclusion
University Professor
Saint Thomas Hall
5600 City Avenue
Philadelphia, PA  19131
nstokes@sju.edu | 610-660-1209

**Lexi Morrison**
Director of Title IX & Equity Compliance
Title IX Coordinator
Campion Student Center, Room 243E
5600 City Avenue
Philadelphia, PA  19131
titleix@sju.edu | 610-660-1145

**Thomas Sheibley**
Deputy Title IX Coordinator
Director of Campus Ministry
Wolfington Hall
5600 City Avenue
Philadelphia, PA  19131
tsheible@sju.edu | 610-660-3125

**Renie Shields**
Deputy Title IX Coordinator
Senior Associate Athletic Director for Student Experience
Barry Hall
5600 City Avenue
Philadelphia, PA  19131
shields@sju.edu | 610-660-2584

b.     **Staff and Administrator Respondents**: Complaints of Discrimination, Harassment or Retaliation where the Respondent is a staff member or administrator, shall be reported to the Director of Employee Relations & Engagement (Taba Pickard; 610-660-3313; tpickard@sju.edu; titleix@sju.edu; 215 City Avenue).

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

      c.    **Faculty Respondents**: Complaints of Discrimination, Harassment or Retaliation where the Respondent is a faculty member shall be reported to the Director of Employee Relations & Engagement (Taba Pickard; 610-660-3313; tpickard@sju.edu; titleix@sju.edu; 215 City Avenue).

      d.    **Independent Contractors, Volunteers, Trustees and Visitors Respondents:** Complaints of Discrimination, Harassment or Retaliation  where the Respondent is an independent contractor, volunteer, trustee and visitor[3] shall be reported to the Director of Employee Relations & Engagement (Taba Pickard; 610-660-3313; tpickard@sju.edu; titleix@sju.edu; 215 City Avenue).

    2.    In the event that the Complainant does not wish to report incidents or concerns to the designated Intake Officer, they may report to another  Intake Officer listed above, or  their designee.

**C.**    **Who May Serve as a Consultant**

The following individual will serve as a consultant (i.e., a person who can explain options to the complainant without it becoming a formal complaint) during the Procedures set forth in Section VIII:

    1.    With regard to reporting, where the Complainant or Respondent are faculty, staff members, and/or administrators, the Title IX Coordinator, or their designee will serve as a consultant during the Procedures outlined in Section V. The Intake Officer and the consultant can be the same individual. When the complaint meets the definition of prohibited behaviors under this Policy, the complainant has the choice to not file a formal complaint and instead choose to seek consultation and mediation.

---

*Notice for Student Respondents:* Where the Respondent is a student (regardless of the Complainant's status) for complaints not involving Sexual Harassment or otherwise falling under the Interim Title IX Grievance Policy, an alleged violation of this Policy shall be resolved under the  Community Standards process along with any other alleged violations of the Community Standards in connection with the incident(s). This includes the Community Standards appeal process.

---

[3]    A visitor, or non-University affiliated individual, may not use the University process to pursue a complaint against a University-affiliated Respondent.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

## VIII.  Procedures

The below-described procedures may be followed in sequence, if the content of the complaint makes it appropriate for consultation or mediation and if the Complainant so requests. Alternatively, a complaint may be filed immediately, without prior consultation or attempt at mediation. In the case of a sufficiently serious allegation, in the judgment of the Intake Officer, immediate filing will take place independent of the wishes of the Complainant. Interim Measures are also noted below in Section IX. For Sexual Harassment (not Discrimination), Supportive Measures or Interim Measures are found in the Interim Title IX Grievance Policy or Interim Sexual Misconduct Policy, as applicable.

### A.        Consulting Procedure

Members of the Saint Joseph's community who wish to discuss questions or concerns about conduct that may be in violation of this Policy may contact the Intake Officer identified in Section VII.B.1, above. The Intake Officer, or their designee, shall provide information to the inquirer concerning available support services and how the process works, including the possibility of initiating a mediation procedure if appropriate.

