# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY V. MANCO, Ph.D., : 
51 Elmgate Road : 
Marlton, New Jersey 08053 : 
 : 
        Plaintiff, : 
    v. :  CIVIL ACTION NO. 2:22-cv-00285
 : 
ST. JOSEPH'S UNIVERSITY : 
5600 City Avenue : 
Philadelphia, Pennsylvania 19131 : 
 : 
and : JURY TRIAL DEMANDED
 : 
HADASSAH COLBERT : 
319 S. Rockford Road : 
Mountville, Pennsylvania 17554 : 
 : 
and : 
 : 
KIERNAN LOUE : 
86 Greenfield Avenue : 
Ardmore, Pennsylvania 19003 : 
 : 
and : 
 : 
LYNLY CARMAN : 
9 Drexel Avenue : 
Stratford, New Jersey 08084 : 
 : 
and : 
 : 
DR. SUSAN LIEBELL : 
113 Johnson Street : 
Highland Park, New Jersey 08904 : 
 : 
and : 
 : 
KARLEIGH LOPEZ : 
2139 Columbia Avenue : 
Atco, New Jersey 08004 : 
 : 
and : 
 : 

1

ERIN FAHEY                                          :
205 Kenmore Drive                                   :
Williamstown, New Jersey 08094                      :
                                                    :
and                                                 :
                                                    :
CORRINE McGRATH                                     :
821 Hoffman Place                                   :
Philadelphia, Pennsylvania 19123                    :
                                                    :
and                                                 :
                                                    :
CHERYL McCONNELL, Ph.D.                              :
258 Charles Ellis Drive                             :
Newtown Square, PA 19073                            :
                                                    :
                    Defendants.                     :


## AMENDED COMPLAINT[1]

Professor Gregory Manco ("Plaintiff" or "Dr. Manco") through his undersigned counsel,

files this First Amended Complaint against defendants St. Joseph's University ("St. Joseph's"),

Hadassah Colbert ("Colbert"), Kiernan Loue ("Loue"), Lynly Carman ("Carman"), Erin Fahey

("Fahey"), Dr. Susan Liebell ("Dr. Liebell"), Karleigh Lopez ("Lopez"), Corrine McGrath

("McGrath"), and Cheryl McConnell, Ph.D. ("Dr. McConnell"), and in support thereof, avers as

follows:


### I.    NATURE OF THE ACTION

---

[1] Please note that Dr. Manco will file a second Amended Complaint to include Retaliation Claims against St. Joseph's for violations of VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 ("PFPO") once the EEOC issues its Right to Sue Letter. Further, Plaintiff's Second Amended Complaint will include Retaliation Claims against Dr. McConnell for violations of the PHRA and PFPO once the PHRC issues their Right to Sue Letter.

1.   Dr. Manco, a Caucasian former Visiting Assistant Professor of Mathematics at St. Joseph's, seeks damages from St. Joseph's as it is responsible for the actions of a small group of administrators when they purported to give credence to completely false, unsupported, undocumented, and implausible allegations of racial bias, and other pretextual reasons and then used those allegations to justify an investigation, suspension and non-renewal of his contract as a Visiting Professor of Mathematics, despite his dedication and excellent performance. In doing so, St. Joseph's violated its legal duty by discriminating against him on the basis of his race, defamed him, and breached its contractual and other legal obligations to him.

2.   More specifically, Dr. Manco was subjected to discrimination and retaliation because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("Section 1981"), the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 ("PFPO").

3.   Dr. Manco was subjected to further discrimination and retaliation because of his race in violation of Section 1981 following the filing of Plaintiff's operative Complaint, and was terminated from his position at St. Joseph's under the pretext that he violated the Family Educational Rights and Privacy Act ("FERPA") when including certain information in Plaintiff's Complaint.

4.   Dr. Manco seeks damages, including economic, back-pay and front-pay, compensatory, punitive damages, attorney fees, costs and all other relief under applicable federal and state law as the Court deems appropriate.

5.   Dr. Manco also seeks damages from St. Joseph's, Colbert, Loue, Carman, Fahey, Lopez, and Dr. Liebell, for defaming him, putting him in a false light, and for civil conspiracy.

6.    Dr. Manco also seeks damages from Lopez, Colbert, Loue, Carman, and Fahey for tortiously interfering with his employment contract with St. Joseph's.

7.    Dr. Manco also seeks damages from McGrath for defaming him, putting him in a false light, and for tortiously interfering with his employment contract with St. Joseph's.

8.    Dr. Manco also seeks damages from Dr. McConnell for retaliation under Section 1981, defamation, civil conspiracy, and for tortiously interfering with his employment contract with St. Joseph's.

9.    Based on the actions described herein, it is clear that all of the defendants acted to "cancel" Dr. Manco. In other words, defendants' actions consisted of the social phenomenon of "cancel culture," which is widespread, has ruined lives, damaged reputations, and jeopardized the futures of individuals. This is exactly what defendants attempted to accomplish by their actions, and for which they were successful.

## II.    THE PARTIES

10.    Dr. Manco is an adult individual and a resident of New Jersey residing at 51 Elmgate Road in Marlton, New Jersey 08053

11.    St. Joseph's is a nonprofit corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 5600 City Avenue, Philadelphia, Pennsylvania, 19131.

12.    At all times material hereto, Dr. Manco was an employee of St. Joseph's within the meaning of the statutes that form the basis of this matter.

13.    At all times material hereto, St. Joseph's was an employer of Dr. Manco within the meaning of the statutes that form the basis of this matter.

14.    At all times material hereto, St. Joseph's employed more than fifteen (15) people.

15.     At all times material hereto, St. Joseph's acted by and through its authorized agents, servants, workmen, and/or employees who were working, then and there, within the course and scope of their employment, authority and/or ostensible authority with St. Joseph's and in furtherance of St. Joseph's business.

16.     Hadassah Colbert is an adult individual and resident of Pennsylvania residing at 319 S. Rockford Road in Mountville, Pennsylvania 17554.

17.     Kiernan Loue is an adult individual and resident of Pennsylvania residing at 86 Greenfield Avenue in Ardmore, Pennsylvania 19003.

18.     Lynly Carman is an adult individual and resident of New Jersey residing at 9 Drexel Avenue in Stratford, New Jersey 08084.

19.     Erin Fahey is an adult individual and resident of New Jersey residing at 205 Kenmore Drive in Williamstown, New Jersey 08094.

20.     Dr. Susan Liebell is an adult individual and resident of New Jersey residing at 113 Johnson Street in Highland Park, New Jersey 08904.

21.     Karleigh Lopez is an adult individual and resident of New Jersey residing at 2139 Columbia Avenue in Atco, New Jersey 08004.

22.     Corrine McGrath is an adult individual and resident of Pennsylvania residing at 821 Hoffman Place in Philadelphia, Pennsylvania 19123.

23.     Cheryl McConnell, Ph.D. is an adult individual and resident of Pennsylvania residing at 258 Charles Ellis Drive, Newtown Square, Pennsylvania 19073.

### III.     JURISDICTION AND VENUE

24.     The causes of action set forth in this Complaint arise under Title VII, Section 1981, the PHRA, and the PFPO and other various state law claims.

25.     The District Court has subject matter jurisdiction over the Title VII and Section 1981 claims pursuant to 28 U.S.C. § 1331.

26.     The District Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

27.     Venue is proper under 28 U.S.C. § 1391(b).

28.     St. Joseph's is an employer as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq., ("Title VII"),  the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA") and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 ("PFPO").

29.     All preconditions to the filing of this action, by way of pursuit of administrative remedies, have been satisfied.  Dr. Manco timely filed charges of discrimination and retaliation at the Pennsylvania Human Rights Commission, and dually-filed at the Equal Opportunity Employment Commission, against St. Joseph's University.

30.     Dr. Manco exhausted his administrative remedies by filing charges of discrimination and retaliation with the United States Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a right to sue letter on March 15, 2022, and this action is timely filed within 90 days of issuance of said right to sue letter.  *See* a true and correct copy of the EEOC Right to Sue Letter attached as Exhibit "A."

IV.     STATEMENT OF FACTS

31.     In 1992, Dr. Manco graduated with a Bachelor of the Arts in Mathematics and Statistics from Rutgers University.

32.    Dr. Manco continued his education with Rutgers University, obtained his Masters in Statistics in 1994, and his Ph.D. in Statistics in 1997.

33.    Prior to joining St. Joseph's, Dr. Manco taught for Rutgers University, University of the Sciences in Philadelphia, and Rowan University.

34.    Dr. Manco first joined St. Joseph's in 2005 as an Adjunct Professor.

35.    In 2007, Dr. Manco was hired as Visiting Assistant Professor of Mathematics ("Visiting Professor") and was in this position until wrongfully denied equitable treatment, wrongfully investigated, wrongfully suspended, wrongfully removed, and denied due process, all of which give rise to this lawsuit.

36.    After becoming a Visiting Professor, Dr. Manco would teach approximately eight (8) courses and approximately 230 students per year.

37.    Moreover, over the course of his career in academia, Dr. Manco published scholarly works, including journal articles, books, two (2) textbooks and an article entitled "Inadmissibility of the studentized likelihood ratio test for testing order-restricted normal means", which was published in Statistics and Decisions, 20 in 2002.

38.    Dr. Manco performed his job duties in a highly competent manner and routinely received positive feedback on his performance.

39.    Dr. Manco received a Teaching Merit Award from St. Joseph's in 2012 for his creation of a new course in combinatorics and probability.

40.    Moreover, in 2020, Kristopher Tapp, Ph.D., Professor and Chair of Mathematics, wrote to Dr. Manco and stated[2]:

---

[2] Moreover, Dr. Tapp was in the process of nominating Dr. Manco for another Teaching Merit Award until the events of February 19, 2021.

Hi Greg,

I hope you're staying healthy and enjoying the start of summer.

Your course evaluations look great!  I'm surprised that I have access to them, since I thought my access was supposed to be blocked this semester.  But I am able to see the quantitative (not the qualitative) like usual.

From past semesters, I've kept a running record for all math faculty of the avg student responses to the two most relevant questions: "explains clearly" and "overall rate professor excellent".  Your numbers this semester are very strong (4.5, 4.67, 4.44, 4.11 for "explains clearly" and 3.83, 4.5, 4.0, 4.44 for "excellent").  Your numbers from past semesters were similarly strong (and with higher response rates).

41.     In addition, from approximately 2004 through 2021 (except from Fall 2012 through Spring 2015), Dr. Manco was involved with St. Joseph's Division 1 Intercollegiate baseball team as both a paid and volunteer assistant baseball coach and as the volunteer director of baseball operations.

42.     Dr. Manco was removed from his role as a volunteer assistant coach with the baseball team as a result of defendants' unlawful actions and the tortious conduct, as more fully described below.

43.     St. Joseph's was founded in 1851 and says it embraces the "the Jesuit educational model" which means that the school recognizes that an individual is multidimensional "who needs the freedom and encouragement to grow mentally, spiritually, personally and creatively."

44.     St. Joseph's also represents that it is an "inclusive and diverse community that educates and cares for the whole person."

45.     St. Joseph's failed to follow its own mission statement, representations, policies, all of which constituted some of St. Joseph's duties as set forth herein.

46.     On or before January 22, 2021, Colbert, a graduate of St. Joseph's, learned of Dr. Manco's Twitter account, which was anonymous and not affiliated with St. Joseph's, and began to view his tweets.

47.    Colbert was a student of Dr. Manco, in the Spring of 2017, receiving a final grade of F.

48.    Colbert never complained about any type of bias or discrimination by Dr. Manco while a student of his, or at any time during her enrollment at St. Joseph's. Additionally, no students ever accused Dr. Manco of bias or discrimination in their end-of-semester student evaluations.

49.    On January 22, 2021, Colbert (who had already graduated from St. Joseph's, submitted an email to Nicole Stokes, Ph.D., St. Joseph's Associate Provost for Diversity, Equity, and Inclusion, Shaily Menon, Ph.D., the Dean of the College of Arts and Sciences, and Dr. Tapp, accusing Dr. Manco of being racist and transphobic.

50.    Colbert included selected screenshots of tweets of Dr. Manco, as supposed evidence to support her claims, adding that Dr. Manco discriminated against her in class and fostered a hostile learning environment four (4) years earlier, in Spring of 2017.  Colbert stated that Dr. Manco should not be allowed to coach or teach students.

51.    On January 26, 2021, Colbert met with Title IX Coordinator Lexi Morrison[3], Intake Officer Taba Pickard, and Tenisha McDowell from Human Resources. Ms. Morrison identified this meeting as the "consultation process" as outlined in St. Joseph's Interim Policy on Discrimination, Harassment, and Retaliation ("Interim Policy").[4]

52.    During this "consultation process," Ms. Morrison broke with the procedures laid out in the Interim Policy, breached the duties owed to Plaintiff, and conspired with Colbert by

---

[3] Ms. Morrison was involved in at least one Title IX lawsuit, *see Harris Fogel v. University of the Arts*, et. al., United States District Court for the Eastern District of Pennsylvania, Docket No.: 18-5137.

[4] A true and correct copy of the Interim Policy is submitted hereto as Exhibit "B."

advising her to find others to support her experience with Dr. Manco, and to get them to reach out to her.

53.     Dr. Manco was completely unaware of the email and the "consultation process" meeting.

54.     Four weeks later, on February 19, 2021, Colbert followed Ms. Morrison's advice by using her Instagram account to spread "selected" screenshots of selected tweets of Dr. Manco with her added defamatory comments, while encouraging others to report him to the University so that he would lose his job.

55.     Karleigh Lopez ("Lopez"), another St. Joseph's graduate, who was never taught by Dr. Manco, and did not know him personally, saw Colbert's posts, and joined in the public campaign to have him terminated. This included her creation of a Tik Tok video which included screenshots of Dr. Manco's tweets and a link to the bias reporting form, a plea to her followers to "flood" the school with complaints, and a public tweet to St. Joseph's with "selected" screenshots of Dr. Manco's tweets and Colbert's added commentary:







56.     As a result of Ms. Morrison's advice, Colbert's execution, and Lopez's assistance, St. Joseph's began to receive complaints about Dr. Manco through the online bias reporting form.

57.     On the afternoon of February 19, 2021, only a few hours after Lopez's public tweet to St. Joseph's, and after the school received three anonymous bias reports about Dr. Manco's Twitter posts, Dr. Tapp asked Dr. Manco to join a Zoom meeting at 5:00 pm.

58.     Dr. Tapp, Dr. Menon, and Zenobia Hargust, St. Joseph's Chief Human Resources Officer, attended the meeting on behalf of St. Joseph's. At the meeting, Dr. Manco was informed that he was being placed on administrative leave immediately, without any due process, and that the complaints against him would be investigated by an external reviewer. After the meeting, Ms. Hargust sent Dr. Manco an email at 5:19 pm wherein Ms. Hargust unilaterally declared Dr. Manco's tweets to be "of a biased or discriminatory nature" and stated that the investigation would be conducted specifically to "gather facts" associated with his tweets.

59.     The conditions required for placing a faculty member on immediate leave for alleged violations of St. Joseph's Interim Policy are spelled out by the policy itself, and sets forth the rights, duties and obligations owed to Plaintiff. These conditions were not met, all to the detriment and loss to Plaintiff. *See* Exhibit B, p., 18-19.

60.     On February 22, 2021, Dr. Tapp informed Dr. Manco's students that he would not be returning for the remainder of the semester on the first school day after Dr. Manco was placed on leave:

Hi Greg,

When I introduced the instructors stepping into your classes, I announced to the students that the change would be for the rest of the semester.  I'm sorry that I didn't communicate to you directly this decision or its rationale.  This decision hadn't yet been made when I spoke with you last Friday, and then it slipped through the cracks.

The decision was informed by considerations including the unknown amount of time that may be needed for the investigation to conclude and the need to provide appropriate direction for the interim instructional coverage. Ultimately, the goal is to limit disruption in the classroom and offer as much continuity for students as possible.

14

61.     Moreover, in response to question from the Hawk (St. Joseph's student newspaper), Gail Benner, the interim chief marketing and communication officers and director of PR and Media stated that Dr. Manco "will not be in the classroom or in a coaching role while the investigation is conducted."

62.     This was prior to any investigation, and without the required due process related to the continuation of the immediate administrative leave, proving that St. Joseph's intended to reach a predetermined outcome, all in violation of the duties owed to Plaintiff. *See* Exhibit B.

63.     Pursuant to the Interim Policy, St. Joseph's then Provost and now incoming Interim President Dr. McConnell was required to meet with Dr. Manco within three (3) days of being placed on leave, specifically to determine if the immediate measure of administrative leave should continue. St. Joseph's failed to meet this requirement, in violation of the duties owed to Plaintiff. *See* Exhibit B, p., 18-19.

