**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GREGORY V. MANCO, PH.D., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 5:22-CV-00285 |
| | : | |
| ST. JOSEPH'S UNIVERSITY, ET AL., | : | |
| | : | |
| Defendants. | : | |

**RESPONSE OF DEFENDANTS ERIN FAHEY, KARLEIGH LOPEZ, AND
HADASSAH COLBERT IN OPPOSITION TO
PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**

Defendants Erin Fahey, Karleigh Lopez, and Hadassah Colbert (collectively, "Opposing Defendants"), by and through their undersigned counsel, respectfully submit this Response in Opposition to Plaintiff's Motion for Leave to File an Amended Complaint ("Plaintiff's Motion").

I.   **INTRODUCTION**

St. Joseph's University ("SJU") Professor Gregory Manco ("Plaintiff" or "Manco") filed this lawsuit to harass his employer and its former students and to punish those who disagree with his intentionally controversial opinions, all in an attempt to gain further attention for himself and his politics. A cursory review of Manco's public Twitter account (@SouthJerzGiants) demonstrates that he is consistently and publicly outspoken on controversial topics of public concern to his over 3,100 followers and anyone else who views his account. Many of Manco's more than 18,500 tweets are *designed* to elicit reactions (including negative reactions) and generate public discussion. Indeed, Manco tweets, writes articles, sits for interviews, and speaks publicly on topics including reparations for slavery, racial sensitivity trainings, transgender identity, affirmative action, diversity, equity and inclusion, the elimination of public schools, minimum wage, maximum corporate tax, abortion, and the "welfare state." By opining on these topics,

Manco's intent is to elicit passionate responses and dialogue.[1]

Manco's tweets, perhaps unsurprisingly, also demonize those who disagree with him.  For example, in his references to a Member of Congress, he states that she is an idiot, scumbag, socialist, pure evil, unintelligent, imbecile, POS, and criminal.  Now, Manco seeks to demonize the Opposing Defendants for disagreeing with him and "revealing him," by citation to *his own* public tweets or to their own experiences with him in the classroom, to SJU.  There seems to be no end to this vindictive approach to litigation because Plaintiff is now attempting to bring yet another additional defendant into this litigation who took a position adversarial to him on social media about this very litigation.

Manco's goal, of course, is to chill speech contrary to his beliefs and to use this Court as a platform for self-aggrandizement.[2]  In fact, it is noteworthy that, to date, Manco has spoken on talk shows, spoken with news outlets, and has published his own articles about the allegations in this litigation.  Manco's agenda, however, is not an appropriate use of the judicial system and our judicial resources.

Manco's original Complaint in this matter is already far sweeping and improperly inclusive of various defendants and claims that lack sufficient factual support.[3]  Now, Manco seeks leave to further amend his Complaint to bring additional futile claims, improper defendants, and unnecessary commentary into his pleadings without need or legal justification.  As to the Opposing

---

[1]     In fact, no reasonable member of society could expect to opine on these topics across thousands of tweets without receiving both positive and negative passionate responses.

[2]     *See, e.g.,* Todd Shepard, Broad + Liberty, Former St. Joe's prof. sues university and former student over free speech fight (Jan. 24, 2022), https://broadandliberty.com/2022/01/24/former-st-joes-prof-sues-university-and-former-student-over-free-speech-fight/ ("Manco's case has occasionally drawn attention from national figures. When news broke that Manco's contract would not be renewed, Georgetown Constitutional law professor and frequent cable news contributor Jonathan Turley called it 'a chilling turn of events.'").

[3]     These claims will be addressed with Motions under Rule 12(b)(6) at the appropriate time.

FP 44142282.5

Defendants, Plaintiff adds an additional claim of intentional infliction of emotional distress ("IIED") and several legal conclusions.  However, Plaintiff's addition of a claim of IIED would be futile as to Opposing Defendants, and Plaintiff's Motion should be denied as to this amendment.[4]

## II.   PROCEDURAL BACKGROUND

On January 21, 2022, this matter was initiated with Plaintiff's original Complaint.  *See* ECF No. 1.  The parties mutually agreed to give all Defendants additional time to respond to Plaintiff's Complaint because Plaintiff represented that he was intending to amend his Complaint to add additional defendants and claims.  Plaintiff's Motion seeks leave to amend the Complaint to, *inter alia*, add an IIED claim against Opposing Defendants.  Plaintiff's Motion should be denied as to the proposed addition of a claim for IIED as to Opposing Defendants.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

Per Federal Rule of Civil Procedure 15(a), courts may grant amendments "when justice so requires."  Fed. R. Civ. P. 15(a).  "While Rule 15 states that 'leave to amend should be "freely given," a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party.'" *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 200 F. Supp. 3d 553, 564 (E.D. Pa. 2016), *aff'd*, 877 F.3d 487 (3d Cir. 2017) (citing *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir.2003), *as*

---

[4]   It is worth noting that Plaintiff's Motion does not include an exhaustive summary of the revisions that he has incorporated into his proposed Amended Complaint.  A close comparison of the Complaint with Plaintiff's proposed Amended Complaint reveals that Plaintiff has incorporated revisions into a *majority* of the paragraphs, not all of which are identified in Plaintiff's Motion.  *See* Am. Compl., ECF No. 28-1, at ¶¶ 1-4, 7-8, 10, 15, 17-25, 28-30, 32, 36-37, 45-46, 49, 52, 59, 61-63, 67, 69-70, 74-75, 79, 82, 84, 87-88, 91-92, 94, 96-99, 102-104, 109, 112, 116-123, 126-147, 150-155, 162-181, 189, 197, 200, 205, 207, 209, 211, 214-225, n. 1, n. 4, n. 5, n.7.