1. Once a complaint is filed (Section VIII.C), the Intake Officer is required to initiate an investigation. The scope and extent of the investigation will depend on the severity of the conduct complained of.

2. If requested by the Complainant, and judged appropriate under the circumstances, the Intake Officer or their designee, serving as a consultant, will assist in attempting to resolve the complaint informally. Such assistance may involve, for example, assisting the Complainant in writing a letter to that person asking that the conduct experienced by the Complainant as discriminatory or harassing cease immediately. Alternatively, the Complainant may ask the consultant to meet with the Respondent, or explore other possible resolutions. Any resolution must be acceptable to all parties involved in the matter including the University.

3. During the consulting procedure, all reasonable efforts will be made to ensure the confidentiality of information received, to the extent permitted by law, including the identities of the parties. **For allegations of Sexual Harassment, the University's procedure for addressing requests for confidentiality is outlined in the Interim Title IX Grievance Policy.** For all other allegations:

   a. The identity of the Complainant will be disclosed to the Respondent during the consulting procedure only if the Complainant gives permission.

   b. If, due to the circumstances of the alleged Discrimination or Harassment, it is not possible to resolve the complaint and yet maintain confidentiality, the Complainant will be informed and be

given the options of proceeding (with disclosure of identity) or withdrawing from the consulting  process. However, the University may still proceed with the investigation.

c. The determination about proceeding with an investigation is made by the Intake Officer, independent of the wishes of the Complainant, based on the nature of the conduct alleged. If the alleged conduct involves Sexual Assault, Sexual Exploitation, Dating Violence, Domestic Violence, and Stalking, then the University will pursue the matter based on the [Interim Title IX Grievance Policy](Interim Title IX Grievance Policy).

4. When the consultant is not the Intake Officer but their designee, the consultant is required to report the conduct to the Intake Officer, if the conduct poses a threat to the University community. If the matter is so reported, the consultant will notify the Complainant and the Respondent of the nature of the report.

## B. **Mediation Procedure**

1. The Complainant may request mediation. The Intake Officer or their designee shall review the request to ensure that mediation is a proper resolution device under the circumstances and will not cause delays in resolving the issue.

2. The Intake Officer will designate the person who is to serve as mediator. Care should be taken that the mediator role not be compromised by existing relationships between the mediator and either of the parties and the mediator be trained in this role and its responsibilities. The Respondent and Complainant may object to a mediator in writing at least 48 hours before the mediation.

3. If the Respondent agrees to participate in mediation, the mediator will contact each party for a pre-mediation meeting. These meetings are confidential and are designed to help clear the way for communication and resolution during mediation. Each party will be advised on the mediation process.

4. Mediation will be conducted in a neutral location. Each party and the mediator will discuss options and methods of resolution.

5. If the parties reach a settlement, then the mediator will write a Resolution Agreement, which both parties shall sign. Even when mediation has been successful, however, the University may still have an obligation to investigate and in cases involving a student Complainant, the Title IX Coordinator will be apprised of the outcome.

6. If the parties cannot reach an agreement, or one or both parties refuse to sign the Resolution Agreement, then the Complainant can file a written

complaint, as outlined below. However, failure to file a written complaint does not relieve the University of its obligation to investigate.

### C.  Complaint Procedure

#### 1.  Filing a Complaint

Any individual who believes that they have, or know someone who has, experienced conduct that may be a violation under this Policy can make a complaint with the appropriate Intake Officer at any time, or following the consultation and/or mediation process; but only members of the University community or the University itself may serve as the Complainant in any University conduct process under this Policy. The complaint should be in writing, but if the Complainant is unable or unwilling to submit a complaint in writing, then the Intake Officer shall prepare a report summarizing the Complainant's allegations. The failure of the Complainant to put the complaint in writing does not relieve the University of its obligation to act in accordance with legal/policy requirements in response to the information provided by the Complainant.