64.     On the morning of February 22, 2021, within the aforementioned three-day period when continuation of his leave should have been reviewed, Dr. Manco emailed Dr. Stokes, Dr. Menon, and Ms. Morrison with proof that the complaints levied against him were not made in good faith, referencing Colbert's failing grade in his class and providing evidence of her tweeting racial animus towards "several [of her] white professors".

65.     Dr. Manco also provided evidence in the email that Colbert and Lopez were no longer enrolled at the school and that he was being defamed on social media.

66.     On February 25, 2021, Ms. Morrison presented Dr. Manco with the bias reports that were received between February 19th and February 23rd. This included Colbert's email from January 22nd, but Ms. Morrison deliberately did not disclose the date of the complaint as she knew that St. Joseph's already violated its Interim Policy. *See* Exhibit B.

67.     It was during the investigation, on March 22, 2021, in his follow-up meeting with the investigator, that Dr. Manco learned that the initial email allegation from Colbert was not made on or after February 19th as Ms. Morrison led him to believe, but four (4) weeks earlier on January 22nd. He also learned, for the first time, of the January 26, 2021 "consultation process" involving Colbert and three administrators. This information had been deliberately concealed from Dr. Manco until it was revealed by Colbert herself in her written response to the investigator.

68.     St. Joseph's investigation concluded on May 12, 2021, exonerating Dr. Manco on all counts.

69.     St. Joseph's outside investigator wrote a ten (10) page summary, finding, *inter alia*, that Dr. Manco's tweets were not in violation of St. Joseph's policy, and that:

    a.  there was no evidence of racial bias in his classroom towards Colbert nor towards any other students;

    b.  that there was no evidence that Manco's political views were evident in the classroom;

    c.  that there was no evidence that Manco treated students unfairly based upon race or any other protected characteristic while they were a student in his class;

    d.  that there was no evidence of discrimination, bias, or unfair treatment noted or referenced in the qualitative student evaluations;

    e.  there was no evidence that Dr. Manco retaliated against Lopez;

    f.   that Dr. Manco was credible when he asserted that he did not invite or encourage physical threats;

16

g.  there was no evidence that Dr. Manco administered grades or conducted himself in class in a manner that revealed any racial bias or harassment towards students based upon his personal views;

h.  that Dr. Manco's Twitter posts did not rise to the level of an unlawful distinction, preference, or detriment to an individual in violation of St. Joseph's University policy;

i.  that Dr. Manco's Twitter posts did not constitute harassment;

j.  that Dr. Manco's Twitter posts did not create an intimidating or hostile working environment under Joseph's University policy;

k.  that Dr. Manco's Twitter posts did not reference any individual specifically or comment on any Joseph's student or employee; and

l.  that there was no evidence that Dr. Manco administered grades or conducted himself in class in a manner that reveals any bias-racial or otherwise-or harassment towards any student based upon his personal views.

70.  Inexplicably St. Joseph's negligently, recklessly and/or intentionally decided to tell a different story with glaring omissions relating to the aforementioned conclusions of the investigation, but rather released a statement which merely stated, "[i]n this case, a definitive determination could not be made due to insufficient evidence", the totality of which is completely taken out of context insofar as, in reality, the parties' and witness who claimed the allegations against Dr. Manco failed to meet their burden of demonstrating that Dr. Manco created a hostile learning environment, retaliated, and that his twitter content was discriminatory.

71.  St. Joseph's statement to the public was malicious, defamatory and false.

72.  St. Joseph's knew its statement to the public was false.

17

73.     The malicious, defamatory and false statement can be understood and interpreted by a reasonable person to be assertions of fact, not opinion.

74.     By publishing the malicious, defamatory and false statements, St. Joseph's placed Dr. Manco in a false light, in a manner that would be highly offensive to a reasonable person, and which caused and continues to cause serious and permanent damage to Dr. Manco's professional and personal reputations, employment, economic horizon, humiliation, mental anguish and suffering.

75.     Although Dr. Manco was cleared of any wrongdoing and St. Joseph's baseball season was still in progress at the time Dr. Manco's administrative leave ended, the Head Baseball Coach instructed Manco to not return for the remainder of the season, all to Plaintiff's detriment and loss.

76.     Prior to defendants' unlawful and tortious conduct, Dr. Manco was listed on the Fall 2021 schedule as professor for four (4) classes, per the usual workload for his fulltime visiting position.

77.     However, despite being cleared by St. Joseph's external investigator, on June 10, 2021, Dr. Manco was informed by Dr. James Carter, the Interim Dean of St. Joseph's College of Arts and Sciences ("Dr. Carter"), that the school made the decision to not renew his "Visiting Faculty annual contract."

78.     On the same date above, Interim Mathematics Chairperson Samuel Smith agreed to keep Dr. Manco as the professor for two (2) of his four (4) classes while hiring him as a part-time adjunct professor for the Fall 2021 semester.

79.     On or about July 29, 2021, as a result of the June 10th letter, Dr. Manco filed an internal appeal as a result of the non-renewal of his fulltime visiting contract.

80.     On August 16, 2021, St. Joseph's locked Dr. Manco out of its online network.

81.     On August 18, 2021, St. Joseph's returned Dr. Manco to the network. Dr. Manco was informed by Ms. Hargust in a phone call that the administration was unaware that Dr. Smith had hired him as an adjunct professor and had considered him to no longer be an employee of the school.

82.     On October 11, 2021, St. Joseph's denied Dr. Manco's internal appeal.

83.     It is clear based on the above that Dr. Manco was not afforded the contractual protections of academic freedom nor due process.

84.     St. Joseph's Interim Policy established, in part, the duty owed to Dr. Manco and states, in relevant part, that each individual is entitled to basic protections such as

1) Freedom from unlawful Discrimination, Harassment, and Retaliation of any type;

2) Freedom to be heard without fear of reprisal;

3) The expectation of confidentiality to the extent that is possible;

4) The assurance of a prompt and equitable investigation and resolution of all allegations of Discrimination, Harassment or Retaliation; and

5) For non-student respondents only: During a formal process, the opportunity of the Respondent and Complainant to be presented with all relevant information in a timely manner, and to respond.

*See* Exhibit B, p. 3.

85.     In addition, the Interim Policy prohibits discrimination on the basis of race. *See* Exhibit B, p. 3.

86.     Moreover, the Interim Policy specifically provides that St. Joseph's is "committed to the principles of academic freedom. Vigorous discussion and debate, even of controversial matters, are an integral part of the educational enterprise." *See* Exhibit B, p. 3.

87.     Further, the Interim Policy adopts additional duties owed to Plaintiff from the American Association of University Professors' 1940 Statement and affirms that St. Joseph's strongly supports and protects the principle of academic freedom. *See* Exhibit B. The Interim Policy also states that "[t]his Policy shall not be construed or applied to restrict academic freedom at the University, nor shall it be construed to restrict constitutionally protected expression …"[5] *See* Exhibit B, p. 5.

88.     As outlined above and more fully in Exhibit B, St. Joseph's has made clear commitments to faculty freedom of expression and academic freedom.[6] These commitments form a legal obligation and the duty of care owed to Plaintiff, all of which St. Josephs breached to the detriment and harm of Plaintiff.

89.     St. Joseph's actions violated its Interim Policy, including but not limited to  Section I, II, IV, VII, VIII, IX, and XI. *See* Exhibit B.

---

[5] Dr. Manco's Twitter posts were clearly protected by academic freedom, which therefore rendered his investigation and suspension illegitimate.

[6] Interestingly, St. Joseph's relied on this very commitment when defending David Parry, Ph.D., an associate professor and chair of the university's communication's department, for comments he made on November 10, 2016 at an event at the university entitled "Making Sense of the Presidential Election." Dr. Parry, who is Caucasian, made comments regarding certain individuals who voted for then President-elect Donald Trump, stating, among other things, "I am not sympathetic to the white voters who make over $50,000  a year and said we are going to vote for Trump. Those people, I am not sympathetic to and I do not believe that you have to open your heart to them. If you are person of color, if you are a woman, you do not have to open your heart to them. They told you are not a person and it is okay to deal with that how you want."  Campus Reform, *Don't 'open your heart to white people,' white prof tells class*, YouTube (Feb. 8, 2017), https://www.youtube.com/watch?v=CD17LGHpTVI.  Instead of launching an external investigation into Dr. Parry as they did with Dr. Manco, St. Joseph's vigorously defended him, stating, in relevant part, "Saint Joseph's University, as an institution of higher education, is fundamentally committed to free speech and the exchange of ideas," and "fostering a safe learning environment is one of the University's primary obligations. Freedom of expression is integral to this effort… this always has been and will remain a central principle at Saint Joseph's University."  Kyle Sammin, *Cancel Culture at Hawk Hill*, THE PHILADELPHIA CITIZEN, Mar. 3, 2021, https://thephiladelphiacitizen.org/cancel-culture-st-josephs/.  Further, on February 22, 2017, the Hawk, the student newspaper, released an article entitled "Correcting the Narrative" which included statements from St. Joseph's administrators, professors, and the student senate discussing the importance of the free-exchange of ideas at St. Joseph's.   Ana Faguy, *Correcting the Narrative*, THE HAWK, Feb. 22, 2017, http://www.sjuhawknews.com/correcting-the-narrative/.    Based on the university's website, Dr. Parry is still employed by St. Joseph's.

90.    After Dr. Manco was illegally suspended and then terminated, Colbert reveled in

her "accomplishment":





In a letter delivered to university leaders at an alumni luncheon, the six alumni, spanning the graduating classes of 1968 to 1973, cited "the creeping illness that seems to be taking over the college where we learned important Jesuit values of being men for others."

I'M HOLLERING

They were particularly upset that the university removed Gregory Manco, a visiting assistant math professor and assistant baseball coach, from the classroom after his anonymous posts on social media in February against reparations for slavery and race and bias training. The university ultimately did not renew his contract, even though an investigation found there was insufficient evidence to conclude definitively that bias was shown.

Collectively, the withheld donations of the six alumni are in the six-figure range, said James A. Henwood, 72, a retired Philadelphia city police lieutenant who graduated from St. Joe's in 1971. Henwood declined to say how much he was

Send Message

22







91.     Through the period described above, Colbert, Lopez, Carman, Loue, Fahey, and

Dr. Liebell all conspired and, in fact, communicated false statements about Dr. Manco in an effort

to destroy his professional career, his reputation in the community, and cause him personal

humiliation, mental anguish and suffering.

92.     More specifically, on February 19, 2021, while trying to convince and instigate

others to report false statements of fact about Dr. Manco, Colbert posted on her Instagram account

a screenshot of a tweet of Dr. Manco with added commentary at the bottom:



93.    Colbert's allegation was a lie, and in fact, Dr. Manco, tweeted from the very same account on February 2, 2021[7], during the period that Colbert is known to have been following his Twitter, that Supreme Court Justice Clarence Thomas and Jackie Robinson were among his heroes:



---

[7] Ironically, this is during the very period of time between Colbert launched the St. Joseph's investigation on January 22, 2021 and when St.  Joseph's informed Dr. Manco of the investigation on February 19, 2021.

94.     Both Colbert and Lopez were "doxing" Dr. Manco by revealing and spreading selected portions of Dr. Manco's social media posts, together with false assertions of fact, on social media platforms that he did not utilize.



95.     Moreover, while Colbert was Dr. Manco's student, Dr. Manco was accommodating and respectful towards her, and concerned for her well-being, as evident in a text conversation with her in the last week of the semester when he granted her a makeup exam after a head injury:



96.     Despite Colbert's knowledge that Dr. Manco showed no bias towards her or any

other student, she continued to lie about him in public statements, and repeatedly communicated

false statements of fact.

97.     Colbert told St. Joseph's in her January 26, 2021 "consultation process" that Dr.

Manco would not "work with her" when she requested to take her final exam late due to her head

injury, all of which was a false statement of fact. To the contrary, Dr. Manco granted Colbert

permission to makeup two (2) different exams, including the final exam. In addition to granting

Colbert a makeup exam in their text message conversation, he granted her a makeup for the final

exam by allowing her to pick the date and time her email request to Dr. Manco to take the exam

late:



98.    Colbert communicated false statements of fact when she told St. Joseph's, in her

initial January 22, 2021 email, that Dr. Manco "purposely made a hard quiz" the day President

Joseph R. Biden, then former Vice President, came to St. Joseph's on April 24, 2018, so "that

students could not miss [the quiz]…" and therefore would have to miss the speech.

99.     Colbert knew that this false assertion of fact was, indeed, a lie as she was previously in Dr. Manco's class, and she knew all quizzes counted as extra credit. Moreover, Joe Biden's visit and speech was deliberately scheduled to begin at 11:00 am when no classes were held on campus. In addition, despite having no obligation to do so, Dr. Manco accommodated students in his 9:30 - 10:45 am class who wanted to arrive to the Joe Biden visit early to get a good seat:

---

**Gregory Manco <gmanco@sju.edu>**                                    Fri, Apr 20, 2018 at 10:56 AM
To: Nico Dennis <nd681883@sju.edu>

You got the last spot!  Must be there for full class.  See ya

GM

On Fri, Apr 20, 2018 at 10:32 AM, Nico Dennis <nd681883@sju.edu> wrote:
Dr. Manco,

I was wondering if there was still a spot for me in the 8:00 class. I am really interested in going to the guest speaking, and would like to get there earlier than 10:45. If not, I understand, but I am reaching out to see if there is still a spot in that class. If you could let me know, that would be much appreciated.

Best

Nico Dennis

On Thu, Apr 19, 2018 at 12:23 PM, Gregory Manco <gmanco@sju.edu> wrote:
Okay .... um ... so there's apparently a demand for this unnamed guest speaker coming to campus ... and ... um .... this is tough ... (really biting my tongue now) .... but .... okay, okay, okay.  I will make a limited amount of room for those of you who wish to get a good seat to hear this person .... ugh .... speak.  There isn't enough room in which to squeeze both sections together into one, but I can grant this for, let's say, FIVE of you (first come, first serve ... you MUST email me to confirm, and I will take the first five who respond.)  You will come to the entire 8:00 section, you can't just roll in for the quiz.

And if you miss out, you can still go to this thing, it's not like you get locked out of the building.

See ya

Dr. Manco

"Capitalism is not a system of the past; it is the system of the future - if mankind is to have a future."
- Ayn Rand

---

[INTENTIONALLY LEFT BLANK]

**Gregory Manco** <gmanco@sju.edu>                                      Thu, Apr 19, 2018 at 3:23 PM
To: Corinne McGrath <cm616351@sju.edu>

You're on time so you're good but please be reminded that you must be in class for the full duration. Got it? 😊

On Thu, Apr 19, 2018 at 3:22 PM Corinne McGrath <cm616351@sju.edu> wrote:
Figure I'm probably seeing this late, but I would like to take the quiz in the 8 AM class period.

Thanks,
Corinne

On Thu, Apr 19, 2018 at 12:23 PM, Gregory Manco <gmanco@sju.edu> wrote:
Okay ... um ... so there's apparently a demand for this unnamed guest speaker coming to campus ... and ... um .... this is tough ...
(really biting my tongue now) .... but .... okay, okay, okay. I will make a limited amount of room for those of you who wish to get a
good seat to hear this person .... ugh .... speak. There isn't enough room in which to squeeze both sections together into one, but I
can grant this for, let's say, FIVE of you (first come, first serve ... you MUST email me to confirm, and I will take the first five who
respond.) You will come to the entire 8:00 section, you can't just roll in for the quiz.

And if you miss out, you can still go to this thing, it's not like you get locked out of the building.

See ya

Dr. Manco

"Capitalism is not a system of the past; it is the system of the future - if mankind is to have a future."
- Ayn Rand

100.    On February 21, 2021, with bias reports still being submitted to St. Joseph's about Dr. Manco, Colbert tweeted that Dr. Manco "[allowed] his followers to send literal death threats to college students."

101.    This was a lie, and Colbert knew it to be a lie.

102.    This lie was then picked up and repeated in a February 23, 2021 article in St. Joseph's student newspaper "The Hawk", specifically repeated this false assertion of fact that, as a result of Dr. Manco's tweets, there were "ongoing" death threats being sent to students.

103.    The authors of the article knew the statement to be false assertions of fact.  This false statement, which severely impugns Dr. Manco's professionalism, was repeated by other St. Joseph's faculty members over the course of the rest of the semester, all to Plaintiff's detriment and loss.