*amended* (Jan. 20, 2004) (citing Fed. R. Civ. P. 15(a))). "'Futility' means that the amended complaint would fail to state a claim upon which relief could be granted." *Id.* (citations omitted). "The futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion. The trial court may thus deny leave to amend where the amendment would not withstand a motion to dismiss." *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 229 (E.D. Pa. 2012) (citations omitted).

Plaintiff seeks to amend his complaint to add claims of IIED against Opposing Defendants. However, such an amendment would be futile, and Plaintiff's Motion should, therefore, be denied as to this amendment.

**B.      Plaintiff's proposed amendment to add claims of IIED against Opposing Defendants would be futile and Plaintiff's Motion should therefore be denied as to this amendment.[5]**

As an initial matter, "no Pennsylvania case law exists upholding an IIED claim which has been predicated upon defamatory language." *See Hill v. Cosby*, No. 15-1658, 2016 WL 491728, at *9 (W.D. Pa. Feb. 9, 2016, *aff'd*, 664 F. App'x 169 (3d Cir. 2016). *See also Garabedian*, 2019 WL 4885969, *7 (wherein this Honorable Court recognizes the holding in *Hill*). In his proposed Amended Complaint, Plaintiff states that Opposing Defendants provided "false and defamatory information to the school." Am. Compl. ¶ 146. Plaintiff also identifies Defendant Colbert's February 19, 2021 Instagram post as defamatory. *See id.* ¶ 54. The remainder of Plaintiff's proposed Amended Complaint makes sweeping allegations of defamatory statements without specifically identifying which statements are defamatory. *Id.* at ¶¶ 122, 124-125, 146, 147, 192,

---

[5]      Plaintiff's Motion would also be futile as to the inclusion of a claim for IIED against Defendant Loue, who has a ***single substantive fact*** plead against her in the original Complaint and the proposed Amended Complaint, for the same reasons that are set forth herein as to the Opposing Defendants. *See* ECF No. 1, ¶ 105; ECF No. 28-1, p. 39, ¶ 112. Namely, Plaintiff fails to set forth conduct that is extreme and outrageous as to Defendant Loue and her actions are subject to judicial privilege. Despite being informed that Defendant Loue lives in the United Kingdom ("U.K.") and not at the address identified in the Complaint, Plaintiff has proposed an Amended Complaint re-inserting an address that is unrelated to Defendant Loue. As Plaintiff is further aware, Defendant Loue has not yet been served in this action and has not authorized the undersigned counsel to waive service on her behalf. Defendant Loue is, therefore, not a party to this action.

4

195, 202-05.   Thus, to the extent that Plaintiff is alleging that all of the Opposing Defendants' statements were defamatory, Plaintiff does not have a legal basis to claim that any such statements also serve as grounds for IIED because they are predicated on purportedly defamatory language.

Plaintiff's proposed amendment to add claims of IIED against Opposing Defendants would also be futile for two additional reasons, both of which serve as independent grounds to deny Plaintiff's Motion.  First, Plaintiff fails to plead extreme and outrageous conduct as to the Opposing Defendants.  Second, all of the actions taken by the Opposing Defendants are entitled to judicial privilege and cannot serve as the basis of an IIED claim.

Thus, Plaintiff's Motion should be denied as to inclusion of a claim for IIED as to Opposing Defendants because inclusion of such a claim would be futile.

### i. The claim for IIED would be futile as to Opposing Defendants because Plaintiff fails to plead extreme and outrageous conduct as to the Opposing Defendants.

An action for IIED requires a plaintiff to show (1) the conduct is extreme; (2) the conduct is intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress is severe. *Kornegey v. City of Phila.*, 299 F. Supp. 3d 675, 683 (E.D. Pa. 2018).  Plaintiff fails to allege facts sufficient to support the first element as to any of the Opposing Defendants.

To state a claim for IIED in Pennsylvania under the first element, a plaintiff must demonstrate that the defendant's conduct was "**so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.**"   *Id.* (emphasis added).   As a matter of law, outrageousness occurs only when "the case is one in which the recitation of the facts to an average member of the community would arouse resentment against the actor, and lead him to exclaim, 'outrageous.'" *Martin-McFarlane v. City of Phila.*, 299 F. Supp. 3d 658, 671 (E.D. Pa. 2017)

5

(emphasis added). As noted by the Third Circuit, Pennsylvania courts have been reluctant to find conduct so outrageous as to permit recovery for this tort. *Miniscalco v. Gordon*, 916 F. Supp. 478, 480-81 (E.D. Pa. 1996) (citing *Clark v. Twp. of Falls,* 890 F.2d 611, 623 (3d Cir. 1989)).

Claims for IIED are frequently dismissed for failure to meet the first element. *See Moore v. Doe*, No. 21-05302, 2022 WL 866678, at *3 (E.D. Pa. Mar. 23, 2022) ("While Pennsylvania courts recognize a cause of action for intentional infliction of emotional distress, they allow recovery only in very egregious cases."). *See, e.g.*, *Doe v. Garabedian*, No. 19-1539, 2019 WL 4885969, at *7 (E.D. Pa. Oct. 2, 2019), *order vacated in part on reconsideration on other grounds*, No. 19-1539, 2020 WL 1244126 (E.D. Pa. Mar. 13, 2020) ("The Court finds that the statements at issue, while reprehensible, are not so extreme or outrageous as to go beyond all possible bounds of human decency. Accordingly, the Court [dismisses] the IIED claim . . . with prejudice as amendment would be futile."); *Ghrist v. CBS Broad, Inc.*, 40 F. Supp. 623, 626, 630-31 (W.D. Pa. 2014) (dismissing claim for IIED at motion to dismiss stage based on Plaintiff's failure to demonstrate egregious conduct).