The Intake Officer shall promptly forward the written complaint or summary report of the Intake Officer to an appropriate Investigator. A person is not required to utilize the consultation or mediation procedure before filing a formal complaint.

#### 2.  Contents of the Complaint

The complaint shall include the name of the Complainant, the name of the Respondent, a statement of alleged conduct (including dates, and the nature of the conduct), and the names of witnesses, if any. Copies of supporting materials, if any, shall be attached to the complaint

#### 3.  Delivery of the Complaint and Response

The Intake Officer will inform the Respondent that a complaint under this Policy has been filed against them. Absent other considerations, within five (5) business days of the filing of the complaint, the Investigator shall allow the Respondent to see the written complaint. If the Complainant declines to put the complaint in writing, the Investigator will prepare a summary and shall allow the Complainant and the Respondent to see the written summary.

    a.    The Respondent shall have an opportunity to respond to the complaint/summary in writing; such response must be submitted within five (5) business days of delivery. If the Respondent waives their right to respond in writing, the Respondent shall be asked to sign a statement acknowledging that they declined to provide a written response. The Complainant shall have the opportunity to see the Respondent's response to the alleged conduct, or to be notified if no response is provided.

b.    The Complainant shall have an opportunity to respond to the summary in writing; such response must be submitted within five (5) business days of delivery. If the Complainant waives their right to respond in writing, the Complainant shall be asked to sign a statement acknowledging that they declined to provide a written response. The Respondent shall have the opportunity to see the Complainant's response to the summary, or to be notified if no response is provided.

c.    In no event will names of witnesses identified by either party be shared in the Investigation Report prepared by the Investigator (see Section VIII.C.5.).

4.    **Investigation**

a.    Absent extraordinary circumstances (to be determined by the Intake Officer), the Investigator shall be chosen from a pool of three (3) individuals from the University community, who are recommended by the Executive Committee of University Council and appointed by the President for staggered terms of three (3) years. Each investigator shall be professionally trained to conduct investigations, and their objectivity should not be compromised by a previously-existing relationship with either the Complainant or the Respondent. The Intake Officer may also delegate the investigatory duties to a qualified external investigator if they determine that it is in the best interests of the parties and the University to do so. In coming to this decision, the Intake Officer may consult the University's Office of the General Counsel or other appropriate resources within the University.

b.    The Investigator shall promptly conduct an investigation of the complaint. The investigation shall include interviews with the parties and witnesses, and review of any relevant documents or other evidence. In most cases, the investigation shall be complete within sixty (60) days of receipt by the Investigator of the complaint. The Investigator may delegate any part of the investigation to an agent with specific expertise (e.g. Office of Public Safety). All who participate in conducting an investigation are obliged to keep confidential what they learn in the process, consistent with applicable legal requirements.

c.    The investigation shall address facts and issues relating to the complaint, which may include, but are not limited to:

i.    The type of conduct complained of

ii.    The frequency of the conduct

        iii.     The date and location of the conduct

        iv.     The factual circumstances

        v.     The relationship between the parties

        vi.     The effect of the Respondent's conduct on the Complainant

        vii.     The awareness of the Respondent of the Complainant's concerns

        viii.     The awareness of the supervisor of the Complainant's concern

        ix.     The identity of witnesses

        x.     The statement of witnesses

        xi.     Prior steps taken to resolve the issue

        xii.     Additional resources available to resolve the issue

d.     During the investigation, every reasonable effort shall be made to protect the privacy rights of all parties; however confidentiality cannot be guaranteed.

5.     **Investigation Report**

a.     Upon completion of the investigation, the Investigator shall report in writing to the Title IX Coordinator who shall share the outcome of the investigation with the Provost when the Respondent is a member of the faculty and with the Chief Human Resources Officer when the Respondent is a member of the staff, administrator, independent contractor, volunteer, trustee or visitor.

b.     The report shall address the facts and issues that were investigated under section (4)(c), above.

c.     The report shall include an outcome (see 6(a) below).

d.     The Complainant and the Respondent shall have the opportunity to view a copy of a summary of the investigation, with information redacted in compliance with FERPA and other legal considerations regarding privacy. This summary shall include the following: date of report, parties, witnesses, dates of investigation, summary of allegations, policy involved, determination of credibility, findings of fact, conclusions, and name of investigator.