104.    St. Joseph's is a private university with a clear agency relationship with its student newspaper, and, for all times relevant, had a duty to monitor, supervise and police the student

newspaper, all of which it failed to do, and is therefore liable for its defamatory acts and publication of false statements.

105.    Also on February 21, 2021, Colbert tweeted that Dr. Manco told a narcoleptic student that they had to sit in the back of the classroom, which if true would be a violation of law and school policy:



106.    Colbert was provided this information from Lopez, after Lopez received it from Carman in a Direct Message conversation and Lopez then submitted the message to St. Joseph's.

107.    Both Colbert and Carman's statements were lies.

108.    Dr. Manco was never told by St. Joseph's or Carman that she had narcolepsy or any disability, and Dr. Manco never made Carman sit in the back of his classroom:

### Re: Math 128 Statistics
1 message

**Gregory Manco** <gmanco@sju.edu>                                                          Mon, Oct 1, 2018 at 8:54 AM
To: Lynly Carman <lc675757@sju.edu>

No worries, I know you are of strong character!  I also know you don't mean any harm.  Sorry to hear you have sleep
difficulties!  See you in a bit

GM

On Mon, Oct 1, 2018 at 8:09 AM Lynly Carman <lc675757@sju.edu> wrote:
> Dr. Manco,
>
> I'm very sorry about this. I have sleep problems and fall asleep often thought the day.
>
> I'll do my best to curb it, and move myself accordingly if I cannot. I'm and very sorry if I offended you or impacted the
> quality of class participation. I also thank you for being so understanding.
>
> I hope that this hasn't reflected poorly on my character. I do take my classwork seriously, and I have never intended to
> be disrespectful.
>
> My sincerest apologies,
> Lynly Carman
>
>
> On Mon, Oct 1, 2018, 6:16 AM Gregory Manco <gmanco@sju.edu> wrote:
>> Hello Lynly,
>>
>> I need a favor from you.  Please do not fall asleep during class.  Or, if you wish to do so, please sit in the back corner
>> of the room, way out of sight.  It is difficult to have any enthusiasm with someone front and center with their head
>> down, paying little to no attention.  You are often like this before I even start lecturing.  Obviously you're very
>> intelligent and I suspect that the class comes easy to you and that you can afford to do this.  But for others this class
>> is a challenge.  I need to be on point with the lecture and, while I typically can overlook these things, the fact that this
>> is a constant issue makes me need to reach out.  Some teachers get angry and will even ask students to leave - I'm
>> not upset and I don't think that's necessary but I do respectfully ask you to please consider my wishes.
>>
>> Thank you in advance.  Please reply to confirm that you are good with this.  Take care,
>>
>> Dr. Manco

---

**Re: class**
1 message

Gregory Manco <gmanco@sju.edu>                                    Fri, Oct 26, 2018 at 8:54 AM
To: Lynly Carman <lc675757@sju.edu>

Oh, well I surely don't want you to fail! You are on of the top students in the class and so I want you to get the A that you deserve!

See you in a bit, and thank you!

Dr. Manco

On Fri, Oct 26, 2018 at 8:22 AM Lynly Carman <lc675757@sju.edu> wrote:
I will try harder, and if in this class I still struggle, I will move. I appreciateyour understanding, and moreover, I appreciate your request. Other teachers typically ignore it, and I think that they're hoping that I will fail. Others, I know more personally, and they know the context of the behavior. Your attention to this matter is just a reminder of how much you care about your students and the quality of the class for everyone.

Thank you again for being so understanding. If my difficulty continues, I will move. I apologized again for any disturbance.

Lynly Carman

On Fri, Oct 26, 2018, 7:09 AM Gregory Manco <gmanco@sju.edu> wrote:
Hi Lynly,

I need for you again to make a better effort to not fall asleep in class, again because you are right in front of me and it brings me down a little. I understand that it may be a medical condition but if you think it can or will happen again then I'd appreciate it if you could situate yourself in the back somewhere. I am not angry or anything so there's no need to apologize ... in fact I'd think that some of your other teachers would be less understanding. (Do you fall asleep in your other classes and, if so, do your teachers tolerate it?) I can tell that you are trying, and it isn't as bad as it was, but still I need you to try harder.

You seem like a really nice person, please don't think I am upset with you. I am just respectfully asking this favor of you so that I can be in the best frame of mind while I lecture.

Thank you!

Dr. Manco

---

109.    Fahey, a graduate St. Joseph's, told Lopez that Dr. Manco thought "mental health is a joke", that "his classroom is not a safe space" and that "he almost made [her] drop out of school." Lopez sent a screenshot of her Direct Message conversation with Fahey to the school.

110.    Fahey also submitted a bias report to St. Joseph's, repeating the "mental health" allegations, and misrepresenting the extent of her absence and the reason she gave Dr. Manco for the absences, and falsely stating that Dr. Manco would not work with her nor take her seriously.

111.    To the contrary, Dr. Manco was never told by Fahey or St. Joseph's that her absences were due to mental health issues. Furthermore, Dr. Manco expressed concern for Fahey's health and well-being and allowed her to make up an exam in the last week of the semester after she missed it without prior warning or notification:

**Re: Erin fahey**
1 message

Gregory Manco <gmanco@sju.edu>                                          Tue, Oct 18, 2016 at 6:36 AM
To: ef642883 <ef642883@sju.edu>

Hi Erin, sorry to hear ... nothing new that we learn today will be on the exam.  Exam is entirely Ch
3.  Get well soon!!!

Dr. Manco

---

**From:** "ef642883" <ef642883@sju.edu>
**To:** "gmanco" <gmanco@sju.edu>
**Sent:** Tuesday, October 18, 2016 5:34:03 AM
**Subject:** Erin fahey

Dr.Manco
I will not be in class today. I am home sick. I have a doctors note that I will give you a copy of when
I return back to school. I am just wondering if anything we learn today will be on the exam? I know
you said all of chapter3 I believe it is.

Thank you
Erin fahey

On Oct 14, 2016, at 7:54 AM, Gregory Manco <gmanco@sju.edu> wrote:

> Hey everyone ... I forgot to assign homework ... please do #47,48.  Thanks!  Have a
> great weekend!
>
> GM
>
> --
> Dr. Gregory V. Manco
> Visiting Assistant Professor of Mathematics
> Saint Joseph's University
> 215-834-5355
> www.sju.edu

36

**Re: Erin Fahey**
1 message

Gregory Manco <gmanco@sju.edu>                                    Thu, Dec 8, 2016 at 8:35 PM
To: ef642883 <ef642883@sju.edu>

You can still take the exam tomorrow at 6:30am just have them fax the note saying you were at the doctor's this morning. Fax is 610-660-3082.

GM


Sent from my iPhone

On Dec 6, 2016, at 6:14 PM, ef642883@sju.edu wrote:

> I forgot to get a physical note from them. However, they said they can fax one in the morning because they are not
> allowed to email them. Would that be okay, or would you need it when I come to your office to take it?  I know this is very
> irresponsible of me and I am very sorry. If it is not possible with these circumstances I will just rely on the final. Thank you
> for trying to be very accommodating.
>
> On Dec 8, 2016, at 11:34 AM, Gregory Manco <gmanco@sju.edu> wrote:
>
>> Erin, with a doctor's note you can take the exam tomorrow morning if you wish ... 6:30–
>> 7:45am at my office.  You've been missing quite a bit, even besides the last few weeks,
>> and I haven't heard from you, that's the bigger concern ... so let me know.  Of course I
>> hope you get well soon, that's most important.  Take care
>>
>> GM
>>
>> From: "ef642883" <ef642883@sju.edu>
>> To: "gmanco" <gmanco@sju.edu>
>> Sent: Thursday, December 8, 2016 11:19:46 AM
>> Subject: Erin Fahey
>>
>> Dr. Manco,
>> I have had quite a few medical problems these past few weeks. I know that I have not
>> been in class. However I was intending to take the exam this morning. I am currently at
>> a doctors office because I cannot swallow. I was wondering if there is any way I can still
>> take the exam before the final?  If not I understand because I know this is a huge
>> inconvenience.
>>
>> Thank you
>> Erin fahey
>>
>> --
>> Dr. Gregory V. Manco
>> Visiting Assistant Professor of Mathematics
>> Saint Joseph's University
>> 215-834-5355
>> www.sju.edu


112.    On February 25, 2021, Loue, a graduate of St. Joseph's, tweeted at St. Joseph's and

accused Dr. Manco of violating the law. St. Joseph's even responded to Loue's defamatory tweet:



113.    Loue was never a student of Dr. Manco and knew this tweet to be false.

114.    Additionally, after Dr. Manco was cleared of any wrongdoing, Dr. Liebell tweeted that Dr. Manco was guilty of professional misconduct, specifically that he does not treat his students with equal respect:



115.     Colbert replied to Dr. Liebell repeating the debunked falsehoods that Dr. Manco was guilty of racism and that he had bullied a disabled student by making her sit in the corner. Dr. Liebell responded that due to privacy issues, other alumni, students, and faculty did not know these supposed facts about Dr. Manco[8]:



116.     Further, on January 25, 2022, following the filing of Plaintiff's initial Complaint, the Philadelphia Inquirer posted a link to their article discussing the lawsuit on Facebook.

117.     Shortly after the story was posted on their Facebook page, McGrath, a graduate of St. Joseph's, who had Dr. Manco as a professor during her senior year at St. Joseph's, commented that "not only was [Dr. Manco] obviously racist and sexist, he was just downright cruel" and that he "took pride in failing and mocking kids":

---

[8] Dr. Liebell is the "life partner" of Dr. Carter, and upon information and belief, Dr. Liebell and Dr. Carter live together.



118.    McGrath's comment was full of falsehoods.  To the contrary, Dr. Manco did not

fail a single student in McGrath's section and the average GPA in her section was a 3.004, which

is a B average.  Additionally, only five out of the thirty students who registered for the course, not

half as McGrath stated, dropped the class, which was not an abnormal number due to the level of

skill required for non-math students and the time of day (9:30 am) that the course took place.

119. Further, McGrath's contention that Dr. Manco was "cruel" does not align with her

thoughts on his class when she was a student of his in the Spring of 2018, as demonstrated by a

March 8, 2018 email exchange between McGrath and Dr. Manco:



120. Additionally, Dr. Manco accomodated McGrath on numerous occasions where she

was unable to attend class throughout the semester:

Gregory Manco <gmanco@sju.edu>

## Re: Class 3/27 & 3/29
1 message

Gregory Manco <gmanco@sju.edu>
To: Corinne McGrath <cm616351@sju.edu>

Tue, Mar 27, 2018 at 11:09 AM

oooooooookay ..... have a great vacation!

GM

On Tue, Mar 27, 2018 at 11:07 AM, Corinne McGrath <cm616351@sju.edu> wrote:
Hi Prof. Manco,

I won't be in class this week (sorry for not emailing earlier) because I'm currently leaving on vacation. Thought I would be there this morning, but ended up having issues with a rental car I currently have.

Have a great week and lovely Easter!

--
**Corinne McGrath**
Christian Life Community Peer Minister
*Saint Joseph's University '18 - Actuarial Science*



Gregory Manco <gmanco@sju.edu>

## Re: Absence
1 message

Gregory Manco <gmanco@sju.edu>
To: Corinne McGrath <cm616351@sju.edu>

Thu, Mar 22, 2018 at 12:31 PM

Corinne, I believe you! I assigned 81,82,83 for homework. Take care and see you next week!

GM

On Thu, Mar 22, 2018 at 9:21 AM, Corinne McGrath <cm616351@sju.edu> wrote:
Hi Dr. Manco,

I won't be able to make it to class today because I couldn't get my car out of its parking spot due to the snow (and I don't have a shovel, which I probably should have bought by now). Promise I gave it quite the try, but there was just no saving it.

Have a great weekend!

Corinne

--
**Corinne McGrath**
Christian Life Community Peer Minister
*Saint Joseph's University '18 - Actuarial Science*



**SJU** SAINT JOSEPH'S UNIVERSITY

Gregory Manco <gmanco@sju.edu>

## Re: Tuesday

1 message

Corinne McGrath <cm616351@sju.edu>
To: Gregory Manco <gmanco@sju.edu>

Thu, Apr 19, 2018 at 3:27 PM

Sounds great! Thanks!

On Thu, Apr 19, 2018 at 3:23 PM, Gregory Manco <gmanco@sju.edu> wrote:
You're on time so you're good but please be reminded that you must be in class for the full duration. Got it? 😊

On Thu, Apr 19, 2018 at 3:22 PM Corinne McGrath <cm616351@sju.edu> wrote:
Figure I'm probably seeing this late, but I would like to take the quiz in the 8 AM class period.

Thanks,
Corinne

On Thu, Apr 19, 2018 at 12:23 PM, Gregory Manco <gmanco@sju.edu> wrote:
Okay .... um ... so there's apparently a demand for this unnamed guest speaker coming to campus ... and ... um .... this is tough ... (really biting my tongue now) .... but .... okay, okay, okay. I will make a limited amount of room for those of you who wish to get a good seat to hear this person .... ugh .... speak. There isn't enough room in which to squeeze both sections together into one, but I can grant this for, let's say, FIVE of you (first come, first serve ... you MUST email me to confirm, and I will take the first five who respond.) You will come to the entire 8:00 section, you can't just roll in for the quiz.

And if you miss out, you can still go to this thing, it's not like you get locked out of the building.

See ya

Dr. Manco

"Capitalism is not a system of the past; it is the system of the future - if mankind is to have a future."
- Ayn Rand

--
**Corinne McGrath**
Christian Life Community Peer Minister
*Saint Joseph's University '18 - Actuarial Science*

--
**Corinne McGrath**
Christian Life Community Peer Minister
*Saint Joseph's University '18 - Actuarial Science*

121.     The emails above demonstrate that the comments made by McGrath in response to the Philadelphia Inquirer's Facebook post were false and that Dr. Manco continues to suffer from the defendants' actions.

122.     Colbert, Loue, Carman, Fahey, McGrath and Dr. Liebell's statements were malicious, defamatory, and false.

123.     Colbert, Loue, Carman, Fahey, McGrath and Dr. Liebell knew their statements were false.

43

124.    The malicious, defamatory, and false statements can be understood and interpreted by a reasonable person to be assertions of fact, not opinion.

125.    By publishing the malicious, defamatory, and false statements, Dr. Manco was placed in a false light before the world-at-large, in a manner that would be highly offensive to a reasonable person and has caused serious damage to Dr. Manco's professional and personal reputations.

126.    Further, at an April 5, 2022 Pennsylvania Senate Public Hearing discussing two election campaign donation bills, an issue which clearly has nothing to do with Dr. Manco, State Senator Sharif Street ("Senator Street"), in his closing remarks, discussed testimony given at the hearing by an investigative reporter from Broad+Liberty and twice made reference to Dr. Manco without stating his name.  *See* Pennsylvania State Senate Public Hearing on SB 982 and HB 2044 (April 1, 2022),  *https://www.senatorargall.com/2022/04/01/sg-040522/*  (remarks by Senator Street at 1:18:50 to 1:20:20).

127.    Specifically, Senator Street stated that the Broad+Liberty reporter went on a radio show, "talking about and defending a St. Joe's professor and gave voice to him after he was terminated for making racist comments."

128.    In similar fashion, Senator Street stated that the Broad+Liberty reporter had written an article defending, "a professor fired for racism."

129.    These two statements made by a public official fifteen (15) months after this saga began again demonstrates how the defendants' actions have led to Dr. Manco's reputation being tarnished and has directly led to his inability to be hired by any university or college as a full-time math professor despite his credentials.

130.    Finally, on May 3, 2022, Dr. Manco was summoned to a Zoom meeting with Ms. Hargust and Dr. McConnell under the guise that they would be discussing certain issues pertaining to St. Joseph's policies related to student privacy and records.

131.    However, on May 2, 2022, before the meeting took place, Dr. Manco learned that he had been removed as the teacher for the summer course he was scheduled to teach, MAT 118:



132.    Dr. Manco learned of his removal from the summer course not from anyone at the University, but rather by viewing the online course schedule and then noticing that the class was removed from his Canvas page.

133.    On the May 3, 2022 Zoom meeting, Dr. Manco was informed by Dr. McConnell that not only was he being removed from teaching his summer course, but he was also being removed as professor from the two courses he was scheduled to teach in the fall semester due to his "violation of certain University policies" that were related to information contained in Plaintiff's initial Complaint.

134.    Specifically, St. Joseph's and Dr. McConnell alleged that Dr. Manco had violated FERPA[9] when including emails from the Defendant former students who spread false information about Dr. Manco in Plaintiff's operative Complaint

135.    St. Joseph's and Dr. McConnell allegations that this was "the most serious FERPA violation I have ever encountered" were false and defamatory.