In *Eck v. Aley Valley School District*, the plaintiffs, several high school students, alleged that a teacher used her position to bully and intimidate them and that their teacher attempted to encourage the plaintiffs' peers to do the same, including by making false statements about the plaintiffs being violent and posing a threat to the school. No. 19-1873, 2019 WL 3842399, at *8 (E.D. Pa. Aug. 15, 2019). The plaintiffs further alleged that these actions by their teacher resulted in the students' suspension from school. *Id.* Despite these allegations of false and threatening behavior by a teacher towards her students, the *Eck* court dismissed plaintiffs' compliant at the motion to dismiss stage holding that "[a]ccepting these allegations as true as we must at the motion to dismiss stage, they do not rise to the level of 'extreme and outrageous' conduct sufficient to

support a claim for intentional infliction of emotional distress." *Id.* "Under Pennsylvania law, **extreme and outrageous conduct is found 'only in the most egregious situations, such as mishandling of a corpse, reckless diagnosis of a fatal disease, and having sexual contact with young children**.'" *Id.* (emphasis added) (quoting *Cheney v, Daily News L.P.*, 654 F. App'x 578, 583-84 (3d Cir. 2016)). *Compare Hoffman v. Mem. Osteopathic Hosp.*, 342 Pa. Super. 375, 382 (1985) (finding evidence sufficient to support finding of IIED against doctor who left patient laying on floor after falling, unable to move and crying, for two hours).

In *Kessler v. Monsour*, the plaintiff, a tenured high school art teacher alleged IIED when faced with the following actions:

> Defendant Monsour ridiculed Dale Kessler's desire to spend School District funds to send students to an art competition; Dale Kessler was given an unsatisfactory job performance review on the wrong form and with inadequate observation; Dale Kessler was suspended when there were allegations of a criminal investigation by state and local police; Dale Kessler was suspended for events surrounding physical contact with a student; no hearing on the latter suspension was held; the defendant unions did not support Dale Kessler in his grievances and complaints; and the actions taken were in retaliation for Dale Kessler's exercise of his free speech rights.

865 F. Supp. 234, 241-42 (M.D. Pa. 1994). The Court found, "[t]his conduct, whether the events are viewed singly or in combination, does not rise to the level of extreme and outrageous conduct contemplated by § 46." *Id.* at 242 (referencing Section 46 of the Restatement (2d) of Torts).

   1. *Defendant Fahey's alleged conduct is not extreme or outrageous.*

Plaintiff has failed to allege facts against Defendant Fahey that are sufficiently extreme and outrageous to set forth the first element of an IIED claim. In the proposed Amended Complaint, the ***only*** paragraphs that contain factual allegations concerning Defendant Fahey's conduct appear at paragraphs 109-11 and set forth the following:

   109.  Fahey told Lopez that Dr. Manco thought "mental health is a

7

> joke", that "his classroom is not a safe space" and that "he almost made [her] drop out of school."  Lopez sent a screenshot of her Direct Message conversation with Fahey to the school.
>
> 110.  Fahey also submitted a bias report to St. Joseph's repeating the "mental health" allegations, and misrepresenting the extent of her absence and the reason she gave Dr. Manco for the absences, and falsely stating that Dr. Manco would not work with her nor take her seriously.
>
> 111.  To the contrary, Dr. Manco was never told, by Fahey or St. Joseph's that her absences were due to mental health issues. Furthermore, Dr. Manco expressed concern for Fahey's health and well-being and allowed her to make up an exam in the last week of the semester after she missed it without prior warning or notification . . . .

Am. Compl. ¶¶ 109-11.  Plaintiff also attaches images of two e-mail discussions that Defendant Fahey had with Plaintiff from October and December 2016, regarding her inability to attend class. Am. Compl. ¶ 111.  Every remaining allegation against Defendant Fahey in the Complaint is a legal conclusion without factual support.  Am. Compl. ¶¶ 5-6, 9, 56, 91, 145-49.

Accordingly, Plaintiff alleges **_two_** actions taken by Defendant Fahey: (1) a single conversation with Defendant Lopez wherein she told Defendant Lopez that Plaintiff thought mental health was a joke, that his classroom was not a safe space, and that Plaintiff almost made her drop out of school; and (2) submission of a bias report to SJU where Defendant Fahey purportedly repeated the "mental health" allegations and "misrepresent[ed] the extent of her absence and the reason she gave Dr. Manco for the absences, and falsely stat[ed] that Dr. Manco would not work with her nor take her seriously."  Am. Compl. ¶¶ 109-10.  These two actions are not extreme and outrageous or "utterly intolerable in a civilized society" and, as such, cannot support the first element of a claim for IIED.  *Kornegey*, 299 F. Supp. 3d at 683.  *See also Eck*, *Kessler*, *supra*.

Thus, the Court should deny Plaintiff's request to amend his complaint to add a claim of

IIED as to Defendant Fahey because such an amendment would be futile.