6.　　**Outcomes and Recommendations**

a.　　The outcomes of the investigation are:

i.　　a finding that it is more likely than not that the alleged violation occurred;

ii.　　a finding that it is more likely than not that a violation did not occur;

iii.　　a determination, one way or the other, could not be made.

b.　　If other conduct that might be a violation of other University policies is discovered or identified during the course of the investigation, this conduct must be reported to the appropriate University official and shall be subject to a separate process.

7.　　**Sanctions:**

a.　　If the Investigator has concluded, based on findings of fact and a determination of credibility, that a violation of this Policy has occurred, sanctions may be imposed by the following University administrator (depending on the status of the Respondent):

i.　　***Faculty Respondents:*** The Provost.

ii.　　***Staff, Administrator, Volunteer, or Independent Contractor Respondents:*** The Chief Human Resources Officer, in consultation with Divisional Vice President or Dean.

b.　　Sanctions include corrective and/or disciplinary action.

c.　　Corrective action may include:

i.　　an order to avoid future contact with the Complainant

ii.　　a requirement for an apology

iii.　　a transfer (e.g., to another department, class, office, residence)

iv.　　participation in counseling and/or training

d.　　Disciplinary action may include:

i.　　written reprimand

ii.　　suspension

          iii.      termination, discharge or dismissal from the University.

    e.     The sanctions shall be communicated to the Respondent; any sanctions that impact the Complainant shall also be communicated to the Complainant.

8. **Appeal**

    a.     Following the outcome of an investigation, the Respondent may appeal the outcome within five (5) business days of receipt of the outcome. Likewise the Complainant may appeal the outcome within five (5) business days of receipt.

    b.     Such appeal should be delivered via email to titleixappeals@sju.edu to the Title IX Coordinator and state the grounds and the facts supporting the grounds for such appeal.

    c.     Grounds for appeal are limited to:

          i.      Material procedural error that could have significantly impacted the outcome of case, or bias in the process or failure to disclose conflict of interest. Bias in the process is not a disagreement with the outcome of the investigation or the findings of the investigator.

          ii.      The existence of previously unavailable or unknown relevant evidence that could have significantly impacted the outcome of the case.

          iii.      The Title IX Coordinator, Deputy Title IX Coordinator, and/or Investigator(s) had a conflict of interest or bias for or against an individual party, or for or against Complainants or Respondents in general, that affected the outcome of the matter.

    d.     The appellant(s) shall bear the burden of establishing one or more of these grounds for appeal. Appeals and responses must be prepared by and submitted by the parties involved (the Complainant and/or the Respondent). Third parties may not submit an appeal or response on behalf of a party involved. Appeals submitted for other reasons or past the five (5) business days shall not be considered.

    e.     Appeals shall be considered by a panel of trained appeal board members). Panelists shall be drawn from membership of the *Title IX Grievance Process Appeal Board*, as reflected in the Interim Title IX Grievance Policy.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

i.   The Respondent and Complainant shall be informed of the three (3) panel members in advance of the appeal to allow for objection to a member of the appeals panel in writing at least 48 hours before the scheduled consideration of the appeal.

ii.  Absent other considerations, the appeal panel shall make a decision within five (5) business days after the appeal period expires. The appeal panel may 1) recommend the sanction be changed or 2) remand the case for further investigation. If the appeals panel finds no merit to the appeal, the decision of the original investigation and sanction shall stand.

iii. During the appeal process, the sanctions are in effect.

iv.  Absent a remand for further investigation the outcome of the appeal process under this Policy is final. In the case of faculty, if after the appeal under this Policy is concluded, the sanction remains termination, discharge or dismissal from the University, the party to be terminated, discharged or dismissed shall have the right to follow procedures regarding separation from the University as provided in the Faculty Handbook [Separation and Appeals Procedures].