---

[9] FERPA, which is codified under 20 U.S.C. § 1232g; 34 CFR Part 99, "protects the privacy of student education records. The law applies to all schools that receive funds under an applicable program of the U.S. Department of Education." U.S. Dept. of Educ., *Federal Educational Rights and Privacy Act (FERPA)* (Aug. 25, 2021), available at https://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html#skipnav2. Education records are defined as, "records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). With regards to whether emails are considered education records under FERPA, in *E.D. v. Colonial Sch. Dist.*, No. 09-4837, 2017 U.S. Dist. LEXIS 50173 (E.D. Pa. 2017), this Court relied on the Eastern District of California's holding in *S.A. v. Tulare Cty. Office Educ.*, No. 08-1215, 2009 WL 3126322 at *14 (E.D. Cal., Sept. 24, 2009), wherein the Court held "an email is an education record only if it *both* contains information related to the student *and* is maintained by the educational agency." *E.D.*, 2017 U.S. Dist. LEXIS 50173, at *28 (quoting *S.A.*, 2009 WL 3126322, at *14). The *E.D.* Court further relied on the Supreme Court's holding in *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426 (2002), where the court held that "the word 'maintain' suggests FERPA records will be kept in a filing cabinet in a records room at the school or on a permanent secure database." *E.D.*, 2017 U.S. Dist. LEXIS 50173, at *[28] (quoting *Owasso*, 534 U.S. at [433]). The *E.D.* Court further explained that emails "have a fleeting nature. An email may be sent, received, read, and deleted within moments." *Id.* at *28 (quoting *S.A.*, 2009 WL 3126322, at *19-20). The *E.D.* Court ultimately concluded that "[u]nless Defendant kept copies of e-mails related to [Plaintiff] as part of its record filing system with the intention of maintaining them, we cannot reach the conclusion that every email that mentions [Plaintiff] is a bona fide education record within the statutory definition." *Id.* at *28-29. Under St. Joseph's Email and Data Storage Policy, which applies to "all users of St. Joseph's University email . . . systems," and "define[s] expectations for the life cycle, availability and the removal of data," a graduated student's email account "remains active for one year after graduation before it is deactivated," and "the data is permanently purged one month later." *See* Saint Joseph's University, *Email and Data Storage Policy*, (May 24, 2021), https://sju.teamdynamix.com/TDClient/1942/Portal/Requests/ServiceDet?ID=49902 (Exhibit "C"). Thus, pursuant to its own internal policies, the information that St. Joseph's contends violated FERPA—specifically the emails exchanged between Dr. Manco and the named former student Defendants—are not in fact *bona fide* education records under *E.D.*: they are purged from St. Joseph's system thirteen (13) months after graduation and are therefore not kept with the intention of permanently maintaining student emails as part of their record filing system.

136.     As a result of his removal from the Fall 2022 schedule, Dr. Manco's relationship with St. Joseph's was terminated.

137.     St. Joseph's rationale for terminating their relationship with Dr. Manco was pretextual and was rather related to the investigation that they launched as a result of Ms. Colbert's initial complaint to St. Joseph's in January 2021 and the filing of Plaintiff's Complaint.

138.     Based on Dr. Carter's June 10, 2021 decision to not renew Dr. Manco's "Visiting Faculty annual contract," it is obvious that St. Joseph's wanted to remove Dr. Manco from the classroom at the end of the 2020-2021 academic year.

139.     The only reason that Dr. Manco was teaching at St. Joseph's during the 2021-2022 academic year was due to Dr. Smith's unilateral decision to bring him back as a part-time adjunct professor.

140.     Dr. Smith's unilateral decision was apparently not supported by St. Joseph's as demonstrated by the phone call that Dr. Manco had with Ms. Hargust in August 2021, where she told Dr. Manco that she was unaware that Dr. Smith had hired him as a part-time adjunct and that she no longer considered him to be an employee of the school.

141.     Thus, it is evident that St. Joseph's had been plotting to remove Dr. Manco from the classroom since Colbert's initial complaint, despite the external investigator exonerating him of any wrongdoing in May 2021.

142.     St. Joseph's and Dr. McConnell's decision to terminate Dr. Manco's employment was retaliatory and in violation of Dr. Manco's rights under Section 1981.

143.     As described above, St. Joseph's and the individual defendants knowingly participated in a plan to defame Dr. Manco, place him in a false light, and discriminate against him.

47

144.    This conspiracy between St. Joseph's and the individual defendants, with the exception of Ms. McGrath, is on-going, as demonstrated by St. Joseph's paying the legal fees for Defendants Colbert, Loue, Lopez and Fahey in an effort to chill their speech regarding the events surrounding this matter.

145.    In furtherance of the herein described improper conduct and conspiracy of Defendants, and St. Joseph's attempt to further conspire and control the narrative of certain co-defendants throughout the course of this litigation, St. Joseph's violated § IV and §V of the Saint Joseph's University Business Code of Conduct and Conflict of Interest Policy[10] by paying for the legal defense of certain co-defendants.

146.    Further, Colbert, Loue, Carman, Fahey, Lopez, and McGrath all intentionally interfered with Dr. Manco's employment contract with St. Joseph's by providing false and defamatory information to the school, and others, and/or publicly defaming him.

147.    As a direct and proximate result of the discriminatory conduct, the breach of contract, defamation, and tortious interference with a contract, Dr. Manco has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, tainted employer acceptability in seeking future employment, a diminution of his economic horizon, a loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time and all of which will continue into the future.

148.    The conduct of all defendants, as set forth above, was outrageous under the circumstances and warrants the imposition of punitive damages.

---

[10] A true and correct copy of the Business Code of Conduct and Conflict of Interest Policy is submitted hereto as Exhibit "D."

149.     Dr. Manco is now suffering, and will continue to suffer irreparable injury and monetary damages as a result of all defendants conduct unless and until the Court granted the relief requested herein.

## VI.   CAUSES OF ACTION

### COUNT I
#### Violation of Title VII (Against St. Joseph's)

150.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

151.     St. Joseph's violated Title VII by committing the above acts of discrimination because of Dr. Manco's race.

152.     St. Joseph's intentionally discriminated against Dr. Manco because of his race as set forth above.

153.     St. Joseph's acted with malice and/or reckless indifference toward the federally protected rights of Dr. Manco and its conduct warrants the imposition of punitive damages.

154.     As a direct and proximate result of St. Joseph's violation of Title VII, Dr. Manco has suffered the damages and losses set forth herein. Dr. Manco is now suffering and will continue to suffer irreparable injury and monetary damages as a result of St. Joseph's discriminatory acts unless and until this Court grants the relief requested herein.

155.     No previous application has been made for the relief requested herein.

### COUNT II
#### Violation of Section 1981 (Against St. Joseph's)

156.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

157.    By committing the foregoing acts of discrimination, and retaliation against Dr. Manco, on the basis of his race, St. Joseph's has violated Section 1981.

158.    Said violations were intentional and willful and warrant the imposition of punitive damages.

159.    As a direct and proximate result of St. Joseph's violation of Section 1981, Dr. Manco has suffered the damages and losses set forth herein.

160.    Dr. Manco is now suffering and will continue to suffer irreparable injury and monetary damages as a result of St. Joseph's discriminatory acts unless and until the Court grants the relief requested herein.

161.    No previous application has been made for the relief requested herein.

COUNT III
Violation of Pennsylvania Human Relations Act (Against St. Joseph's)

162.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

163.    St. Joseph's has violated the PHRA by committing the above acts of discrimination because of Dr. Manco's race.

164.    As a direct and proximate result of St. Joseph's violation of the PHRA, Dr. Manco has suffered the damages and losses set forth herein.

165.    Dr. Manco is now suffering and will continue to suffer irreparable injury and monetary damages as a result of St. Joseph's discriminatory acts unless and until this Court grants the relief requested herein.

166.    No previous application has been made for the relief requested herein.

COUNT IV
Violation of Philadelphia Fair Practices Ordinance (Against St. Joseph's)

167.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

168.     St. Joseph's has violated the PFPO by committing the above acts of discrimination because of Dr. Manco's race.

169.     St. Joseph's intentionally discriminated against Dr. Manco because of his race as set forth above.

170.     St. Joseph's acted with malice and/or reckless indifference toward the statutorily protected rights of Dr. Manco and its conduct warrants the imposition of punitive damages.

171.     As a direct and proximate result of St. Joseph's violation of the PFPO, Dr. Manco has suffered the damages and losses set forth herein.

172.     Dr. Manco is now suffering and will continue to suffer irreparable injury and monetary damages as a result of St. Joseph's discriminatory acts unless and until this Court grants the relief requested herein.

173.     No previous application has been made for the relief requested herein.

COUNT V
Retaliation Under Section 1981 (Against St. Joseph's and Dr. McConnell)

174.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

175.     On or about May 3, 2022, St. Joseph's and Dr. McConnell, again, retaliated against Dr. Manco in direct violation of his rights protected under Section 1981 as set forth above.

176.     Dr. Manco was acting under a reasonable, good faith belief that his right to be free from discrimination on the basis of his race was violated.

51

177.    Dr. Manco was subjected to a materially adverse action at the time, or after the protected conduct took place.

178.    There was a causal connection between St. Joseph's and Dr. McConnell's materially adverse actions and Dr. Manco's protected activity.

179.    As a direct and proximate result of St. Joseph's and Dr. McConnell's retaliation against Dr. Manco, he has suffered the damages and losses set forth herein.

180.    Dr. Manco is now suffering and will continue to suffer irreparable injury and monetary damages as a result of St. Joseph's and Dr. McConnell's retaliatory acts unless and until this Court grants the relief requested herein.

181.    No previous application has been made for the relief requested herein.

COUNT VI
Breach of Contract (Against St. Joseph's)

182.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

183.    At all times relevant hereto, a contractual relationship existed between St. Joseph's and Dr. Manco through, inter alia, St. Joseph's written policies and handbooks regarding discrimination complaints, investigations, and discipline of faculty members.

184.    As outlined above, St. Joseph's breached its agreements with Dr. Manco in relation to the Interim Policy.

185.    As a direct, proximate, and foreseeable consequence of St. Joseph's numerous material breaches, Dr. Manco has sustained significant damages including, but not limited to loss of his professorship, and as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, and other direct and consequential damages.

186.     Dr. Manco is entitled to recover damages for St. Joseph's breach of its contractual obligations and duties including specific performance of the contract.

COUNT VII
Negligence (Against St. Joseph's)

187.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

188.     In the event the Court were to find that no contracts exist between Dr. Manco and St. Joseph's, St. Joseph's owed duties of care to Dr. Manco independent of any contractual duties including, but not limited to an academic environment free of race discrimination where discrimination misconduct policies and procedures were fair and reasonable, including providing Dr. Manco with support through trained and non-biased administrators.

189.     Based on the aforementioned facts and circumstances, St. Joseph's has negligently, recklessly and intentionally breached its duties of care owed to Dr. Manco, the duties set forth herein and the duties it assumed.

190.     As a direct, proximate, and readily foreseeable consequence of St. Joseph's aforementioned conduct, Dr. Manco has sustained significant damages including, but not limited to monetary damages, emotional distress, and other direct and circumstantial damages.

COUNT VIII
Defamation (Against All Defendants)

191.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

192.     As outlined above, all defendants made public statements that were malicious, defamatory and false.

193.     Such statements were related to Dr. Manco and were intended to harm him.

194.     Defendants knew that the statements were false at the time they made them.

195.     As a result of defendants' malicious, defamatory and false statements, Dr. Manco has lost credibility within his community.

196.     Defendants defamed Dr. Manco and proximately caused injury to Dr. Manco's personal reputation, professional reputation and/or credibility as a person or otherwise.

197.     Specifically, the statements have caused Dr. Manco to suffer damages and harm including, but not limited to the following:

a. Loss of his personal and professional reputation;

b. Loss of business opportunities and potential and/or existing customers;

c. Limitations in future business prospects;

d. Being subjected to unwanted negative attention, negative public attention, and negative reviews;

e. Having dishonesty and immorality imputed to his personal and professional character;

f. Being subject to suggestions that he engages in unethical, or immoral business and/or personal practices; and

g. Emotional distress, embarrassment, mental anguish, and personal humiliation.

198.     The actions of defendants have damaged significant and long-lasting damage to the professional reputation to the reputation of Dr. Manco and virtually eliminated the possibility that he will ever again find an equivalent position in higher education in his chose field.

COUNT IX
False Light (Against All Defendants (except Dr. McConnell))

199.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

200.     Defendants' statements were false statements of fact, which Defendants' knew and/or recklessly disregarded, in impugning Dr. Manco, publicizing said statements to the public and placing Dr. Manco in a false light before the public.

201.     The false statements constitute false light invasion of privacy in that the same has subjected Dr. Manco to unreasonable and high objectional publicity by attributing his characteristics, conduct, practices, endorsements, or beliefs which are false, thereby placing Dr. Manco in a false light before the public.

202.     The false light in which Dr. Manco has been placed due to the publication of the false and defamatory statements would be highly offensive to a reasonable person.

203.     Defendants acted with actual knowledge of the false and defamatory nature of the statements.

204.     The false and defamatory tweets have placed Dr. Manco in a false light before the public in that, on its face, it reflects upon Dr. Manco's reputation and character in a manner that: 1) injures Dr. Manco's reputation and subjects Dr. Manco to public hatred, ridicule, shame, or disgrace; and 2) adversely affects Dr. Manco's trade, profession and/or business.

205.     In the alternative, the false and defamatory tweets have placed Dr. Manco in a false light before the public in that it is capable of being interpreted as reflecting upon Dr. Manco's reputation and/or character in a manner that: 1) injures Dr. Manco's reputation and/or exposes Dr. Manco to public hatred, ridicule, shame, or disgrace; and 2) adversely affects Dr. Manco's trade, profession and/or business.

206.     Defendants placed Dr. Manco in a false light before the public and proximately caused injury to Dr. Manco's personal reputation, professional reputation and/or credibility as a person or otherwise.

207.    Specifically, the statements have caused Dr. Manco to suffer damages and harm including, but not limited to the following:

a. Loss of his personal and professional reputation;

b. Loss of business opportunities and potential and/or existing customers;

c. Limitations in future business prospects;

d. Being subjected to unwanted negative attention, negative public attention, and negative reviews;

e. Having dishonesty and immorality imputed to his personal and professional character;

f. Being subject to suggestions that he engages in unethical, or immoral business and/or personal practices; and

g. Emotional distress, embarrassment, mental anguish, and personal humiliation.

## COUNT X
### Civil Conspiracy (Against All Defendants)

208.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

209.    The defendants, acting with a common purpose of overt acts, collusion and malice, unlawfully planned and acted together to sabotage and destroy Dr. Manco's reputation, employment, career, and to present him in a false light to interfere with his, then, and future employment as a way to retaliate against him in violation of Pennsylvania tort law.

210.    Defendants' actions caused injury to Dr. Manco's personal reputation, professional reputation, and/or credibility as a person or otherwise, and caused economic damages.

211.    Specifically, the statements have caused Dr. Manco to suffer damages and harm including, but not limited to the following:

a. Loss of his personal and professional reputation;

56

b. Loss of business opportunities and potential and/or existing customers;

c. Limitations in future business prospects;

d. Being subjected to unwanted negative attention, negative public attention, and negative reviews;

e. Having dishonesty and immorality imputed to his personal and professional character;

f. Being subject to suggestions that he engages in unethical, or immoral business and/or personal practices; and

g. Emotional distress, embarrassment, mental anguish, and personal humiliation.

COUNT XI
Tortious Interference with Contract (Against All Individual Defendants except McConnell)

212.     Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

213.     Dr. Manco had a contractual relationship with St. Joseph's.

214.     During the existence of the contractual relationship, Colbert, Loue, Carman, Liebell, Lopez, Fahey and McGrath engaged in activities, as described above, to have Dr. Manco suspended and his contract terminated.

215.     Colbert, Loue, Carman, Liebell, Lopez, Fahey and McGrath engaged in this activity with the specific intent to harm Dr. Manco's relationship with St. Joseph's.

216.     Colbert, Loue, Carman, Liebell, Lopez, Fahey and McGrath were neither privileged nor justified in acting in this manner.

217.     As a direct and proximate result of Colbert, Loue, Carman, Liebell, Lopez, Fahey and McGrath's actions, St. Joseph's suspended Dr. Manco and elected not to renew his contract.

COUNT XII

Intentional Infliction of Emotional Distress ("IIED") (Against All Defendants)

218.    Dr. Manco incorporates herein by reference the paragraphs set forth above as if set forth herein in their entirety.