                2.  *Defendant Lopez's alleged conduct is not extreme or outrageous.*

Plaintiff has similarly failed to allege facts against Defendant Lopez that are sufficiently extreme and outrageous.  In the proposed Amended Complaint, the only paragraphs that contain factual allegations concerning Defendant Lopez's conduct, are as follows:

> 55.    Karleigh Lopez ("Lopez"), another St. Joseph's graduate, who was never taught by [Plaintiff], and did not know him personally, saw Colbert's [Instagram] posts, and joined in the public campaign to have [Plaintiff] terminated. This included her creation of a Tik Tok video which included screenshots of [Plaintiff's] tweets and a link to the bias reporting form, a plea to her followers to "flood" the school with complaints, and a public tweet to St. Joseph's with "selected" screenshots of [Plaintiff's] tweets and Colbert's added commentary.[6]

> 94.    Both Colbert and Lopez were "doxing" [Plaintiff] by revealing and spreading selected portions of Dr. Manco's social media posts, together with false assertions of fact, on social media platforms that he did not utilize.[7]

---

[6]    Three images of Defendant Lopez's TikTok video follow this paragraph in Plaintiff's proposed Amended Complaint at ECF 28-1 pp. 12-14.  These images are layered.  The first image includes a screenshot of Plaintiff's tweet that reads: "Suppose your great-great-grandfather murdered someone. The victim's great-great-grandson knocks on your door, shows you the newspaper clipping from 1905, and demands compensation from you. Your response? Now get this racist reparations bullshit out of your head for good."  Defendant Lopez's superimposed commentary reads "these racist tweets are from saint josephs university math professor and baseball coach greg manco."  The second image shows Plaintiff's tweet that shares a photo of the Ayn Rand poster on his former office door, which identifies himself as a "math professor," panned wide enough to reveal Plaintiff's name plate, thus identifying Plaintiff as the owner of the Twitter account.  Defendant Lopez's superimposed text reads "proof this account is actually his."  She also writes: "In the past few years, despite multiple racist incidents on campus, administration failed to suspend students & likely will not hold their faculty accountable unless we flood their dms [direct messages] & emails."  The third and final still image shows contact information from SJU's website for its Chair of Mathematics, Director of Graduate Programs in Mathematics Education, and a Visiting Assistant Professor of Mathematics; includes the "flood their dms" language previously discussed; and adds "pls email/ report on sju website."  Similarly, Defendant Lopez's caption for the entire video reads "pls report [Plaintiff's] disgusting racist tweets to any of the emails, phone numbers included in this video or submit a report in the link in my bio #fyp."

[7]    Sharing publicly posted social media content from one platform to another is not doxing. "Doxing" means to publicly identify or publish private information, usually as a form of harassment. *See* https://www.merriam-webster.com/dictionary/dox.  Although Plaintiff alleges his Twitter account was "anonymous and not affiliated with

> 106. Colbert was provided this information [about Plaintiff telling a narcoleptic student that they had to sit in the back of the classroom] from Lopez, after Lopez received it from Carman in a Direct Message conversation and Lopez then submitted the message to St. Joseph's.

> 109. Fahey, a graduate of St. Joseph's, told Lopez that [Plaintiff] thought "mental health is a joke", that "his classroom is not a safe space" and that "he almost made [her] drop out of school." Lopez sent a screenshot of her Direct Message conversation with Fahey to [SJU].

Am. Compl. ¶¶ 55, 94, 106, 109. Further, the Complaint references a February 19, 2021 "public tweet" to SJU by Defendant Lopez without further detail about what that public tweet said. Am. Compl. ¶ 57. Every remaining allegation against Defendant Lopez in the proposed Amended Complaint is a legal conclusion without factual support. Am. Compl. ¶¶ 5-6, 9, 56, 91, 145-49.

Thus, Plaintiff's claims against Defendant Lopez are based on three sets of actions taken by her: (1) two private reports to SJU where she repeats information revealed to her by former students about their experiences with Manco in the classroom; (2) her February 19, 2021 "public tweet" to SJU, the contents of which are unknown; and (3) her TikTok video that shared screenshots of Plaintiff's tweets with her written reactions. Am. Compl. ¶¶ 55, 57, 106, 109. These actions are not extreme and outrageous or "utterly intolerable in a civilized society" and, as such, cannot support the first element of a claim for IIED. *Kornegey*, 299 F. Supp. 3d at 683. *See also Eck*, *Kessler*, *supra*.

---

St. Joseph's," (Am. Compl. ¶ 46) Plaintiff posted numerous publicly available tweets and replies identifying himself as the author of his Tweets and referencing his affiliation with SJU, e.g.:



Thus, the Court should deny Plaintiff's request to amend his complaint as to adding a claim of IIED as to Defendant Lopez because such an amendment would be futile.

> 3. *Defendant Colbert's alleged conduct is not extreme or outrageous.*

Finally, Plaintiff has failed to allege facts against Defendant Colbert that are sufficiently extreme and outrageous. Just as with Defendants Fahey and Lopez, Plaintiff's IIED claim against Defendant Colbert is nothing more than Plaintiff's attempt to punish Defendant Colbert for purportedly saying things on social media and to SJU about Plaintiff that Plaintiff does not like. The relevant facts from the proposed Amended Complaint are scattered and non-chronological; accordingly, they are rearranged and grouped below into three categories.