## IX.   Interim Measures

The following procedures for Interim Measures apply to all prohibited behaviors defined in this Policy, except for Sexual Harassment. **Procedures for Interim Measures for Sexual Harassment are found under the Interim Title IX Grievance Policy.**

A.   The Complainant or the Intake Officer may request interim measures from the appropriate University official who must have authority to impose the interim measure.

i.   *Faculty Respondents:* The Provost.

ii.  *Staff, Administrator, Volunteer, Independent Contractor or Visitor:* The Chief Human Resources Officer, in consultation with Divisional Vice President or Dean.

B.   If the University official believes that interim measures are necessary, either for the sake of the Complainant or other parties, then the University official may impose the least restrictive action that will both protect the Complainant (or others) and preserve the interests of the Respondent given the circumstances presented.

C.   The University will impose interim measures immediately if the safety and security of either party or other members of the University community is threatened or when the ability of the complaining student, employee or others to participate and/or

perform effectively in their respective University environments requires it. In these situations, the University official shall offer to meet with the parties within three (3) business days of the imposition of interim measures. In this case, the purpose of the meeting is not to determine responsibility of the parties, but to determine whether the interim measures should continue based on the nature of the allegations. In other situations, where interim measures have not immediately been imposed, but where some form of interim measures may need to be considered pending the outcome of the investigation, the University official shall offer to meet with the parties and/or other persons who may have relevant information prior to imposing interim measures. The purpose of this meeting is not to determine responsibility of the parties but to determine whether interim measures should be imposed based on the nature of the allegations and other pertinent information.

D.     The University official may meet with the parties separately, or meet with them together, but in no event will either party be required to be present for the meeting with the other party without the full and informed consent of both parties to do so.

E.     Examples of measures that interim measures may include:

    1.     Transfer out of a class or work assignment

    2.     Suspension (full or partial)

    3.     An order to avoid or restrict contact

    4.     Change in Housing

    5.     Administrative leave with or without pay

F.     The University is also obliged to take effective corrective action promptly, when it appears that a Hostile Environment has been created by some form of Discrimination or Harassment. This corrective action may include changes to University policies and/or services.

## X.     Good Faith Complaints

Complaints made in good faith under this Policy will not result in any adverse action against the Complainant. No other person who participates in a good faith investigation will be treated adversely because of that participation.

However, if an investigation results in a finding that the Complainant knowingly accused another falsely of Discrimination, Harassment or Retaliation, then the Complainant will be subject to appropriate sanctions, which may include termination of employment or, in the case of students, permanent separation from the University.

## XI.     Other Rights and Responsibilities

This Policy shall not be deemed to take away any rights or responsibilities of faculty members under the Faculty Handbook, administrators and professionals under the Administrators and Professionals Handbook, staff members under the Staff Handbook, students under the Student Handbook, and union members under their collective bargaining agreements.

## XII.    Education

This Policy reflects the University's commitment to educate all of the members of the University community about the nature of discrimination, harassment and retaliation, their impact on individuals and the University as a whole, the steps necessary to address it, and the protections available to all involved: Complainant, Respondent and others. Such education is essential to establishing and maintaining a campus environment in which the dignity of all persons is respected.  It is the responsibility of every employee and student to become informed about these matters by participating in required educational sessions.

The University's Title IX Coordinator and Deputy Title IX Coordinators are responsible for providing appropriate education for employees (faculty, administrators and staff) and students.