219.    Plaintiff brings claim against all Defendants for IIED.

220.    All Defendants acted in be extreme and outrageous as set forth herein.

221.    All Defendants acted intentionally and/or recklessly as set forth herein.

222.    As direct and proximate cause of all Defendants' conduct, Dr. Manco suffered severe emotional distress, together with physical manifestations associated with severe emotional distress.

223.    By reason of the foregoing, and as a direct and proximate cause of Defendants' aforementioned conduct, Defendants intentionally and recklessly harassed and inflicted emotional injury on Plaintiff by subjecting him to outrageous treatment beyond all bounds of decency.

224.    As set forth above, Defendants individually and collectively verbally and mentally abused Plaintiff and treated him in a demeaning and inferior manner, which no reasonable person could be expected to endure.

225.    As a direct and proximate result of Defendants' malicious and conscious wrongful actions, Plaintiff has sustained severe emotional distress.

## V.    RELIEF

WHEREFORE, Dr. Manco respectfully requests that this Court enter judgment in his, and against defendants, jointly and severally:

a) declaring the acts and practices complained of herein to be in violation of Title VII;

b) declaring the acts and practices complained of herein to be in violation of the PHRA;

c) declaring the acts and practices complained of herein to be in violation of the PFPO;

58

d) enjoining and restraining permanently the violations alleged herein;

e) awarding damages to Dr. Manco for the past and future economic losses that he has

suffered;

f) awarding compensatory damages to Dr. Manco for past and future emotional upset,

mental anguish, humiliation, loss of life's pleasures, and pain and suffering;

g) awarding punitive damages to Dr. Manco;

h) awarding Dr. Manco the costs of this action, together with reasonable attorney's fees;

i) awarding delay damages and/or compensation for delay;

j) granting such other and further relief as this Court deems appropriate.

                               Respectfully submitted,

                               ZARWIN, BAUM, DeVITO,
                               KAPLAN, SCHAER & TODDY, P.C.

                               /s/ Joseph M. Toddy
                               JOSEPH M. TODDY, ESQ.
                               SCOTT ZLOTNICK, ESQ.
                               2005 Market Street, 16th Floor
                               Philadelphia, PA  19103
                               215.569.2800; Fax  215.569.1606
                               Attorneys for Plaintiff
                               jmtoddy@zarwin.com
                               szlotnick@zarwin.com

Dated:

EXHIBIT "A"

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Gregory Manco<br>51 Elmgate Road<br><br>Marlton, NJ 08053 | From: Philadelphia District Office<br>801 Market St ,Suite 1000<br>Philadelphia ,Pennsylvania ,19107 |
|---|---|

| EEOC Charge No.<br>530-2022-02345 | EEOC Representative<br><br>Legal Unit<br>Legal | Telephone No.<br>(267) 589-9707 |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

<div style="padding-left:2em">

Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

The EEOC is terminating its processing of this charge.

</div>

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Karen McDonough,
**Enforcement Manager**

**March 15, 2022**
*(Date Mailed)*

| cc: | Leslie Miller Greenspan<br>Partner<br>Tucker Law Group<br>Ten Penn Center 1801 Market Street, Suite 2500<br>Philadelphia, PA 19103 | Scott Zlotnik<br>Zarwin Baum DeVito Kaplan Schaer Toddy P.C.<br>2005 Market St, 16th Floor<br>Philadelphia, PA 19103 |
|---|---|---|

Enclosure with EEOC
Form 161-B (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS**   **--**   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS**   **--**   **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION**   **--**   **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE**   **--**   **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

# EXHIBIT "B"

Saint Joseph's University

# Interim Policy Prohibiting
# Discrimination, Harassment and Retaliation

If you believe you are the victim of Sexual Misconduct, please immediately go to Section III of this document for resources and reporting information.

A comprehensive listing of on-campus and off-campus resources can be found at https://sites.sju.edu/support/resources/.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

Saint Joseph's University

| TABLE OF CONTENTS | *page* |
|---|---|

| | | |
|---|---|---|
| **I.** | **Preface** | 3 |
| **II.** | **Purpose** | 3 |
| **III.** | **Interaction of This Policy with the University's Interim Title IX Grievance Policy and Interim Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking** | 4 |
| **IV.** | **Definitions** | 4 |
| | A.  Protected Category(ies) | 4 |
| | B.  Discrimination | 5 |
| | C.  Harassment | 5 |
| | D.  Sexual Harassment | 5 |
| | E.  Retaliation | 6 |
| | F.  Complainant | 6 |
| | G.  Respondent | 6 |
| | H.  Examples of Conduct That Can Constitute Discrimination or Harassment | 6 |
| **V.** | **Consensual Romantic and/or Sexual Relationships** | 6 |
| **VI.** | **Academic Freedom** | 7 |
| **VII.** | **Processing Discrimination, Harassment and Retaliation Reports and Complaints** | 7 |
| | A.  General Provisions | 7 |
| | B.  Where to Report Alleged Discrimination, Harassment or Retaliation | 9 |
| | C.  Who May Serve as a Consultant | 10 |
| **VIII.** | **Procedures** | 11 |
| | A.  Consulting Procedure | 11 |
| | B.  Mediation Procedure | 12 |
| | C.  Complaint Procedure | 13 |
| **IX.** | **Interim Measures** | 18 |
| **X.** | **Good Faith Complaints** | 19 |
| **XI.** | **Other Rights and Responsibilities** | 20 |
| **XII.** | **Education** | 20 |
| **XIII.** | **Records** | 22 |
| **XIV.** | **Revisions** | 22 |

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

## I.      Preface

In keeping with Saint Joseph's University's ("Saint Joseph's" or "University") mission as a Catholic, Jesuit University and a formal and informal community of faith, we must hold ourselves to a high standard of respect and fairness in our personal conduct and interactions. As such a community, we espouse that each individual is entitled to certain basic protections. These protections include, but are not limited to:

- Freedom from unlawful Discrimination, Harassment, and Retaliation of any type.

- Freedom to be heard without fear of reprisal.

- The expectation of confidentiality to the extent that is possible.

- The assurance of a prompt and equitable investigation and resolution of all allegations of Discrimination, Harassment or Retaliation.

- For non-student respondents only: During a formal process, the opportunity of the Respondent and Complainant to be presented with all relevant information in a timely manner, and to respond.

At the same time, the University is committed to the principles of academic freedom. Vigorous discussion and debate, even of controversial matters, are an integral part of the educational enterprise.

## II.     Purpose

As a Catholic, Jesuit University, Saint Joseph's is committed to the just and respectful treatment of students, faculty, and staff. To this end, Saint Joseph's prohibits unlawful discrimination against, and harassment of, its employees, students, or applicants for employment or admission on the basis of any characteristic protected by state or federal law. The prohibition extends to discrimination, harassment and retaliation by third parties visiting campus or participating in University-sponsored activities.

The University's *Interim Policy Prohibiting Discrimination, Harassment and Retaliation* ("Policy") is designed to educate members of the University community about discrimination, harassment and retaliation and provide clear procedures when a violation of this Policy occurs. It is the University's hope that through continued education, and appropriate action upon receipt of reports and complaints of conduct that may be a violation of the Policy, the University can eliminate discrimination, harassment and retaliation within the Saint Joseph's community.

This Policy applies to alleged conduct by Saint Joseph's University students, faculty, staff (union and non-union employees), volunteers, administrators, independent contractors, Trustees or third parties ("Covered Individuals").

**III.** **Interaction of This Policy with the University's Interim Title IX Grievance Policy and Interim Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking**

The University has an Interim Title IX Grievance Policy, which addresses supportive measures, formal complaints, investigations, hearings and appeals for matters involving Title IX sexual harassment. As stated in the Interim Title IX Grievance Policy, that policy also applies to sexual harassment as defined in this Policy.

***Therefore, please refer to the Interim Title IX Grievance Policy for information on filing a formal complaint, investigations, hearings and appeals for all matters involving sexual harassment as defined in this Policy.***

The University also has an Interim Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking (the "Sexual Misconduct Policy"). The Sexual Misconduct Policy can be found by clicking on the policy title above. ***Most complaints or matters that would typically fall under the Sexual Misconduct Policy, or that would typically fall under both this Policy and the Sexual Misconduct Policy, are now covered by the Interim Title IX Grievance Policy.*** However, if for any reason a complaint or matter is not covered by the Interim Title IX Grievance Policy, and if particular conduct by a Covered Individual would be prohibited by both the Sexual Misconduct Policy and this Policy, then the Sexual Misconduct Policy controls for all Covered Individuals, with one exception. Sexual Harassment (as defined below) falls into conduct prohibited by both this Policy and the Sexual Misconduct Policy.

For incidents of alleged sexual harassment, the Sexual Misconduct Policy's protections and procedures with regard to on- and off-campus reporting resources, information on medical and psychological resources, and the availability of interim and remedial measures shall apply.

The grievance process forconduct prohibited by this Policy which does not include an allegation of sexual harassmentis as follows:

> 1. *For student Respondents:* Any discipline/resolution of such conduct is controlled by the Community Standards process (see Student Handbook at www.sju.edu/studenthandbook).
>
> 2. *For non-student Respondents:* Any discipline/resolution of such conduct is controlled by Sections VII-IX of this Policy.

**IV.** **Definitions**

> A. **Protected Category(ies):** The law prohibits Discrimination and Harassment on the basis of sex/gender, race, age, color, religion, national origin, ethnic origin, sexual orientation, gender identity, disability, genetic information, marital status, and military and military veteran status. These are Protected Categories under the law.

Saint Joseph's University

**B.**   **Discrimination:** Any unlawful distinction, preference, or detriment to an individual as compared to others in the terms or conditions of his or her employment or education on the basis of his or her Protected Category status. To request a reasonable accommodation for a disability(ies), students should contact Office of Student Disabilities Services (Dr. Christine Mecke) at 610-660-1774 and non-students should contact the EEO Officer (Zenobia Hargust) at 610-660-3336.

**C.**   **Harassment:** Verbal, written, visual, or physical conduct directed toward an individual due to that individual's Protected Category status that has the purpose or effect of unreasonably interfering with the individual's work or academic performance, or otherwise creating an intimidating, hostile, or offensive working or learning environment.[1]

**D.**   **Sexual Harassment:** Unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic, or physical conduct of a sexual nature, when: (1) submission to or rejection of such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement (quid pro quo); or (2) such conduct creates a hostile environment (defined below). This Policy shall not be construed or applied to restrict academic freedom at the University, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful.

*Unwelcome verbal or physical conduct of a sexual nature creates a Hostile Environment* when it (a) is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or creates a hostile or abusive educational environment, or (b) explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive environment. In determining whether harassment has created a hostile environment, consideration will be made not only as to whether the conduct was unwelcome to the person who feels harassed, but also whether a reasonable person in a similar situation would have perceived the conduct as objectively offensive.

Individuals who experience unwelcome conduct of a sexual nature that they reasonably perceive to be harassing, but may or may not meet the Sexual Harassment definition outlined in this Policy, are encouraged to report the behaviors so that the University can take proactive steps to prevent the behaviors from continuing and perhaps escalating and to protect or otherwise assist the Complainant(s).

---

[1]      This Policy shall not be construed or applied to restrict academic freedom at the University, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

E.   **Retaliation:** Any act(s) or attempted act(s) to seek retribution against anyone who has reported an alleged violation of this Policy or against anyone who has participated in an investigation or related proceeding under this Policy. Prohibited retaliatory acts include, but are not limited to, intimidation, threats, coercion, or discrimination.

F.   **Complainant**: The person alleged to have been subjected to conduct in violation of this Policy.

G.   **Respondent**: An individual accused of conduct that might be a violation of this Policy.

H.   **Examples of Conduct That Can Constitute Discrimination or Harassment**

   1.   Examples of discriminatory conduct include decisions based on stereotypes or assumptions about the abilities, traits, or performance of individuals because of their Protected Category status listed in Section IV. A, above.

   2.   Conduct that can constitute Harassment includes, but is not limited to:

      a.   Epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to the Protected Categories,

      b.   Placing on walls, bulletin boards, email, or elsewhere on the University's premises graphic material that shows hostility or aversion to an individual or group that relate to the Protected Categories,

      c.   Sexually explicit, graphic, abusive, degrading, intimidating, or offensive jokes, comments, remarks or gestures;

      d.   Sexual advances, propositions, flirtations, requests or pressure of any kind for sexual favors;

      e.   Physical contact or intimidation.

**V.   Consensual Romantic and/or Sexual Relationships**

Romantic/sexual relationships between employees (including faculty and athletic staff) and students with whom they also have an academic, supervisory or evaluative relationship, or between an employee and his or her subordinate, are fraught with the potential for exploitation and may compromise the University's ability to enforce its policy against sexual harassment. Employees must be mindful that the authority that they exercise in their interactions with students and subordinates may affect the decision of a student or a subordinate to enter into or end a romantic or sexual relationship. Even when both parties have initially consented, the development of a sexual relationship renders both the employee and the institution vulnerable to possible later allegations of sexual harassment, in light of the significant power differential that exists between faculty members and students, athletic staff members and student athletes, or supervisors and

subordinates. Such relationships can also become the basis for a complaint of harassment or discrimination by a colleague who is adversely affected by them.

As a result, the University prohibits all faculty and staff from engaging in or pursuing romantic/sexual relationships with students whom they are currently supervising, teaching, advising, or providing services to. Moreover, anyone involved in such a relationship with someone – other than a student -- over whom they have supervisory power must recuse themself from decisions that affect the compensation, evaluation, employment conditions, instruction and/or academic status of the subordinate involved. Such relationships should be reported to both persons' immediate supervisors in a timely fashion.

## VI.    Academic Freedom

The American Association of University Professors Joint Statement on the Freedoms and Rights of Students (1967, revised in 1990, 91, and 92) articulates that: "The freedom to learn depends upon appropriate opportunities and conditions in the classroom, on the campus, and in the larger community. The responsibility to secure and to respect general conditions conducive to the freedom to learn is shared by all members of the academic community." Saint Joseph's strongly supports and protects the principle of academic freedom. All members of the University community have a right to use the academic forum, provided by the University, to discuss controversial subjects and to express ideas that some or most of the members of the community strongly oppose. Harassment is not about voicing unpopular ideas. It is one form of intimidation.

In its 1940 Statement on Tenure AAUP states that "Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning". In an instructional context, wide latitude is required for professional judgment in determining appropriate content and presentation of academic material, provided this material is germane to the subject matter of the course.  In its policy statement on sexual harassment, the AAUP further states: "Intimidation and harassment are inconsistent with the maintenance of academic freedom on campus. This statement is no less germane if one is being made unwelcome because of sex, rather than unwelcome because of race, religion, politics, or professional interests." *Academe*, September-October 1990, pp. 42-43.

## VII.    Processing Discrimination, Harassment and Retaliation Reports and Complaints

### A.    General Provisions

1.    The procedures set forth below are internal administrative procedures of the University. As to those forms of Discrimination or Harassment that also violate state or federal law, an aggrieved party may also file a complaint with the appropriate local, state, or federal agency, and in a court with jurisdiction. Both the Complainant and the Respondent may have an advisor from the Saint Joseph's University community, who is not a family member

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

or attorney[2], accompany  them during any of the procedures in this section. The advisor acts in a support role only, and not as an advocate or spokesperson. The advisor has the same obligations of confidentiality as all other participants in the proceedings.

2.      Reports and complaints of Discrimination and Harassment should be made as soon as possible after the incident(s) occurs. All reports and complaints will be investigated promptly and appropriate action will be taken as expeditiously as possible under the circumstances presented. The University will respect the privacy of the Complainant, the Respondent, and the witnesses, if any, in a manner consistent with the University's obligations (legal or under this Policy) to investigate the matter, protect the individuals involved, take appropriate remedial action, and comply with any discovery or disclosure obligations required by law. This means that, although confidentiality will be respected, it cannot be guaranteed.

3.      The University may investigate a report or complaint of Discrimination or Harassment regardless of whether the Complainant desires the University to pursue the report or complaint, if the University has cause to believe that the action reported or complained of constitutes a violation of this Policy, breach of applicable law or a threat to the University community.

4.      All students and employees should report any Discrimination or Harassment, experienced by themselves or another, to the appropriate University officer described in Section VII. B below. No student or employee should assume that the University already knows about a particular situation or event.

5.      **Non-Retaliation Statement:** The University prohibits Retaliation against any individual who complains of a violation of this Policy or assists in providing information about a complaint of a violation of this Policy. Anyone who believes they have been retaliated against for participating in this process in any capacity should report the matter promptly. Reports and complaints of Retaliation will be investigated and dealt with as any other report and complaint brought under this Policy.