> a.  <u>Defendant Colbert's January 2021 Report to SJU</u>

Plaintiff alleges that on January 22, 2021, Defendant Colbert, an SJU graduate, emailed certain SJU leadership (Nicole Stokes, Ph.D., SJU's Associate Provost for Diversity, Equity, and Inclusion, Shaily Menon, Ph.D., the Dean of the College of Arts and Sciences, and Dr. Tapp), "accusing Dr. Manco of being racist and transphobic." Am. Compl. ¶ 49. According to Plaintiff, Defendant Colbert "included selected screenshots of tweets of Dr. Manco, as supposed evidence to support her claims, adding that Dr. Manco discriminated against her in class and fostered a hostile learning environment four (4) years earlier, in Spring of 2017. Colbert stated that Manco "should not be allowed to coach or teach students." Am. Compl. ¶ 50. Plaintiff goes on:

> 98.    Colbert communicated false statements of fact when she told St. Joseph's, in her initial January 22, 2021 email, that Dr. Manco "purposely made a hard quiz" the day President Joseph R. Biden, then former Vice President, came to St. Joseph's on April 24, 2018, so "that students could not miss [the quiz]…" and therefore would have to miss the speech.

> 99.    Colbert knew that this false assertion of fact was, indeed, a lie as she was previously in Dr. Manco's class, and she knew all quizzes counted as extra credit. Moreover, Joe Biden's visit and

speech was deliberately scheduled to begin at 11:00 am when no classes were held on campus.  In addition, despite having no obligation to do so, Dr. Manco accommodated students in his 9:30-10:45 am class who wanted to arrive to the Joe Biden visit early to get a good seat. . . .[8]

51.    On January 26, 2021, Colbert met with Title IX Coordinator Lexi Morrison, Intake Officer Taba Pickard, and Tenisha McDowell from Human Resources. Ms. Morrison identified this meeting as the "consultation process" as outlined in St. Joseph's Interim Policy on Discrimination, Harassment, and Retaliation ("Interim Policy").

97.    Colbert told St. Joseph's in her January 26, 2021 "consultation process" that Dr. Manco would not "work with her" when she requested to take her final exam late due to her head injury, all of which was a false statement of fact. To the contrary, Dr. Manco granted Colbert permission to makeup two (2) different exams, including the final exam. In addition to granting Colbert a makeup exam in their text message conversation, he granted her a makeup for the final exam by allowing her to pick the date and time her email request to Dr. Manco to take the exam late. . . .[9]

52.    During this "consultation process" Ms. Morrison broke with the procedures laid out in the Interim Policy, breached the duties owed to Plaintiff, and conspired with Colbert by advising her to find others to support her experience with Dr. Manco, and to get them to reach out to her.

Am. Compl. ¶¶ 51-52, 97-99.[10]

To summarize, in Defendant Colbert's report to SJU in January 2021, she purportedly made the following statements about Plaintiff:  (1) he was racist and transphobic; (2) he discriminated against her in class and fostered a hostile learning environment during the Spring of 2017; (3) he should not be allowed to coach or teach students; (4) he purposely made a quiz hard in April 2018;

---

[8]    Screenshots of emails between Plaintiff and his students are affixed to this paragraph.

[9]    Screenshots of emails between Plaintiff and Defendant Colbert are affixed to this paragraph.

[10]    Notably, Plaintiff does not provide any details about the "selected screenshots" of Plaintiff's own tweets that Defendant Colbert purportedly provided to SJU.

and (5) he would not "work with her" when she requested to take her final exam late due to a head injury.  *None* of the foregoing actions, taken as true, rise to the level of atrocity required to state an IIED claim.  *See Eck, Kessler, supra.*  Making reports to a university about a professor's behavior, even if such reports are unflattering or untrue, is not extreme or outrageous or "utterly intolerable in a civilized society" and, as such, cannot support the first element of a claim for IIED.  *Kornegey*, 299 F. Supp. 3d at 683.  *See also Eck*, *Kessler*, *supra.*

b.   Defendant Colbert's February 2021 Social Media Posts

The proposed Amended Complaint also references a handful of social media posts allegedly posted by Defendant Colbert from February 19, 2021 and February 21, 2021.

The relevant posts from February 19, 2021 allege:

> 54.   [f]our weeks later [after Colbert's SJU Report], on February 19, 2021, Colbert followed Ms. Morrison's advice by using her Instagram account to spread 'selected' screenshots of selected tweets of Dr. Manco with her added defamatory comments, while encouraging others to report him to the University so that he would lose his job.

Am. Compl. ¶ 54.  The proposed Amended Complaint appears to provide two examples of these "selected screenshots" from February 19, 2021 at paragraphs 92 and 94.  The first screenshot is a tweet authored by Plaintiff where he questions whether "race/bias 'training'…actually divides us and *worsens* race relations."  Am. Compl. ¶ 92.  On top of the tweet is Defendant Colbert's superimposed text that "When I took this man for stat[istics] I had a feeling he didn't like Black people but now reading his Twitter I know that he doesn't like Black people."  Am. Compl. ¶ 92.  The second screenshot is another tweet authored by Plaintiff where he equates reparations as a public policy with the descendant of a murder victim personally demanding compensation at the doorstep of the descendant of the murderer, adding: "Now get this racist reparations bullshit out of your head for good."  Am. Compl. ¶ 94.  On top of the tweet is Defendant Colbert's

superimposed comment, "Professor Gregory Manco of Saint Joseph's University everyone!!!! This man should not be allowed to teach in any classroom that Black students are in! Or really any students really!!!"  Am. Compl. ¶ 94.  Plaintiff also alleges that by sharing his tweets "with false assertions of fact, on social media platforms that he did not utilize," Defendant Colbert and Defendant Lopez were "doxing" Plaintiff.[11]

Plaintiff also references the following tweets by Defendant Colbert from February 21, 2021:

> 100.   On February 21, 2021, with bias reports still being submitted to St. Joseph's about Dr. Manco, Colbert tweeted that Dr. Manco "[allowed] his followers to send literal death threats to college students."