<u>Contact Information for the Title IX Coordinator</u>:

**Lexi Morrison**
Director of Title IX & Equity Compliance
Title IX Coordinator
Campion Student Center, Room 243E
5600 City Avenue
Philadelphia, PA  19131
titleix@sju.edu | 610-660-1145

<u>Contact Information for the Deputy Title IX Coordinators</u>:

**Taba Pickard**
Deputy Title IX Coordinator
Director, Employee Relations and Engagement
215 City Avenue
Philadelphia, PA  19131
tpickard@sju.edu | 610-660-3313

**Thomas Sheibley**
Deputy Title IX Coordinator
Director of Campus Ministry
Wolfington Hall
5600 City Avenue
Philadelphia, PA  19131
tsheible@sju.edu | 610-660-3125

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

Saint Joseph's University

**Renie Shields**
Deputy Title IX Coordinator
Senior Associate Athletic Director for Student Experience
Barry Hall
5600 City Avenue
Philadelphia, PA  19131
shields@sju.edu | 610-660-2584

### Campus Resources

- Associate Provost for Diversity, Equity & Inclusion / University Professor (Nicole R. Stokes, Ph.D.) – nstokes@sju.edu; Saint Thomas Hall; 610-660-1209
- Title IX Coordinator (Lexi Morrison) – titleix@sju.edu; Campion 243E; 610-660-1145
- Deputy Title IX Coordinator (Thomas Sheibley) – tsheible@sju.edu; Wolfington; 610-660-3125
- Deputy Title IX Coordinator (Renie Shields) – shields@sju.edu; Barry Hall; 610-660-2584
- Deputy Title IX Coordinator (Taba Pickard) – tpickard@sju.edu; 215 City Avenue; 610-660-3313
- EEO Officer (Zenobia Hargust) – zhargust@sju.edu; 215 City Avenue; 610-660-3336
- Employee Assistance Program – 888-293-6948 or 800-327-1833 (employees)
- Counseling and Psychological Services – Merion Gardens A504; 610-660-1090; https://sites.sju.edu/counseling/ (students)
- Student Health Center – Quirk Hall; 610-660-1175; www.sju.edu/studenthealth (students)
- Office of International Students and Scholars – Campion 216; 610-660-3496; https://sites.sju.edu/oid/iss (students and employees)
- Student Accounts – Barbelin 121; 610-660-2000; https://www.sju.edu/offices/student-accounts (students)
- Public Safety and Security – Barbelin; 610-660-1111; https://sites.sju.edu/security/
- Office of Community Standards – communitystandards@sju.edu; Campion 243; 610-660-1046; https://sites.sju.edu/communitystandards/ (students)

For further information or details of campus resources for faculty and staff, contact the Office of Human Resources at 610-660-3309 or visit the HR website at https://sites.sju.edu/humanresources/.

### Off-Campus Resources

Complaints of discrimination or harassment may also be filed in a timely manner with the following government agencies:

**Equal Employment Opportunity Commission**
801 Market Street, Ste. 1300
Philadelphia, PA  19107-3127
800/669-4000

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

**Office of Civil Rights**
U.S. Department of Education
100 Penn Square East, Ste. 515
Philadelphia, PA  19107-3323

**Pennsylvania Human Relations Commission**
110 N. 8th Street, Ste. 501
Philadelphia, PA 19107
215/560-2496

**Philadelphia Commission on Human Relations**
601 Walnut Street, Ste. 300 South
Philadelphia, PA  19106
215/686-4670

**Resources Cited in this Document**
http://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure
http://www.aaup.org/AAUP/pubsres/policydocs/contents/stud-rights.htm
http://www.aaup.org/AAUP/pubsres/policydocs/contents/statementonprofessionalethics.htm

## XIII.   Records

Records generated under this policy shall be maintained in confidence and consistent with applicable laws. Disposition of the case will become part of the record. The Title IX Coordinator and the EEO Officer shall review these records and make such reports or recommendations as may be necessary to effectuate the purpose of this policy to the President.

## XIV.   Revisions

The Title IX Coordinator and EEO Officer will initiate an annual review of the policy. Additional review/revisions will be conducted as needed to comply with legal requirements.