---

[2]      The advisor may be someone who holds a J.D., so long as the person holding the J.D. is not then engaged in the active practice of law *and* discloses and affirms these circumstances to the Intake Officer *prior to* attending any meetings in this capacity with the advisee party.

**B.      Where to Report Alleged Discrimination, Harassment or Retaliation**

1.      Reports of Discrimination, Harassment or Retaliation should be made to the Intake Officer identified below:

a.      **Student Respondents**: Complaints of Discrimination, Harassment or Retaliation where the Respondent is a student shall be reported to the following individuals:

> **Nicole R. Stokes, Ph.D.**
> Associate Provost for Diversity, Equity & Inclusion
> University Professor
> Saint Thomas Hall
> 5600 City Avenue
> Philadelphia, PA  19131
> nstokes@sju.edu | 610-660-1209

> **Lexi Morrison**
> Director of Title IX & Equity Compliance
> Title IX Coordinator
> Campion Student Center, Room 243E
> 5600 City Avenue
> Philadelphia, PA  19131
> titleix@sju.edu | 610-660-1145

> **Thomas Sheibley**
> Deputy Title IX Coordinator
> Director of Campus Ministry
> Wolfington Hall
> 5600 City Avenue
> Philadelphia, PA  19131
> tsheible@sju.edu | 610-660-3125

> **Renie Shields**
> Deputy Title IX Coordinator
> Senior Associate Athletic Director for Student Experience
> Barry Hall
> 5600 City Avenue
> Philadelphia, PA  19131
> shields@sju.edu | 610-660-2584

b.      **Staff and Administrator Respondents**: Complaints of Discrimination, Harassment or Retaliation where the Respondent is a staff member or administrator, shall be reported to the Director of Employee Relations & Engagement (Taba Pickard; 610-660-3313; tpickard@sju.edu; titleix@sju.edu; 215 City Avenue).

    c.   **Faculty Respondents**: Complaints of Discrimination, Harassment or Retaliation where the Respondent is a faculty member shall be reported to the Director of Employee Relations & Engagement (Taba Pickard; 610-660-3313; tpickard@sju.edu; titleix@sju.edu; 215 City Avenue).

    d.   **Independent Contractors, Volunteers, Trustees and Visitors Respondents:** Complaints of Discrimination, Harassment or Retaliation where the Respondent is an independent contractor, volunteer, trustee and visitor[3] shall be reported to the Director of Employee Relations & Engagement (Taba Pickard; 610-660-3313; tpickard@sju.edu; titleix@sju.edu; 215 City Avenue).

    2.   In the event that the Complainant does not wish to report incidents or concerns to the designated Intake Officer, they may report to another Intake Officer listed above, or their designee.

**C.**    **Who May Serve as a Consultant**

The following individual will serve as a consultant (i.e., a person who can explain options to the complainant without it becoming a formal complaint) during the Procedures set forth in Section VIII:

    1.   With regard to reporting, where the Complainant or Respondent are faculty, staff members, and/or administrators, the Title IX Coordinator, or their designee will serve as a consultant during the Procedures outlined in Section V. The Intake Officer and the consultant can be the same individual. When the complaint meets the definition of prohibited behaviors under this Policy, the complainant has the choice to not file a formal complaint and instead choose to seek consultation and mediation.

---

*Notice for Student Respondents:* Where the Respondent is a student (regardless of the Complainant's status) for complaints not involving Sexual Harassment or otherwise falling under the Interim Title IX Grievance Policy, an alleged violation of this Policy shall be resolved under the Community Standards process along with any other alleged violations of the Community Standards in connection with the incident(s). This includes the Community Standards appeal process.

---

[3]    A visitor, or non-University affiliated individual, may not use the University process to pursue a complaint against a University-affiliated Respondent.

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

## VIII.   Procedures

The below-described procedures may be followed in sequence, if the content of the complaint makes it appropriate for consultation or mediation and if the Complainant so requests. Alternatively, a complaint may be filed immediately, without prior consultation or attempt at mediation. In the case of a sufficiently serious allegation, in the judgment of the Intake Officer, immediate filing will take place independent of the wishes of the Complainant. Interim Measures are also noted below in Section IX. For Sexual Harassment (not Discrimination), Supportive Measures or Interim Measures are found in the Interim Title IX Grievance Policy or Interim Sexual Misconduct Policy, as applicable.

### A.        Consulting Procedure

Members of the Saint Joseph's community who wish to discuss questions or concerns about conduct that may be in violation of this Policy may contact the Intake Officer identified in Section VII.B.1, above. The Intake Officer, or their designee, shall provide information to the inquirer concerning available support services and how the process works, including the possibility of initiating a mediation procedure if appropriate.

1. Once a complaint is filed (Section VIII.C), the Intake Officer is required to initiate an investigation. The scope and extent of the investigation will depend on the severity of the conduct complained of.

2. If requested by the Complainant, and judged appropriate under the circumstances, the Intake Officer or their designee, serving as a consultant, will assist in attempting to resolve the complaint informally. Such assistance may involve, for example, assisting the Complainant in writing a letter to that person asking that the conduct experienced by the Complainant as discriminatory or harassing cease immediately. Alternatively, the Complainant may ask the consultant to meet with the Respondent, or explore other possible resolutions. Any resolution must be acceptable to all parties involved in the matter including the University.

3. During the consulting procedure, all reasonable efforts will be made to ensure the confidentiality of information received, to the extent permitted by law, including the identities of the parties. **For allegations of Sexual Harassment, the University's procedure for addressing requests for confidentiality is outlined in the Interim Title IX Grievance Policy.** For all other allegations:

   a. The identity of the Complainant will be disclosed to the Respondent during the consulting procedure only if the Complainant gives permission.

   b. If, due to the circumstances of the alleged Discrimination or Harassment, it is not possible to resolve the complaint and yet maintain confidentiality, the Complainant will be informed and be

given the options of proceeding (with disclosure of identity) or withdrawing from the consulting process. However, the University may still proceed with the investigation.

    c.    The determination about proceeding with an investigation is made by the Intake Officer, independent of the wishes of the Complainant, based on the nature of the conduct alleged. If the alleged conduct involves Sexual Assault, Sexual Exploitation, Dating Violence, Domestic Violence, and Stalking, then the University will pursue the matter based on the [Interim Title IX Grievance Policy](#).

4.    When the consultant is not the Intake Officer but their designee, the consultant is required to report the conduct to the Intake Officer, if the conduct poses a threat to the University community. If the matter is so reported, the consultant will notify the Complainant and the Respondent of the nature of the report.

**B.    Mediation Procedure**

1.    The Complainant may request mediation. The Intake Officer or their designee shall review the request to ensure that mediation is a proper resolution device under the circumstances and will not cause delays in resolving the issue.

2.    The Intake Officer will designate the person who is to serve as mediator. Care should be taken that the mediator role not be compromised by existing relationships between the mediator and either of the parties and the mediator be trained in this role and its responsibilities. The Respondent and Complainant may object to a mediator in writing at least 48 hours before the mediation.

3.    If the Respondent agrees to participate in mediation, the mediator will contact each party for a pre-mediation meeting. These meetings are confidential and are designed to help clear the way for communication and resolution during mediation. Each party will be advised on the mediation process.

4.    Mediation will be conducted in a neutral location. Each party and the mediator will discuss options and methods of resolution.

5.    If the parties reach a settlement, then the mediator will write a Resolution Agreement, which both parties shall sign. Even when mediation has been successful, however, the University may still have an obligation to investigate and in cases involving a student Complainant, the Title IX Coordinator will be apprised of the outcome.

6.    If the parties cannot reach an agreement, or one or both parties refuse to sign the Resolution Agreement, then the Complainant can file a written

complaint, as outlined below. However, failure to file a written complaint does not relieve the University of its obligation to investigate.

**C.      Complaint Procedure**

1.      **Filing a Complaint**

Any individual who believes that they have, or know someone who has, experienced conduct that may be a violation under this Policy can make a complaint with the appropriate Intake Officer at any time, or following the consultation and/or mediation process; but only members of the University community or the University itself may serve as the Complainant in any University conduct process under this Policy. The complaint should be in writing, but if the Complainant is unable or unwilling to submit a complaint in writing, then the Intake Officer shall prepare a report summarizing the Complainant's allegations. The failure of the Complainant to put the complaint in writing does not relieve the University of its obligation to act in accordance with legal/policy requirements in response to the information provided by the Complainant.

The Intake Officer shall promptly forward the written complaint or summary report of the Intake Officer to an appropriate Investigator. A person is not required to utilize the consultation or mediation procedure before filing a formal complaint.

2.      **Contents of the Complaint**

The complaint shall include the name of the Complainant, the name of the Respondent, a statement of alleged conduct (including dates, and the nature of the conduct), and the names of witnesses, if any. Copies of supporting materials, if any, shall be attached to the complaint

3.      **Delivery of the Complaint and Response**

The Intake Officer will inform the Respondent that a complaint under this Policy has been filed against them. Absent other considerations, within five (5) business days of the filing of the complaint, the Investigator shall allow the Respondent to see the written complaint. If the Complainant declines to put the complaint in writing, the Investigator will prepare a summary and shall allow the Complainant and the Respondent to see the written summary.

a.      The Respondent shall have an opportunity to respond to the complaint/summary in writing; such response must be submitted within five (5) business days of delivery. If the Respondent waives their right to respond in writing, the Respondent shall be asked to sign a statement acknowledging that they declined to provide a written response. The Complainant shall have the opportunity to see the Respondent's response to the alleged conduct, or to be notified if no response is provided.

b.     The Complainant shall have an opportunity to respond to the summary in writing; such response must be submitted within five (5) business days of delivery. If the Complainant waives their right to respond in writing, the Complainant shall be asked to sign a statement acknowledging that they declined to provide a written response. The Respondent shall have the opportunity to see the Complainant's response to the summary, or to be notified if no response is provided.

c.     In no event will names of witnesses identified by either party be shared in the Investigation Report prepared by the Investigator (see Section VIII.C.5.).

4.    **Investigation**

a.     Absent extraordinary circumstances (to be determined by the Intake Officer), the Investigator shall be chosen from a pool of three (3) individuals from the University community, who are recommended by the Executive Committee of University Council and appointed by the President for staggered terms of three (3) years. Each investigator shall be professionally trained to conduct investigations, and their objectivity should not be compromised by a previously-existing relationship with either the Complainant or the Respondent. The Intake Officer may also delegate the investigatory duties to a qualified external investigator if they determine that it is in the best interests of the parties and the University to do so. In coming to this decision, the Intake Officer may consult the University's Office of the General Counsel or other appropriate resources within the University.

b.     The Investigator shall promptly conduct an investigation of the complaint. The investigation shall include interviews with the parties and witnesses, and review of any relevant documents or other evidence. In most cases, the investigation shall be complete within sixty (60) days of receipt by the Investigator of the complaint. The Investigator may delegate any part of the investigation to an agent with specific expertise (e.g. Office of Public Safety). All who participate in conducting an investigation are obliged to keep confidential what they learn in the process, consistent with applicable legal requirements.

c.     The investigation shall address facts and issues relating to the complaint, which may include, but are not limited to:

i.     The type of conduct complained of

ii.    The frequency of the conduct

      iii.     The date and location of the conduct

      iv.     The factual circumstances

      v.     The relationship between the parties

      vi.     The effect of the Respondent's conduct on the Complainant

      vii.     The awareness of the Respondent of the Complainant's concerns

      viii.     The awareness of the supervisor of the Complainant's concern

      ix.     The identity of witnesses

      x.     The statement of witnesses

      xi.     Prior steps taken to resolve the issue

      xii.     Additional resources available to resolve the issue

    d.     During the investigation, every reasonable effort shall be made to protect the privacy rights of all parties; however confidentiality cannot be guaranteed.

5.    **Investigation Report**

    a.     Upon completion of the investigation, the Investigator shall report in writing to the Title IX Coordinator who shall share the outcome of the investigation with the Provost when the Respondent is a member of the faculty and with the Chief Human Resources Officer when the Respondent is a member of the staff, administrator, independent contractor, volunteer, trustee or visitor.

    b.     The report shall address the facts and issues that were investigated under section (4)(c), above.

    c.     The report shall include an outcome (see 6(a) below).

    d.     The Complainant and the Respondent shall have the opportunity to view a copy of a summary of the investigation, with information redacted in compliance with FERPA and other legal considerations regarding privacy. This summary shall include the following: date of report, parties, witnesses, dates of investigation, summary of allegations, policy involved, determination of credibility, findings of fact, conclusions, and name of investigator.

6.      **Outcomes and Recommendations**

    a.      The outcomes of the investigation are:

        i.      a finding that it is more likely than not that the alleged violation occurred;

        ii.     a finding that it is more likely than not that a violation did not occur;

        iii.    a determination, one way or the other, could not be made.

    b.      If other conduct that might be a violation of other University policies is discovered or identified during the course of the investigation, this conduct must be reported to the appropriate University official and shall be subject to a separate process.

7.      **Sanctions:**

    a.      If the Investigator has concluded, based on findings of fact and a determination of credibility, that a violation of this Policy has occurred, sanctions may be imposed by the following University administrator (depending on the status of the Respondent):

        i.      ***Faculty Respondents:*** The Provost.

        ii.     ***Staff, Administrator, Volunteer, or Independent Contractor Respondents:*** The Chief Human Resources Officer, in consultation with Divisional Vice President or Dean.

    b.      Sanctions include corrective and/or disciplinary action.

    c.      Corrective action may include:

        i.      an order to avoid future contact with the Complainant

        ii.     a requirement for an apology

        iii.    a transfer (e.g., to another department, class, office, residence)

        iv.     participation in counseling and/or training

    d.      Disciplinary action may include:

        i.      written reprimand

        ii.     suspension

       iii.      termination, discharge or dismissal from the University.

    e.      The sanctions shall be communicated to the Respondent; any sanctions that impact the Complainant shall also be communicated to the Complainant.

8.    **Appeal**

    a.      Following the outcome of an investigation, the Respondent may appeal the outcome within five (5) business days of receipt of the outcome. Likewise the Complainant may appeal the outcome within five (5) business days of receipt.

    b.      Such appeal should be delivered via email to titleixappeals@sju.edu to the Title IX Coordinator and state the grounds and the facts supporting the grounds for such appeal.

    c.      Grounds for appeal are limited to:

       i.      Material procedural error that could have significantly impacted the outcome of case, or bias in the process or failure to disclose conflict of interest. Bias in the process is not a disagreement with the outcome of the investigation or the findings of the investigator.

       ii.      The existence of previously unavailable or unknown relevant evidence that could have significantly impacted the outcome of the case.

       iii.      The Title IX Coordinator, Deputy Title IX Coordinator, and/or Investigator(s) had a conflict of interest or bias for or against an individual party, or for or against Complainants or Respondents in general, that affected the outcome of the matter.

    d.      The appellant(s) shall bear the burden of establishing one or more of these grounds for appeal. Appeals and responses must be prepared by and submitted by the parties involved (the Complainant and/or the Respondent). Third parties may not submit an appeal or response on behalf of a party involved. Appeals submitted for other reasons or past the five (5) business days shall not be considered.

    e.      Appeals shall be considered by a panel of trained appeal board members). Panelists shall be drawn from membership of the *Title IX Grievance Process Appeal Board*, as reflected in the Interim Title IX Grievance Policy.

i.    The Respondent and Complainant shall be informed of the three (3) panel members in advance of the appeal to allow for objection to a member of the appeals panel in writing at least 48 hours before the scheduled consideration of the appeal.

ii.    Absent other considerations, the appeal panel shall make a decision within five (5) business days after the appeal period expires. The appeal panel may 1) recommend the sanction be changed or 2) remand the case for further investigation. If the appeals panel finds no merit to the appeal, the decision of the original investigation and sanction shall stand.

iii.    During the appeal process, the sanctions are in effect.

iv.    Absent a remand for further investigation the outcome of the appeal process under this Policy is final. In the case of faculty, if after the appeal under this Policy is concluded, the sanction remains termination, discharge or dismissal from the University, the party to be terminated, discharged or dismissed shall have the right to follow procedures regarding separation from the University as provided in the Faculty Handbook [Separation and Appeals Procedures].

## IX.    Interim Measures

The following procedures for Interim Measures apply to all prohibited behaviors defined in this Policy, except for Sexual Harassment. **Procedures for Interim Measures for Sexual Harassment are found under the [Interim Title IX Grievance Policy](.)**.