> 101.   This was a lie, and Colbert knew it to be a lie.

> 105.   Also on February 21, 2021, Colbert tweeted that Dr. Manco told a narcoleptic student that they had to sit in the back of the classroom, which if true would be a violation of law and school policy:



> 106.   Colbert was provided this information from Lopez, after Lopez received it from Carman in a Direct Message conversation and Lopez then submitted the message to St. Joseph's.

> 107.   Both Colbert and Carman's statements were lies.

Am. Compl. ¶¶ 100-01, 105-07.  Plaintiff alleges that as a result of Defendant Colbert's actions and the independent actions of others, SJU began to receive complaints about Plaintiff through its bias reporting form.  Am. Compl. ¶ 56.

---

[11]   As noted in footnote 7, *supra*, Defendant Colbert's actions, as outlined in the proposed Amended Complaint, were not "doxing" Plaintiff.  *See also* Am. Compl. ¶ 46, where Plaintiff admits ownership of his Twitter account.

To summarize, on February 19, 2021, Plaintiff alleges that Defendant Colbert reshared two of <u>Plaintiff's own tweets</u> and superimposed the following opinions related to those posts: (1) Plaintiff doesn't like black people; and (2) Plaintiff should not be able to teach in any classroom. Further, Plaintiff alleges that on February 21, 2021, Defendant Colbert tweeted that Plaintiff: (1) allowed his followers to "send literal death threats to college students;" and (2) told a narcoleptic student that they had to sit in the back of the classroom because they were narcoleptic.  Again, *none* of the foregoing actions, taken as true, rise to the level of atrocity required to state an IIED claim.  *See Eck*, 2019 WL 3842399 at \*8.  A former student expressing her opinions about her former a professor on the internet, including that she believes he is racist, and even making false allegations about what that professor did is not extreme or outrageous behavior or "utterly intolerable in a civilized society" and, as such, cannot support the first element of a claim for IIED. *Kornegey*, 299 F. Supp. 3d at 683.  *See also Eck*, *Kessler*, *supra.*

### c.  Defendant Colbert's Social Media Posts After the Alleged Non-Renewal of Plaintiff's Contract With SJU.

On June 10, 2021, Plaintiff was informed that SJU would not renew his contract, and on the same day, he was informed that he would be kept on for two of four classes and hired as a part-time adjunct professor for the Fall 2021 semester.  Am. Compl. ¶¶ 77-78.  Plaintiff, thereafter, curiously alleges that he "was illegally suspended and then terminated" – despite having just acknowledged he had not been terminated at all[12] – and claims that Defendant Colbert "reveled in her "accomplishment" by posting an Instagram story about it.  Am. Compl. ¶ 90.  Five images in the proposed Amended Complaint from Defendant Colbert's story show the following:

> Image 1 (Compl. ¶ 90, p. 22):  Defendant Colbert shares an article from *The Philadelphia Inquirer* about SJU alumni protesting

---

[12]    Indeed, per Plaintiff's proposed Amended Complaint, he's been actively teaching at SJU until May 2022. *See* Am. Compl. ¶¶ 131-36.  Notably, Plaintiff has not alleged claims against *The Inquirer*, or the alumni protestors mentioned in its article, for falsely suggesting to readers that Plaintiff was no longer employed by SJU.

Plaintiff's removal.  She seemingly circles a protestor's sign that says "RE-HIRE MANCO AND FIRE THE WOKESTERS," and adds her own commentary: "Oooops….Did I do that…."

Image 2 (Compl. ¶ 90, p. 23):  Defendant Colbert shares an article from *The Philadelphia Inquirer* about SJU alumni protesting Plaintiff's removal.  She seemingly underlines the word "Gregory Manco" and adds, "I'm hollering."

Image 3 (Compl. ¶ 90, p. 24):  Defendant Colbert shares a meme stating: "Stay in yo lane, bitch."  She seemingly adds her own commentary: "That chrome dome fucked with the wrong student and found out! As well as I told Saint Joseph's to fix the racism issue and they smiled in my face and didn't do it now yall missing money. Let that shit burn and rot."

Image 4 (Compl. ¶ 90, p. 25):  Defendant Colbert shares a meme stating: "I'm praying for you though."  She seemingly adds her own commentary: "Too many fake ass black students didn't want to help me.  Called me an angry black woman thought I was doing too much. And you sided with these white supremacist so you wouldn't look a certain way. And I'm not saying this to punch down but yall look even more dumb now.  See what happens when you keep your foot on their neck?"

Image 5 (Compl. ¶ 90, p. 26):  Defendant Colbert shares an image of a woman in a go kart and seemingly adds her own commentary: "Now all the white supremacist alumni is sick and showing their asses and proving my damn point. They don't really like black people, POC, or women at SJU.  Anyways, when you do coonery, coonery finna do you! that's the lesson to learn from today kids! And when a white MFer trying to put some Jim Crow on you, open your mouth! Bc now Gregory Manco fat head waiting in the unemployment line"

Am. Compl. ¶ 90.  Plaintiff then raises tweets between Defendant Colbert and Defendant Liebell, where they are discussing the *Inquirer* article that Defendant Colbert had also shared on Twitter:

114.    Additionally, after Dr. Manco was cleared of any wrongdoing, Dr. Liebell tweeted that Dr. Manco was guilty of professional misconduct, specifically that he does not treat his students with equal respect:

108.    Colbert replied to Dr. Liebell repeating the debunked falsehoods that Dr. Manco was guilty of racism and that he had

bullied a disabled student by making her sit in the corner.  Dr. Liebell responded that due to privacy issues, other alumni, students, and faculty did not know these supposed facts about Dr. Manco.