A.    The Complainant or the Intake Officer may request interim measures from the appropriate University official who must have authority to impose the interim measure.

i.    ***Faculty Respondents:*** The Provost.

ii.    ***Staff, Administrator, Volunteer, Independent Contractor or Visitor:*** The Chief Human Resources Officer, in consultation with Divisional Vice President or Dean.

B.    If the University official believes that interim measures are necessary, either for the sake of the Complainant or other parties, then the University official may impose the least restrictive action that will both protect the Complainant (or others) and preserve the interests of the Respondent given the circumstances presented.

C.    The University will impose interim measures immediately if the safety and security of either party or other members of the University community is threatened or when the ability of the complaining student, employee or others to participate and/or

perform effectively in their respective University environments requires it. In these situations, the University official shall offer to meet with the parties within three (3) business days of the imposition of interim measures. In this case, the purpose of the meeting is not to determine responsibility of the parties, but to determine whether the interim measures should continue based on the nature of the allegations. In other situations, where interim measures have not immediately been imposed, but where some form of interim measures may need to be considered pending the outcome of the investigation, the University official shall offer to meet with the parties and/or other persons who may have relevant information prior to imposing interim measures. The purpose of this meeting is not to determine responsibility of the parties but to determine whether interim measures should be imposed based on the nature of the allegations and other pertinent information.

D.      The University official may meet with the parties separately, or meet with them together, but in no event will either party be required to be present for the meeting with the other party without the full and informed consent of both parties to do so.

E.      Examples of measures that interim measures may include:

     1.      Transfer out of a class or work assignment

     2.      Suspension (full or partial)

     3.      An order to avoid or restrict contact

     4.      Change in Housing

     5.      Administrative leave with or without pay

F.      The University is also obliged to take effective corrective action promptly, when it appears that a Hostile Environment has been created by some form of Discrimination or Harassment. This corrective action may include changes to University policies and/or services.

## X.      Good Faith Complaints

Complaints made in good faith under this Policy will not result in any adverse action against the Complainant. No other person who participates in a good faith investigation will be treated adversely because of that participation.

However, if an investigation results in a finding that the Complainant knowingly accused another falsely of Discrimination, Harassment or Retaliation, then the Complainant will be subject to appropriate sanctions, which may include termination of employment or, in the case of students, permanent separation from the University.

## XI.     Other Rights and Responsibilities

This Policy shall not be deemed to take away any rights or responsibilities of faculty members under the Faculty Handbook, administrators and professionals under the Administrators and Professionals Handbook, staff members under the Staff Handbook, students under the Student Handbook, and union members under their collective bargaining agreements.

## XII.    Education

This Policy reflects the University's commitment to educate all of the members of the University community about the nature of discrimination, harassment and retaliation, their impact on individuals and the University as a whole, the steps necessary to address it, and the protections available to all involved: Complainant, Respondent and others. Such education is essential to establishing and maintaining a campus environment in which the dignity of all persons is respected.  It is the responsibility of every employee and student to become informed about these matters by participating in required educational sessions.

The University's Title IX Coordinator and Deputy Title IX Coordinators are responsible for providing appropriate education for employees (faculty, administrators and staff) and students.

Contact Information for the Title IX Coordinator:

**Lexi Morrison**
Director of Title IX & Equity Compliance
Title IX Coordinator
Campion Student Center, Room 243E
5600 City Avenue
Philadelphia, PA  19131
titleix@sju.edu | 610-660-1145

Contact Information for the Deputy Title IX Coordinators:

**Taba Pickard**
Deputy Title IX Coordinator
Director, Employee Relations and Engagement
215 City Avenue
Philadelphia, PA  19131
tpickard@sju.edu | 610-660-3313

**Thomas Sheibley**
Deputy Title IX Coordinator
Director of Campus Ministry
Wolfington Hall
5600 City Avenue
Philadelphia, PA  19131
tsheible@sju.edu | 610-660-3125

Effective June 1, 2013
Reviewed & Updated
June 2015, November 2015, March 2017, September 2018, August 2019, May 2020, (Interim) August 2020

**Renie Shields**
Deputy Title IX Coordinator
Senior Associate Athletic Director for Student Experience
Barry Hall
5600 City Avenue
Philadelphia, PA  19131
shields@sju.edu | 610-660-2584

<u>**Campus Resources**</u>

- Associate Provost for Diversity, Equity & Inclusion / University Professor (Nicole R. Stokes, Ph.D.) – nstokes@sju.edu; Saint Thomas Hall; 610-660-1209
- Title IX Coordinator (Lexi Morrison) – titleix@sju.edu; Campion 243E; 610-660-1145
- Deputy Title IX Coordinator (Thomas Sheibley) – tsheible@sju.edu; Wolfington; 610-660-3125
- Deputy Title IX Coordinator (Renie Shields) – shields@sju.edu; Barry Hall; 610-660-2584
- Deputy Title IX Coordinator (Taba Pickard) – tpickard@sju.edu; 215 City Avenue; 610-660-3313
- EEO Officer (Zenobia Hargust) – zhargust@sju.edu; 215 City Avenue; 610-660-3336
- Employee Assistance Program – 888-293-6948 or 800-327-1833 (employees)
- Counseling and Psychological Services – Merion Gardens A504; 610-660-1090; https://sites.sju.edu/counseling/ (students)
- Student Health Center – Quirk Hall; 610-660-1175; www.sju.edu/studenthealth (students)
- Office of International Students and Scholars – Campion 216; 610-660-3496; https://sites.sju.edu/oid/iss (students and employees)
- Student Accounts – Barbelin 121; 610-660-2000; https://www.sju.edu/offices/student-accounts (students)
- Public Safety and Security – Barbelin; 610-660-1111; https://sites.sju.edu/security/
- Office of Community Standards – communitystandards@sju.edu; Campion 243; 610-660-1046; https://sites.sju.edu/communitystandards/ (students)

For further information or details of campus resources for faculty and staff, contact the Office of Human Resources at 610-660-3309 or visit the HR website at https://sites.sju.edu/humanresources/.

<u>**Off-Campus Resources**</u>

Complaints of discrimination or harassment may also be filed in a timely manner with the following government agencies:

**Equal Employment Opportunity Commission**
801 Market Street, Ste. 1300
Philadelphia, PA  19107-3127
800/669-4000

**Office of Civil Rights**
U.S. Department of Education
100 Penn Square East, Ste. 515
Philadelphia, PA  19107-3323

**Pennsylvania Human Relations Commission**
110 N. 8th Street, Ste. 501
Philadelphia, PA 19107
215/560-2496

**Philadelphia Commission on Human Relations**
601 Walnut Street, Ste. 300 South
Philadelphia, PA  19106
215/686-4670

**Resources Cited in this Document**
http://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure
http://www.aaup.org/AAUP/pubsres/policydocs/contents/stud-rights.htm
http://www.aaup.org/AAUP/pubsres/policydocs/contents/statementonprofessionalethics.htm

## XIII.   Records

Records generated under this policy shall be maintained in confidence and consistent with applicable laws. Disposition of the case will become part of the record. The Title IX Coordinator and the EEO Officer shall review these records and make such reports or recommendations as may be necessary to effectuate the purpose of this policy to the President.

## XIV.   Revisions

The Title IX Coordinator and EEO Officer will initiate an annual review of the policy. Additional review/revisions will be conducted as needed to comply with legal requirements.

EXHIBIT "C"



Services A-Z   /   Search

Service Catalog  /  Information Technology  /  IT Policies & Procedures  /  Email and Data Storage Policy

## Email and Data Storage Policy

🏷 Email • Gmail • Google • office365 • microsoft • storage • m365

**Purpose:**

- To securely and efficiently manage the data generated and stored by all users while enrolled or employed at Saint Joseph's University.
- To define expectations for the life cycle, availability and removal of data.

**Scope:**

This policy applies to all users of Saint Joseph's University email, collaboration tools and storage systems.  This includes the use of Google Workspace and Microsoft 365 products.

**Policy:**

Access to email, collaboration tools and software through Google Workspace and Microsoft 365 is granted to each student at the time of enrollment and to each employee at the time of hire. This entitlement ends after a student's account is deactivated and the data is permanently purged one month later. For graduated students, the account remains active for one year after graduation before it is deactivated.  For students whose records are deactivated for other reasons, such as academic dismissal or registration inactivity, the entitlement will be rescinded at the time of deactivation and the data will be purged one month later.  For employees, the entitlement ends at the time of separation and the data will be purged six months thereafter.  The purge permanently deletes all email and storage data.  For files shared with other users, the data is deleted after the last file owner's account expires.

Usage of email and data storage is subject to the University's Access & Use Policy.

### Details

Service ID: 49902
**Created**
Mon 5/24/21 10:26 AM

**Modified**
Mon 5/24/21 11:51 AM

### Attachments (0)

No files found.

Powered by TeamDynamix | Site Map

EXHIBIT "D"

# SAINT JOSEPH'S UNIVERSITY
## BUSINESS CODE OF CONDUCT AND CONFLICT OF INTEREST POLICY

### I.   SCOPE OF POLICY

This Business Code of Conduct and Conflict of Interest Policy ("Policy") applies to the Trustees, Officers, and Employees, including Key Employees and Faculty, of the University (together, "Covered Persons").

### II.   PURPOSE

Saint Joseph's University ("University") is committed to operating in an ethical manner with integrity and fairness and to complying with all applicable legal and regulatory requirements. To ensure the integrity of the activities of the University, Covered Persons are expected to conduct their relationships with each other, the University, and outside organizations with objectivity, transparency and honesty. Covered Persons must fulfill their responsibilities to the University with care and loyalty. All determinations and actions of the Board of Trustees and the University administration must be made for the sole purpose of advancing the best interests of the University excluding any considerations of personal advantage or gain.

The University recognizes that Covered Persons often maintain personal and professional relationships and associations with each other, and interests in outside organizations and that situations may arise where an individual's private interests conflict or appear to conflict with his or her obligations to the University. Thus, it is the general policy of the University that Covered Persons avoid and disclose situations in which their financial or other interests could present actual, potential, or apparent conflicts of interest or adversely impact the reputation of the University.

The University has created this Policy to assist Covered Persons in identifying and addressing Conflicts of Interest (defined below in Section III) and to provide guidance with respect to the manner in which Covered Persons conduct the business of the University. The Policy is designed to promote the following objectives:

1. To provide guidance to Covered Persons in identifying Conflicts of Interest as well as situations that may give rise to Conflicts of Interest.
2. To provide a process for disclosing and eliminating or appropriately managing Conflicts of Interest.
3. To provide guidance to Covered Persons regarding the manner in which they conduct the business of the University.
4. To seek to ensure that external sources of funding for the University promote values and practices consistent with the University's mission.
5. To seek to ensure that Covered Persons perform their responsibilities with objectivity and integrity and do not inappropriately benefit or appear to benefit personally, directly or indirectly, from an outside organization or individual conducting or seeking to conduct business with the University.

1

October 7, 2016  (As Approved by Board of Trustees)

## III.    DEFINITIONS

**"Audit & Risk Committee"** is a Standing Committee of the Board, empowered to act on behalf of the Board in certain instances under the authority of the Bylaws.

**"Confidential Information"** includes, but is not limited to, medical, personnel, security, academic, background check, conflict of interest, identifiable biometric records and other non-public information about individuals; business records; contracts and business terms; business and donor relationships; computer system passwords and security codes; proprietary and competitively sensitive information, including non-public information about anticipated material requirements, price actions, programs, and selection of contractors and subcontractors in advance of official announcements; unpublished grant proposals, non-public research data, manuscripts and correspondence; non-public financial, procurement, health-safety, audit, insurance and claims information; and non-public information relating to internal investigations, pre-litigation and litigation and administrative agency charges, audits and inquiries; and other information the confidentiality of which is protected by law or University policies.

**"Conflict of Interest"**, as further described in this Policy, means any circumstance in which the direct or indirect personal, professional, financial, or other interests of a Covered Person may potentially, actually or apparently diverge from, be inconsistent with, or interfere with the best interests of the University, or may be reasonably perceived as such.

"**Covered Person**" means the Trustees, Officers, and Employees, including Key Employees and Faculty, of the University.

**"Employee"** means any one to whom or on behalf of whom an IRS W-2 is issued by the University.

**"Faculty"** means all full-time, part-time, visiting and adjunct faculty members. Although the term does not include volunteer faculty members, a department chairperson may, under appropriate circumstances and with notice to the person affected, designate a volunteer faculty member in his or her department as "Faculty" for the purposes of the Policy. The University President may at his or her discretion in writing exempt as a class part-time and/or visiting faculty from this definition and from all or a portion of the Policy.

**"Goods"** include products of any nature provided to or for the University in any capacity, as an Employee, full-time or part-time, an independent contractor, consultant, for which an individual or a third party (e.g., Jesuit Community) receives payment or compensation, in cash or in kind, from the University.

**"Key Employee"** is an Employee of the University who is not an Officer, Trustee or Faculty who (1) is expected to receive or received during the previous calendar year Total Compensation from the University in an amount exceeding $100,000 and (2) is expected to have or share or had or shared during the previous calendar year organization-wide control or influence similar to that of an Officer or Trustee, or managed or exercised during the previous calendar year authority or control over at least 10 percent of the University's activities.

**"Officer"** means those persons described as officers in the governing documents of the University.

**"Proprietary Information"** includes, but is not limited to, intellectual property such as patents, trademarks, and copyrights, as well as business plans, databases, records, employment information, and any unpublished financial data and reports.

2

October 7, 2016  (As Approved by Board of Trustees)

**"Related Party"** means (a) a Covered Person, (b) a Relative or (c) any entity in which any Covered Person or Relative has Significant Financial Interest.

**"Related-Party Transaction"** means any transaction, agreement, or other arrangement in which the University has or is considering entering into with a Related Party.

**"Relative"** means a Covered Person's (i) spouse, ancestors, brothers and sisters (whether whole or half-blood), children (whether natural or adopted), grandchildren, great-grandchildren, and spouses of brothers, sisters, children, grandchildren, and great-grandchildren; or (ii) domestic partner.

**"Services"** include work of any nature performed for the University in any capacity, as an Employee, full-time or part-time, an independent contractor, consultant, for which an individual or a third party (e.g., Jesuit Community) receives payment or compensation, in cash or in kind, from the University.

**"Significant Financial Interest"** means (1) any ownership or investment interest in an organization (including stock, stock options, a partnership interest or any other ownership or investment interest) valued at more than $10,000, except equity in a publicly traded company amounting to less than a 5% interest in the company, (2) receipt of non-dividend compensation (including salary, consulting fees, royalty payments, honorarium, or other membership) from an organization of more than $10,000 in a 12-month period; (3) a loan from, or other indebtedness to, an organization, regardless of the amount; or (4) a position of real or apparent management or fiduciary authority in an organization, such as director, officer, trustee, or partner. This definition does <u>not</u> include an interest owned solely by reason of investment in an organization by a mutual fund, pension fund, or other institutional investment fund over which the Covered Person or Relative exercises no control.

**"Total Compensation"** means all benefits received by an Employee, Key Employee or Faculty or on behalf of another Related Party providing Goods or Services to the University including, but not limited to, base salary, bonuses, health insurance, life insurance, short- and long-term disability insurance, and paid time off.

**"Trustee"** means a voting member of the governing body of the University.

## IV.   BUSINESS CODE OF CONDUCT

All University operations and endeavors must be conducted and pursued with the highest standards of integrity in compliance with applicable University policies, laws and regulations. For the protection of the University, it is essential that all activities be conducted in the best interests of the University. The University has upheld and will continue to uphold the highest levels of ethics and integrity in conducting its affairs. This Policy serves to set forth basic standards of ethical and legal behavior, to provide reporting mechanisms for known or suspected Conflicts of Interest and/or ethical or legal violations, and to help prevent and detect wrongdoing. Given the range and complexity of issues that may arise in the course of carrying out the University's business, this Policy does not identify all of the potential issues but serves only as a general guide.

### A.  Protection and Proper Use of University Assets.

Covered Persons must protect the University's assets and ensure their proper and efficient use. University assets include, but are not limited to, funds, facilities, property, services, and Proprietary Information.