Am. Compl. ¶¶ 114-15.




Plaintiff then concludes, without elaboration, that "[d]espite Colbert's knowledge that Dr. Manco showed no bias towards her or any other student, she continued to lie about him in public statements, and repeatedly communicated false statements of fact."  Am. Compl. ¶ 96. There are no further allegations of fact to support this claim.  Every remaining allegation against Defendant Colbert is a legal conclusion.  Am. Compl. ¶¶ 5-6, 9, 56, 91, 145-49.

Again, none of the foregoing actions by Defendant Colbert, taken as true, rise to the level of atrocity required to state an IIED claim.  A former student sharing an article on social media, her opinions about and personal connection to that article, and then discussing the article's subject matter with those who engage with her is not extreme or outrageous behavior or "utterly intolerable

in a civilized society" and, as such, cannot support the first element of a claim for IIED. *Kornegey*, 299 F. Supp. 3d at 683. *See also Eck*, *Kessler*, *supra*.

Thus, the Court should deny Plaintiff's request to amend his complaint as to adding a claim of IIED as to Defendant Colbert because such an amendment would be futile.

### ii. The IIED claim is futile as to Opposing Defendants because the Opposing Defendants engaged in conduct that is subject to judicial privilege.

Throughout the proposed Amended Complaint, Plaintiff blames Opposing Defendants for engaging in actions that led to SJU's investigation into him and the ultimate non-renewal of his contract. Am. Compl. ¶¶ 55-58, 91, 146. Thus, taking Plaintiff's allegations as true, even if this Honorable Court finds that the actions taken by the Opposing Defendants were extreme and outrageous, all of the actions taken by the Opposing Defendants were pertinent and material to SJU's investigation into Plaintiff and premised on their purported attempts to initiate a quasi-judicial proceeding against Plaintiff. For this reason, their actions are entitled to judicial privilege and cannot serve as the basis of an IIED claim and any amendment to add IIED claims against Opposing Defendants based on these facts would be futile. *See Garabedian*, 2019 WL 4885969, *7 (recognizing that the judicial privilege extends to IIED claims under Pennsylvania law); *See also Church Mut. Ins. Co. v. Alliance Adjustment Grp.*, 102 F. Supp. 3d 719, 730 (E.D. Pa. 2015) ("[Pennsylvania's judicial privilege] extends to all tort actions . . . .").

The Eastern District of Pennsylvania has dismissed cases at the 12(b)(6) stage when Pennsylvania's "judicial privilege" is found to apply. *See e.g.*, *Ortiz v. De. River Port Auth.*, No. 09-6062, 2010 WL 1994911 (E.D. Pa. May 17, 2010); *Giusto v. Ashland Chem. Co.*, 994 F. Supp. 587, 594 (E.D. Pa. 1998); *Fogel v. Univ. of the Arts*, No. 18-5137, 2019 WL 1384577, at *8 (E.D. Pa. Mar. 27, 2019). Whether a statement deserves an absolute privilege is a question of law for

the court. *Pawlowski v. Smorto*, 588 A.2d 36, 41 (1991). The judicial proceeding privilege provides immunity for communications: "(1) issued as a matter of regular course of the proceedings; or (2) pertinent and material to the proceedings." *Bochetto v. Gibson*, 580 Pa. 245 (2004). "These two factors apply equally to communications made prior to the initiation of judicial proceedings." *Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F. Supp. 2d 232, 247 (E.D. Pa. 2012) (citations omitted). "[T]he privilege is absolute, meaning that, where it attaches, the declarant's intent is immaterial even if the statement is false and made with malice." *Schanne v. Addis*, 121 A.3d 942, 947 (Pa. 2015). *See also Church Mut. Ins. Co. v. Alliance Adjustment Grp.*, 708 Fed. App'x 64, 71 (3d Cir. 2017). This privilege also extends to quasi-judicial proceedings. *Milliner v. Enck*, 709 A.2d 417, 419 n.1 (Pa. Super. Ct. 1998).

In *Fogel v. University of the Arts*, this Honorable Court recognized that a private university's internal investigation into a professor's misconduct (that ultimately led to the professor's termination) constituted a quasi-judicial proceeding. 2019 WL 1384577, at *10. The *Fogel* court found, at the motion to dismiss stage, that the statements made during the quasi-judicial proceeding by the defendant who initiated the investigation were protected by the judicial privilege. *Id.* Specifically, *Fogel* involved a professor from a different university who reported purported sexual misconduct by the plaintiff professor to the plaintiff's employer, University of the Arts (a private university), sparking an investigation. *Id.* at *1-*4. Ultimately, the plaintiff professor was terminated and brought claims for defamation against the defendant professor and others. *Id.* This Court dismissed the defamation claims, in part, finding the defendant professor's statements protected by Pennsylvania's judicial proceeding privilege. *Id.* at *8. Specifically, this Court found the defendant professor's statements to the university were "pertinent and material" to the subsequent investigation and conclusions, and that they initiated quasi-judicial proceedings

against the plaintiff that warranted the application of absolute privilege.  *Id.*  In its reasoning, the

Court compared the situation to that of *Schanne*, 121 A.3d at 949, where the privilege was not

applied because the defendant reported a teacher's alleged misconduct to a friend, as opposed to

the school. Explaining, the Court in *Fogel* noted:

> Unlike *Schanne* where the plaintiff reported misconduct to her friend without any expectation of disciplinary proceedings, [the former professor] reported [plaintiff's] misconduct to his school's Title IX coordinator 'initiating' an investigation against [plaintiff]. The policy rationale explained in the supreme court's opinion in *Schanne* applies here to 'incentivize' individuals like [the defendant professor] to speak freely in seeking to initiate proceedings . . . .