October 7, 2016  (As Approved by Board of Trustees)

Covered Persons who have access to University funds are responsible for their use and may not authorize the funds to be spent for the benefit of Related Parties or to provide others with gifts, favors, or payments, other than for authorized Services rendered to the University or in accordance with the University's Business Expense Policy. Covered Persons shall not use or cause others to use University funds to make a contribution to any political party, committee, candidate or office holder of any local, state or national government. A Covered Person may not direct anyone to obtain a gift or favor for any Related Party. If a Covered Person believes that another Covered Person's conduct or direction is unethical or improper, he or she must report it as follows:  If the concern involves the conduct of a Covered Person who is an Employee or Faculty, the concern must be reported to the Vice President or Dean overseeing his/her department or school; if the concern involves the conduct of a Covered Person who is an Officer who is not the President (i.e., a Vice President, Corporate Secretary, or Treasurer), the concern must be reported to the President; if the concern involves the conduct of a Covered Person who is the President or a Trustee, the concern must be reported to the Chair of the Audit & Risk Committee.  Alternatively, in each of these situations, if the Covered Person obligated to make such a report prefers, the report can be made anonymously to the University Director of Internal Audit or to the hotline by calling: 1-833-770-0008, and such report shall be relayed to the Office of the General Counsel and the Chairperson of the Audit & Risk Committee, or to the Executive Committee of the Board and the Office of the General Counsel if the concern involves the Chairperson of the Audit & Risk Committee or any member of the Audit & Risk Committee.  The hotline shall also serve as a help line, to address questions related to this Policy. More information is available on the University's website at: https://sites.sju.edu/humanresources/ .

Anyone reporting a concern must act in good faith, without malice to the University or any individual within the University, and must have reasonable grounds for believing that the information shared in the report is accurate and substantiates the concern.  Anyone who believes he/she is being retaliated against for reporting concerns must contact the Director of Internal Audit immediately.

University facilities, property, or services may not be taken, sold, disposed of, loaned or given away without proper prior authorization. A Covered Person may not use University equipment or facilities for non-incidental personal use without proper prior documented authorization. Covered Persons who suspect unauthorized or inappropriate use or distribution of University assets should report such suspicion, and Covered Persons who have actual knowledge of such use or distribution must immediately report such knowledge to the Vice President overseeing his/her department (if the Covered Person whose conduct at issue is not a Trustee or Officer) or to the Chairperson of the Audit and Risk Committee or the President (if the Covered Person whose conduct is at issue is a Trustee or Officer or if the situation is such that the conduct cannot be reported directly to the Vice President).  If the Covered Person desiring or obligated to make such a report prefers, the report can be made anonymously to the University Director of Internal Audit or to the hotline by calling1-833-770-0008, and such report shall be relayed to the foregoing. **Unauthorized or inappropriate use or distribution of University assets violates the Policy and may also result in criminal and/or civil liability.**

> **B.  Confidentiality.**

Covered Persons must maintain the confidentiality of Confidential Information entrusted to them, except when disclosure is authorized in writing and in advance by an appropriate Officer of the University or required by law, in consultation with the Office of the General Counsel. Confidential Information shall not be used for the direct or indirect benefit of any Related Party. The obligation to preserve Confidential Information continues even after termination of employment with or service to the University.

October 7, 2016  (As Approved by Board of Trustees)

### C.  Compliance with Laws, Rules, and Regulations.

In conducting the affairs of the University, Covered Persons must comply with applicable laws, rules, and regulations at all levels of government in the United States, the Commonwealth of Pennsylvania and any other jurisdiction in which the University conducts business. The University recognizes that it would be unduly burdensome to expect all Covered Persons to know the details of all laws and regulations applicable to the University. However, the University expects Covered Persons to use their best judgment and, in the event that they are unsure as to whether action or inaction violates a law or regulation, the University expects all Covered Persons to seek guidance from the Office of General Counsel.  The Office of General Counsel shall report any substantiated concerns about such violations to the Audit & Risk Committee and to President, the Executive Committee or full Board as appropriate.

### D.  Conflicts of Interest.

Covered Persons are required to fulfill their responsibilities with care and loyalty. All decisions and actions of Covered Persons are to be made for the sole purpose of advancing the best interests of the University and the public good. As defined in Section III of this Policy, and discussed in more detail below, a Conflict of Interest exists when the direct or indirect personal, professional, financial, or other interests of a Covered Person  may potentially, actually or apparently diverge from, be inconsistent with, or interfere with the best interests of the University, or may be reasonably perceived as such. This Policy sets forth in detail the standards and procedures to be followed when dealing with situations that may present a Conflict of Interest.

### E.  Records, Disclosures, and Communications.

University records shall be prepared completely, accurately, and honestly. Covered Persons involved in the preparation of reports and documents and related information to be filed with or submitted to federal, state, and local authorities by the University are required to disclose such information in a manner that is complete, fair, accurate, timely, and understandable. Such Covered Persons shall not knowingly conceal or falsify information, misrepresent or omit material facts. Covered Persons making authorized public communications on behalf of the University shall comply with the same standards. **Concealing material facts or deliberately falsifying reports, data, or other documents violates University policy and may also result in criminal and/or civil liability.**

### V.    CONFLICT OF INTEREST GUIDELINES

As defined in Section III of this Policy, a Conflict of Interest exists when the direct or indirect personal, professional, financial, or other interests of a Covered Person may potentially, actually or apparently diverge from, be inconsistent with, or interfere with the best interests of the University, or may be reasonably perceived as such.  A Conflict of Interest includes, but is not limited to, indirect conflicts, such as benefits provided to a Relative of a Covered Person. Business or personal relationships, or the involvement in certain activities, may give rise to a Conflict of Interest by impairing the independent judgment of a Covered Person in the exercise of duties relating to the University and its operations.  Any arrangements or circumstances, including political, family or other relationships, that might dissuade the Covered Person from acting in the best interests of the Organization could give rise to a Conflict of Interest.

October 7, 2016  (As Approved by Board of Trustees)

While it is not possible to develop a detailed set of rules that cover all circumstances and factual scenarios, in most instances, Conflicts of Interest can be avoided simply by continuing to exercise good judgment, and the University relies on the sound judgment of its Covered Persons to prevent many such conflict situations. This Policy serves as a guide to the types of activity by Covered Persons that might constitute a Conflict of Interest.

### A.  Presumed Conflicts of Interest

Certain Conflicts of Interest, described in this Section as "Presumed Conflicts of Interest," are prohibited by the University, unless otherwise permitted under Section D, below.

Each of the following situations, although not meant to constitute an exhaustive list, gives rise to a Presumed Conflict of Interest.

(1) Related-Party Transactions.

(2) Engaging, directly or indirectly, in activities that compete with the interests of the University or appropriating or diverting business opportunities of the University. This includes (a) holding, directly or indirectly, an ownership or other financial interest (other than a *de minimis* interest) or having an employment, management, or fiduciary role in an outside organization that is a competitor of the University, or (b) appropriating or diverting a business or financial opportunity that a Covered Person knows or should know the University is pursuing or is considering pursuing or reasonably might be interested in pursuing if the University were aware of the opportunity.

(3) Accepting any gift or favor that is illegal under applicable law or regulation or otherwise prohibited under other applicable University policies.

(4) Accepting any gift(s) or favor(s) having or totaling a fair market value of more than ONE HUNDRED DOLLARS ($100.00)  (including entertainment) or a loan (other than an arm's length loan made in the ordinary course of business from a banking or other financial institution), even where not illegal under applicable law or prohibited under other applicable University policies, from any person or outside organization seeking a benefit from the University (e.g., seeking to do business or continuing to do business with the University, or seeking to have a student admitted to the University) if the offer or acceptance of the gift, favor, or loan could reasonably be viewed as intended to influence the University to act favorably toward the person or outside organization. Where it is impracticable for a Covered Person (or his or her Related Party) to decline a gift that would otherwise constitute a Conflict of Interest under this Section, the Covered Person must contact the Chairperson of the Audit & Risk Committee (if the Covered Person is the President or Trustee) or the President (for all other Covered Persons) and follow the procedures set forth in Section B, C, and D, below. Covered Persons (or their Related Parties) may accept occasional unsolicited gifts or favors (e.g. tickets to local sporting events or golf outings, business dining, holiday baskets) provided such gift(s) or favor(s) do(es) not annually exceed a total fair market value of ONE HUNDRED DOLLARSY ($100.00), is customary in the industry and will not influence or appear to influence the judgment or conduct of the Covered Person with respect to his or her University responsibilities.  When in doubt regarding the fair market value of such gift, the Covered Person must consult with the Chairperson of the Audit & Risk Committee (if the Covered Person is the President or Trustee) or the President (for all other Covered Persons).

October 7, 2016  (As Approved by Board of Trustees)

(5) Use of University assets and resources, including the services of University Employees, for personal purposes by a Related Party.

(6) Obtaining, using, or disclosing Confidential Information or Proprietary Information for direct or indirect personal interest, profit, or advantage; obtaining or using Confidential Information or Proprietary Information for a purpose that may be detrimental to University; or disclosing Confidential Information or Proprietary Information to a person or entity that is not authorized by the University to receive it.

**B.       Disclosure of Conflicts of Interest**

Covered Persons must disclose on an ongoing basis the material facts relating to any Conflict of Interest as soon as they become aware of the existence of a possible Conflict of Interest and annually as required by this Policy. In the event that a Covered Person becomes aware that he or she has not disclosed a Conflict of Interest in a timely manner, the Covered Person has a continuing duty to disclose it as promptly as possible thereafter.  In other words, if a Covered Person becomes aware of or encounters a Conflict of Interest during the period of time between the submissions of annual disclosure statements, the Conflict of Interest must be disclosed *at the time that he or she becomes aware of or encounters a Conflict of Interest*.

Covered Persons must disclose the precise nature of the Covered Person's interest and/or involvement in the conduct or relationship giving rise to the Conflict of Interest. In order to assure full disclosure, such disclosures must be made not only on behalf of the Covered Person completing the form, but also with respect to the Covered Person's Related Parties.

Upon election, appointment, or initial employment, and annually thereafter, a Covered Person must complete and sign the University Conflict of Interest Disclosure Statement ("Disclosure Statement"). The Disclosure Statement of Trustees and the President shall be directed to the Chairperson of the Audit & Risk Committee and reviewed and maintained by the Office of General Counsel, which shall provide a summary of the disclosed Conflicts of Interest to the Audit & Risk Committee with General Counsel's recommendations re the same; and such summary and recommendations, along with the Committee's comments, shall be provided by the Chairperson of the Audit & Risk Committee, on behalf of the Committee, to the Chairperson of the Board for presentation to the Executive Committee of the Board, and the full Board as appropriate. The Disclosure Statement of all other Officers (Vice Presidents, Corporate Secretary and Treasurer), Faculty, Key Employees and Employees shall be directed to the President and reviewed and maintained by the General Counsel, with a summary of all disclosed Conflicts of Interest provided to the Chairperson of the Audit & Risk Committee, and to the Chairperson of the Board for presentation, as appropriate, to either the Executive Committee of the Board, or to the full Board.  A copy of the Disclosure Statements of the Trustees shall be maintained by the Office of the General Counsel as part of the University's corporate books and records. A copy of the Disclosure Statements of Officers, Faculty, Key Employees and Employees shall also be maintained in the Covered Person's personnel file and made available for review and audit by General Counsel and the Audit & Risk Committee, as needed.  Information disclosed by Covered Persons shall be held in confidence and only available to those Officers of the University with a business need to know such information, and when the best interest of the University would be served, and shall be disclosed to the Board of Trustees, when required or appropriate.

October 7, 2016  (As Approved by Board of Trustees)

Any Covered Person who is uncertain whether he or she has a Conflict of Interest in any matter shall disclose the potential conflicting interest in accordance with the procedures above, and the Audit & Risk Committee shall determine, in consultation with the Office of General Counsel, whether there is a Conflict of Interest and shall make recommendations re the same to the President, Executive Committee or full Board as appropriate.   As explained below, any Covered Person involved in the matter shall recuse himself or herself from discussion and voting on the matter.

If a Covered Person, or any other individual believes a Covered Person has a Conflict of Interest and has not disclosed said Conflict of Interest, or material facts pertaining to a Conflict of Interest, the individual shall promptly report the matter to the Chairperson of the Audit & Risk Committee, who shall consult with the Committee and the Office of General Counsel, and shall involve the President, or the Executive Committee or the full Board as appropriate (for example, but not limited to, when Conflicts of Interest involve a Trustee or the President), to review or investigate the concerns.   Reports can also be made anonymously to the hotline.

If the Board has reasonable cause to believe that the President or a Trustee has failed to disclose actual, potential or apparent Conflicts of Interest, the Chairperson of the Board or, if the Conflict of Interest involves the Chairperson of the Board, the Vice-Chairperson of the Board or another Board designee shall inform the President or Trustee of the basis for such belief and afford such Covered Person an opportunity to explain the alleged failure to disclose.  If, after hearing the Covered Person's response and after making any further investigation warranted by the circumstances, the Board determines the person has failed to disclose a Conflict of Interest, the Board shall take appropriate disciplinary and corrective action.  These same procedures shall be followed by the President, with a report to the Executive Committee, when the matter involves any other Covered Person.  **Intentional violation of this Policy constitutes cause for termination of employment or removal from office.**

C.  **Restraint on Participation**

Covered Persons who have declared themselves or have been determined by the University in accordance with the procedures herein to have a Conflict of Interest shall refrain from participating in consideration of the Conflict of Interest, unless, for special reasons, the Board or President, or the Committee reviewing the matter, requests information or interpretation from the person or persons involved. The Covered Persons with a Conflict of Interest shall not vote on such matters and shall not be present at the time of vote.

With respect to a matter before the Board or a Committee of the Board, the minutes of the Board or Committee shall record the names of the Covered Persons who were found to have a Conflict of Interest the nature of the actual, potential, or apparent conflicting interest, and the Board's decision as to how to resolve the Conflict of Interest.  The minutes must also record both the names of the Covered Persons who abstained and of the individuals who were present for discussions regarding the transaction or relationship, any votes relating to the transaction or relationship, the content of the discussion, including any alternatives to the proposed transaction or relationship, if considered, and a record of any votes taken in connection with the determination.

D.  **Evaluation of Transaction or Relationship Involving Conflict of Interest**

Depending on its nature and the potential benefits to the University, a Related-Party Transaction or other conduct giving rise to a Conflict of Interest may be subject to approval by the Board of Trustees or be subject to approval or recommendation by the Executive Committee of the Board of Trustees. In no event

October 7, 2016  (As Approved by Board of Trustees)

may a Covered Person with a Conflict of Interest be present at or participate in the deliberation or vote by the Board of Trustees, or Committee thereof, on the matter giving rise to the Conflict of Interest, such as the Covered Person's Total Compensation by the University, or attempt to influence improperly the deliberation or voting on the matter. A Covered Person may, where requested by the Board of Trustees or applicable Board Committee, be present at the meeting prior to the commencement of deliberations or vote on the matter in order to present information or answer questions concerning the Conflict of Interest. The Board of Trustees shall consider the following factors in determining whether or not to permit the Related-Party Transaction or other conduct giving rise to the Conflict of Interest: (1) the nature and extent of the Related Party's  involvement in the University business involved (in particular, whether the Related Party would be providing Services that are advisory or fiduciary in nature such that independence is an important factor weighing in favor of avoiding Conflicts of Interest, as in the case of auditing or legal Services); (2) whether the best interests of the University are served; (3) whether the proposed transaction is a "fair market value" transaction; (4) whether the University will be economically harmed by the Conflict of Interest; (5) whether compelling factors weigh in favor of retaining a Related Party (e.g. if the Goods or Services provided by the Related Party are unique and can be handled more expeditiously only by a Related Party); (6) whether the proposed transaction would have involved a Related Party but for the Related Party's role and relationship with the University; (7) the magnitude of the Conflict of Interest and the extent to which it is related to the University business involved; and (8) the extent to which the Related Person is amenable to effective oversight and management of the conduct giving rise to the Conflict of Interest.

The Board, or Board Committee thereof, must *prior to approving* the Related-Party Transaction or conduct, (1) consider alternatives to the extent available; (2) approve the Related-Party Transaction or other conduct by not less than a majority vote of the Board or Board Committee members present at the meeting; and (3) contemporaneously document in writing the basis for the approval, including consideration of alternative transactions as well as the independent fair market data on which the Board or Board Committee relied in making its decision.

During deliberations regarding approval of a Related-Party Transaction or other conduct, the Board (or Committee thereof) , in consultation with the Office of the General Counsel and informed by the recommendation of the Audit & Risk Committee, must determine whether the Conflict of Interest must be managed, reduced, or eliminated, and such determination shall be documented in writing in the Board or Committee meeting minutes noting the specific facts and circumstances that formed the basis for the determination.

Depending on the nature of the Conflict of Interest and the recommendations of the Audit & Risk Committee, the President may be in a position to make such determinations with respect to Covered Persons who are not Trustees; however, any such determinations must be made following the procedures above and such determinations shall be recorded in a President's report, which shall be made in writing and timely presented to the Executive Committee and included in the notes thereof.

October 7, 2016  (As Approved by Board of Trustees)