*Fogel*, 2019 WL 1384577, at *10.

Similar to *Fogel*, this action involves private university's internal investigation into a

professor's misconduct that, allegedly, ultimately led to the non-renewal of his contract.  Am.

Compl. ¶¶ 77.  Consistent with *Fogel,* SJU's investigation constitutes a quasi-judicial proceeding

and the actions taken by the Opposing Defendants, who, per Plaintiff's proposed Amended

Complaint, initiated SJU's investigation, are protected by the judicial privilege.  Specifically,

Defendant Fahey's report to SJU, Defendant Lopez's reports to SJU, tweet to SJU, and TikTok

asking her followers to report Plaintiff's tweets to SJU, and Defendant Colbert's January 2021

Report to SJU and social media posts, outlined in Sections III(B)(i)(1)-(3), *supra*, are entitled to

judicial privilege based on *Fogel.*

As Plaintiff avers in his proposed Amended Complaint, SJU's investigation into Manco

was related to the "biased or discriminatory nature" of his tweets and was conducted to "gather

facts" associated with his tweets and all of Opposing Defendants' actions were "pertinent and

material" to SJU's investigation into Plaintiff's biased or discriminatory actions.  Am. Compl.

¶ 58.

Further, taking Plaintiff's allegations as true, Opposing Defendants intent in communicating with each other and SJU was specifically to initiate a quasi-judicial proceeding against Plaintiff. *Id.* at ¶¶ 49-51, 54-55, 92, 94, 98, 100, 105-06, 109-10. Per Plaintiff, just "a few hours after Lopez's public tweet to St. Joseph's, and after the school received three anonymous bias reports about [Plaintiff's] Twitter posts" he was placed on an immediate administrative leave wherein SJU was investigating the "biased or discriminatory nature" of his tweets. Am. Compl. ¶¶ 57-58. Plaintiff, himself, alleges that "St. Joseph's began to receive complaints about" him "as a result of Ms. Morrison's advice, Colbert's execution, and Lopez's assistance . . . ." *Id.* at ¶ 56. *See also id.* at ¶ 9 ("[I]t is clear that all of the defendants acted to 'cancel' Dr. Manco."); ¶ 55 (describing Defendant Lopez's actions as "join[ing] in the public campaign to have him terminated"); ¶ 91 ("Through the period described above, Colbert, Lopez . . . Fahey . . . all conspired and, in fact, communicated false statements about Dr. Manco in an effort to destroy his professional career, his reputation in the community, and cause him personal humiliation, mental anguish and suffering.") ¶ 146 ("Colbert . . . Fahey, Lopez . . . all intentionally interfered with Dr. Manco's employment contract with [SJU]"). Thus, per Plaintiff's own allegations in the proposed Amended Complaint, Opposing Defendants intended to initiate these quasi-judicial proceedings against Plaintiff. Like the defendant in *Fogel*, who was protected by the judicial privilege for initiating quasi-judicial proceedings against a current professor, the Opposing Defendants should be protected by the judicial privilege for reporting Plaintiff and initiating the SJU investigation. "Under such a predicate, there is a colorable nexus between immunity and the privilege's underlying policy pertaining to the unencumbered resolution of claims in a judicial (or quasi-judicial) setting." *Schanne*, 121 A.3d at 559-60.

Further, the privilege should also apply because public policy favors empowering

individuals like Opposing Defendants to make such reports.  *See Schanne v. Addis*, 898 F. Supp. 2d 751, 757 (E.D. Pa. 2012) ("When courts choose to apply the privilege, they deem the policy concerns – encouraging open communication without fear of retributive lawsuits – to outweigh the right of the defamation plaintiff to seek redress.") (vacated and remanded on other grounds).

Because Opposing Defendants' actions were privileged, an amendment to add a claim for IIED would be futile and Plaintiff's Motion should, therefore, be denied as to addition of this claim against Opposing Defendants.

## IV.     <u>CONCLUSION</u>

For the reasons stated herein, Opposing Defendants respectfully request that this Court deny Plaintiff's Motion for Leave to File an Amended Complaint as to Plaintiff's requested inclusion of a claim for IIED as to Opposing Defendants.

**FISHER & PHILLIPS, LLP**

By:     <u>*/s/ Deniz Uzel Reilly*</u>
        Michael R. Galey, Esquire
        Deniz Uzel Reilly, Esquire
        Two Logan Square, 12th Floor
        100 N. 18th Street
        Philadelphia, PA  19103
        (610) 230-2150 (phone)
        mgaley@fisherphillips.com
        dreilly@fisherphillips.com

        *Counsel for Defendants*
        *Hadassah Colbert, Kiernan Loue, Karleigh*
        *Lopez, and Erin Fahey*

Date:  June 8, 2022

FP 44142282.5