IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY V. MANCO, Ph.D,       :
     Plaintiff,              :
                                :
     v.                        :        CIVIL ACTION NO. 22-285
                                :
ST. JOSEPH'S UNIVERSITY, *et al.*,    :
     Defendants.            :

**<u>MEMORANDUM OPINION</u>**

**Schmehl, J.**    /s/ JLS                            **January  25 , 2024**

## I.    <u>INTRODUCTION</u>

Before the Court are the motions of Defendants, Saint Joseph's University ("SJU"), Hadassah Colbert, Keirnan Loue, Lynly Carman, Dr. Susan Liebell, Karleigh Lopez, Erin Fahey, Corrine McGrath, and Dr. McConnell to dismiss the Second Amended Complaint filed by Plaintiff, Gregory V. Manco, Ph.D. ("Plaintiff" or "Manco"). Manco filed a Second Amended Complaint seeking relief for alleged wrongful termination, defamation, reverse race discrimination in violation of Title VII, violations of 42 U.S.C. § 1981, violation of the Pennsylvania Human Relations Act ("PHRA"), violations of the Philadelphia Fair Practices Ordinance ("PFPO"), breach of contract, false light, civil conspiracy, tortious interference with contract, and intentional infliction of emotional distress ("IIED"). Based upon the parties' submissions and after oral argument being held, Defendants' motions will be granted in part and denied in part.

## II.    <u>BACKGROUND</u>

Manco was originally hired by SJU as an adjunct professor in 2005 and served as a Visiting Professor of Mathematics from 2007 until 2021. (ECF No. 51, Sec. Amd. Compl. at ¶¶

34, 35, 41). Sometime in January of 2021, Hadassah Colbert ("Colbert"), a former student of Manco's at SJU, discovered Manco's anonymous Twitter account, and on January 22, 2021, Colbert submitted an email to Nicole Stokes, Ph.D ("Stokes") and Dr. Tapp, in which she "labeled Dr. Manco as racist and transphobic," included screenshots of his tweets, and alleged that Manco discriminated against her in class four years earlier. (Sec. Am. Compl. at ¶¶ 46, 49, 50).

Four days later, on January 26, 2021, Colbert met with Title IX Coordinator Lexi Morrison ("Morrison"), Intake Officer Taba Pickard ("Pickard"), and Tenisha McDowell ("McDowell"). (*Id.* at ¶ 51). This consultation process is outlined in SJU's Interim Policy on Discrimination, Harassment, and Retaliation ("Interim Policy"). (*Id.*). Manco alleges that in this meeting, "Morrison . . . conspired with Colbert by providing her with advice regarding how she could strengthen her complaint." (*Id.* at ¶ 52).

On February 19, 2021, Colbert spread screenshots of Manco's tweets on Instagram with her own commentary which Manco alleges was defamatory. (*Id.* at ¶ 54). Karleigh Lopez ("Lopez"), a former SJU student, saw the Instagram posts and then created and published a TikTok video that included screenshots of Manco's tweets and included "a link to the bias reporting form as well as a plea to her followers to 'flood' the school with complaints" about Manco. (*Id.* at ¶ 54-56). Lopez then sent Manco's public tweets to SJU administrators and included Colbert's commentary. (*Id.* at ¶ 57). That same day, SJU received three additional anonymous bias reports. (*Id.* at ¶ 58). Later that day, Manco was placed on administrative leave pending the outcome of an investigation into his conduct that was to be conducted by an independent third party. (*Id.* at ¶ 60).

Manco alleges that Lopez and Colbert continued to make defamatory tweets; on February 21, 2021, Colbert tweeted that Manco "told a narcoleptic student they had to sit in the back of the classroom because they were narcoleptic." (Sec. Am. Compl. at ¶117). Manco further alleges that other students, like Fahey and Loue, made defamatory and false statements and tweets about Manco's conduct. (*Id*. at ¶¶ 121-124). He further alleges that McGrath stated on Facebook that Manco was "obviously racist and sexist, he was just downright cruel" and that he "took pride in failing and mocking kids." (*Id.* at ¶ 128).

On May 12, 2021, the independent investigation concluded. Manco alleges (without ever seeing the report) that the report "exonerated him." (Sec. Am. Compl. at ¶¶ 76-77). SJU released a statement that there was not enough evidence to reach a definite conclusion. (*Id.* ¶ 79, Ex. E). Plaintiff alleges that this statement was "malicious, defamatory, and false" and that SJU knew it was false, thus placing him in a false light and negatively impacting his reputation and employment, among other things. (*Id.* at ¶¶ 80-83). Manco believes that "the only reason SJU released a statement at all is because Dr. Manco is white and SJU feared student backlash." (*Id.* at ¶ 84).

On June 10, 2021, Dr. James Carter ("Carter") informed Plaintiff that the school had decided not to renew his visiting faculty contract, and instead that he would only be teaching two classes, rendering him an adjunct professor. (*Id.* at ¶ 88- 89). Manco appealed this decision, but his appeal was denied, allegedly in violation of "the contractual protections of academic freedom" and "due process awarded to him under the SJU Interim Policy." (*Id.* at ¶¶ 91, 94-96). Plaintiff alleges that "SJU has made express commitment to the ideas of faculty freedom of expression and academic freedom. These commitments constitute a legal obligation on the part

of SJU, as well as the duty of care owed to Plaintiff, all which SJU breached to the detriment and harm of Plaintiff." (Sec. Am. Compl. at ¶ 100).

On May 3, 2022, Manco was removed as a professor for the only two courses that he would be teaching that fall, with SJU citing "violation of University policies." (*Id.* at ¶ 145). Manco alleges that this was done in retaliation against him for his filing of a federal lawsuit against the University. (*Id.*) He goes on to allege that Dr. McConnell defamed him during this process by sending him a letter stating that he potentially violated FERPA. (*Id.*; see also Exhibit "I".) Manco then alleges that SJU "had been plotting to remove Dr. Manco from the classroom since Colbert's initial complaint" and that "SJU['s] decision to terminate Dr. Manco's employment was retaliatory and in violation of Dr. Manco's rights . . ." (*Id.* at ¶¶153-54). In the aggregate, this conduct, according to Manco, was a conspiracy between all the defendants (except McGrath) to terminate his employment. (*Id.* at ¶¶156-57).

## III.   LEGAL STANDARD

Motions to dismiss are governed by Federal Rule of Civil Procedure 12(b)(6).  If a plaintiff fails to state a claim upon which relief can be granted, the court may dismiss the action. Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss . . . Threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Id.* at 678-79.  A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011)

(citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (*quoting Twombly*, 550 U.S. at 557).

In *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016), the Third Circuit instructed district courts to apply a three-step analysis to 12(b)(6) motions: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegation that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." (*quoting Iqbal*, 556 U.S. at 675, 679). *See Burtch*, 662 F.3d at 221*; Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).

In our analysis of a motion to dismiss, the Third Circuit allows us to consider documents "attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

IV.    <u>DISCUSSION</u>

A.  <u>WRONGFUL TERMINATION</u>

Manco has brought a claim for wrongful termination against SJU and McConnell. Under Pennsylvania law, "an employer may terminate an employee without cause provided that 'the dictates of public policy,' contract, or a statutory provision do not prohibit such termination." *Gillispie v. RegionalCare Hospital Partners, Inc.*, 898 F.3d 585, 597 (3d Cir. 2018) (*quoting Spierling v. First Am. Home Health Servs., Inc.*, 737 A.2d 1250, 1253 (Pa. Super. 1999). "[W]here the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge." *Geary v. U.S. Steel Corp.*, 456 Pa. 171, 184-85 (1974). In other words, in Pennsylvania, an employer may terminate an at-will employees' employment "for any reason that does not violate public policy." *Dick v. Healthcare Risk Solutions, LLC*, 2008 WL 4682621, at *2 (E.D. Pa. 2008) (citing *Geary*, 456 Pa. at 184.)

"[A] cause of action for wrongful discharge may be maintained where there is no available statutory remedy for an aggrieved employee." *Hicks v. Arthur*, 843 F. Supp. 949, 957 (E.D. Pa. 1994) (citing *Freeman v. McKellar*, 795 F. Supp. 733, 741 (E.D. Pa. 1992)). However, if "the legislature has enacted laws which precisely protect the interests of employees that the plaintiff alleges have been violated, then plaintiff's cause of action cannot be maintained." *Id.*

Manco alleges that he was "terminat[ed] for engaging in protected activity by way of filing a civil action Complaint in federal court" and that this was a "clear and definitive violation of public policy." (Sec. Am. Compl. at ¶¶ 166, 167). Even assuming that the alleged conduct (retaliation) is against public policy, Plaintiff's claims still must be dismissed. As this Court held

6

in *Hicks*, a plaintiff may not pursue "claims of wrongful discharge through the public policy exception where there are statutory remedies available" which the plaintiff may pursue. *Hicks*, 843 F. Supp. at 957 (dismissing plaintiffs' claims that had alternate statutory remedies); *see also Kinnally v. Bell of Pennsylvania*, 748 F. Supp. 1136, 1146 (E.D. Pa. 1990) (stating first that "[f]ederal Courts, applying Pennsylvania law, will recognize such exceptions only where there is no available statutory means of vindicating the public policy in question," and then "[a]ble to pursue her rights under statute, plaintiff may not appeal to the common law as an additional means of policy implementation."); *Bruffett v. Warner Communications, Inc.*, 692 F.2d 910, 917-19 (3d Cir. 1982).

Like in *Hicks*, the statutory remedies available to Manco include the PHRA, Section 1981, and Title VII. Like the cases *supra*, Manco has statutory remedies for the alleged retaliation, including state and federal law. Plaintiff is already seeking relief under these statutory remedies. As such, this claim is not subject to the public policy exception and must be dismissed.

## B. <u>DISCRIMINATION</u>

Manco alleges that SJU and Dr. McConnell engaged in "reverse" race discrimination by not renewing his teaching contract at SJU. He alleges that "SJU intentionally discriminated against Dr. Manco because of his race" and that "SJU would not have taken the drastic, life-changing adverse employment actions that it took against Dr. Manco if Dr. Manco was a different race." (Sec. Am. Compl. at ¶¶ 180-182).

Plaintiff asserts a claim for race discrimination under Title VII, PHRA, PFPO, § 1981 under the burden shifting pretext theory set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). (*Id.* at ¶¶ 151, 152, 187, 192, 198). "Courts apply the same burden-shifting framework to discrimination claims asserted under Title VII, the PHRA, PFPO, § 1981 and § 1983." *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 593 (E.D. Pa.

2020) (citing *Jones v. Sch. Dist. of Phila.*, 198, F.3d 403, 410 (3d Cir. 1999)); *see Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).

Under the burden shifting framework, the "plaintiff must first carry the initial burden of establishing a *prima facie* case of discrimination." *Branch v. Temple University*, 554 F. Supp.3d 642, 648 (E.D. Pa. 2021) (*quoting Norman v. Kmart Corp.*, 485 F. App'x 591, 592 (3d Cir. 2012)). To establish a *prima facie* case of racial discrimination, "a plaintiff must show (1) he is a member of a protected class, (2) he was qualified for the position he sought to attain or retain, (3) he suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Id.* at 649 (cleaned up) (*quoting Robinson v. Nat'l R.R. Passenger Corp.*, 2019 WL 3331033, at *9 (E.D. Pa. 2019); *see Vaughan v. Boeing Company*, 733 Fed. Appx. 617, 622 (3d Cir. 2018); *Jones v. Sch. Dist. of Phila.*, 198, F.3d 403, 410-11 (3d Cir. 1999)).

Here, the first three prongs are properly alleged. Manco is Caucasian, and race is a protected class. (Sec. Am. Compl. at ¶ 1). Manco was qualified for his position; he had a Ph.D. in Statistics and taught Mathematics as a Visiting Professor since 2007. (*Id.* at ¶ 35). Manco suffered an adverse employment action; his contract to teach at SJU was not renewed. (*Id*. at ¶ 88). SJU contends, however, that Plaintiff has failed to adequately plead the fourth element and therefore we must dismiss these claims.

"The central focus of the fourth element is whether the employer is treating some people less favorably than other because of their race, color, religion, sex, or national origin." *Branch*, 554 F. Supp.3d at 649 (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)). "Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similar

situated employees outside of the plaintiff's protected class." *Id.* (citing *Smith v. Sec'y U.S. Navy*, 843 F. App'x 466, 469 (3d Cir. 2021) and *May v. PNC Bank*, 434 F. Supp. 3d 284, 298 (E.D. Pa. 2020)); see also *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999) (stating to state *prima facie* case in the context of "reverse discrimination," a plaintiff must "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." ).

Here, Plaintiff's claim is premised on his race. His statement that SJU "would not have taken the drastic, life-changing adverse employment actions that it took against Dr. Manco if Dr. Manco were a different race," makes clear that this claim is premised on perceived racial discrimination. (Sec. Am. Compl. at ¶ 182). However, this allegation is vague and conclusory; nowhere in the complaint does Dr. Manco provide factual support for this allegation.

In *Iadimarco*, a white employee alleged that he was not given a promotion despite being ranked "superior" in every category and a black employee was given the position without a ranking. 190 F.3d at 164. Additionally, the plaintiff alleged that the position required an engineering degree and that he possessed one, but the employee hired did not. *Id.* The Third Circuit held that a fact finder could conclude that the white plaintiff was discriminated against due to his race based on these allegations, and thus he had established a *prima facie* case under Title VII. *Id.* at 165. While this case dealt with a motion for summary judgment, it demonstrates the type of facts needed to sufficiently plead a *prima facie* case. Conversely, in *Varol v. Pave-Rite, Inc.*, 472 Fed. Appx. 102, 104 (3d Cir. 2012), the Third Circuit affirmed a District Court's decision to grant a motion to dismiss because the plaintiff "failed to set forth the elements for a *prima facie* case of discrimination and did not include any facts that could be discerned to state a facially plausible right to relief." In that case, the plaintiff's complaint included "vague

allegation[s]" that his company replaced him with a non-Muslim driver; the Third Circuit affirmed that this was insufficient to show discrimination. *Id.*

Here, Manco alleges that employees of a different race would not have been treated as he was and that his contract was not renewed because he was white. But like the plaintiff in *Varol*, these are vague allegations. At best, Plaintiff alleges that his guarantee of academic freedom was treated differently than other white professors. (Sec.Am. Compl. at ¶ 100, fn 4 (stating that "SJU relied on this very commitment [to academic freedom] when defending David Parry, Ph.D., . . ." (a Caucasian professor who gave a controversial speech)). Based on this, it might be true that Manco was treated differently than similarly situated employees, but it does not support that the difference in treatment is a result of race, as both professors are Caucasian. As such, Manco has failed to establish a *prima facie* case because he has not included facts to support this allegation—he merely makes conclusory statements about his belief that the lack of contract renewal was based on race.

Further, to the extent Manco is arguing that he was discriminated against because the University perceived him as a racist, it has been held that being falsely perceived as racist is not a protected characteristic under anti-discrimination laws. *Bank v. Comm. College of Phila.*, 2022 WL 2905243 (E.D. Pa. July 22, 2022). "Racism is a state of mind or a belief, whereas race is a state of being." *Ledda v. St. John Neumann Regional Academy*, 2021 WL 1035106, at *5 *(M.D. Pa. Feb. 18, 2021) (M.J. Carlson), report and recommendation adopted, 2021 WL 1017370 (M.D. Pa. Mar. 17, 2021). Thus, "[w]hile falsely accusing someone of being a racist is morally wrong, such accusations cannot form the basis of a race discrimination claim." *Id.* (quoting *Lovelace v. Washington Univ. Sch. of Med.*, 931 F.3d 698, 708 (8th Cir. 2019)).

For all the reasons set forth above, Manco has failed to establish the fourth element of a *prima facie* case because his allegations that employees of a different race would be treated differently are conclusory and vague. Further, Manco's complaint fails to set forth any facts that show he was discriminated against because he was white; rather, his complaint contains facts of Defendants' alleged perception of him as a racist. As such, Plaintiff has failed to state a claim upon which relief can be granted. Accordingly, Count III of Plaintiff's Second Amended Complaint is dismissed in its entirety, and Counts IV, V, and VI are dismissed as they pertain to racial discrimination under § 1981, PHRA, and PFPO.

## C. <u>RETALIATION</u>

Manco also brings claims against SJU and McConnell for retaliation. "To establish a *prima facie* case of retaliation in violation of Title VII, the PHRA, PFPO, and § 1981, plaintiff must show (1) he engaged in protected activity; (2) his employer took an adverse action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action." *Tomaszewski*, 460 F. Supp.3d at 599. In "a retaliation case, a plaintiff must demonstrate that there has been an underlying section 1981 violation." *Estate of Olivia ex rel. McHugh*, 604, F.3d 788, 798 (3d Cir. 2010) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 443, 451 (2008). The plaintiff "must have acted under a good faith, reasonable belief that a violation existed." *Castleberry v. STI Group*, 863 F.3d 259, 267 (3d Cir. 2017) (*quoting Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)) (internal quotations omitted).

In the instant matter, Manco's retaliation claims against SJU are premised on the PHRA, PFPO, and § 1981. He alleges that "SJ[U's] decision to terminate Dr. Manco's employment was retaliatory and in violation of Dr. Manco's rights under Section 1981." (Sec. Am. Compl. at ¶

154). He subsequently goes on to state SJU's retaliation violated the PHRA and PFPO. (*Id.* at ¶¶ 192, 197).

Manco alleges that he engaged in a protected activity, filing a federal lawsuit against SJU. (*Id.* at ¶ 144). He alleges that his employer took adverse action against him by not renewing his teaching contract. He also alleges a causal connection between the two: he specifically alleges that SJU first removed him from teaching courses in the summer for "violating school policies" (something he claims is untrue) and then he was removed because he "engag[ed] in protected activity by filing a Complaint in federal court." (*Id.* at ¶¶ 144, 145). He makes clear each element of a *prima facie* case. He bases his allegations on the fact that he was first removed for an alleged FERPA violation, something he disputes and claims that the allegations about his FERPA violations were in response to him including student emails in a complaint in federal court, a protected activity.

Plaintiff has clearly alleged every *prima facie* element for retaliation under § 1981, the PHRA, and PFPO. This Court will not dismiss Plaintiff's retaliation claim against SJU as set forth in Counts IV, V and VI of his Second Amended Complaint.

Manco also asserts discrimination and retaliation claims against Dr. McConnell, former provost of SJU, under the PHRA, PFPO, § 1981 (Counts IV, V, and VI). (Sec. Am. Compl. at ¶¶ 187, 197-98). Here, for the same reasons stated *supra*, Manco has failed to state a claim for racial discrimination as to McConnell under the PHRA, PFPO, or § 1981. Accordingly, his discrimination claims against McConnell are dismissed.

Manco alleges that SJU and Dr. McConnell "terminated Dr. Manco . . . on the pretextual grounds that he violated FERPA by filing his initial complaint . . ." (*Id.* at ¶ 198). For the same reasons stated *supra*, Manco has stated a *prima facie* case for retaliation against McConnell. Like

SJU, he alleges that he filed a complaint, that his contract was not renewed, and he alleges a connection between this activity and McConnell. Manco states, "Dr. McConnell informed Dr. Manco that not only was he being removed from teaching his summer course, he was also being removed as professor from the only two courses he was scheduled to teach in the fall semester due to his 'violation of University policies . . .'" (*Id.* at 144). He goes on to allege that this was pretextual. (*Id.* at 152). As such, Manco has alleged the *prima facie* elements for retaliation and that claim shall be permitted to proceed as to McConnell.

### D. <u>BREACH OF CONTRACT</u>

Plaintiff's Second Amended Complaint includes a breach of contract claim against SJU for breaching the agreements that it had with Manco pursuant to its Interim Policy. A *prima facie* case for breach of contract under Pennsylvania law contains three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Udodi v. Stern*, 438 F. Supp.3d 293, 299 (E.D. Pa. 2020) (internal quotations omitted) (*quoting Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)).

Here, SJU concedes (for the purposes of this motion only) that there was a contract and that the essential terms were attached as "Exhibit A" in Plaintiff's Second Amended Complaint. (ECF No. 66, p. 16). This satisfies the first element required to state a claim. Manco also adequately alleges damages. He alleges that because of the breach, he "sustained significant damages, including, but not limited to loss of his professorship . . . loss of lifetime earnings, loss of education opportunities, pain and suffering, and other direct and consequential damages." (Sec. Am. Compl. at ¶¶ 62, 205). The question that remains for this motion is whether Manco has alleged sufficient facts to plausibly establish the second element, a breach of the duty imposed by the contract.

Manco alleges that SJU violated the interim policy in several ways. First, he argues that SJU breached the contract by placing him on administrative leave. (*Id.* at ¶¶ 60, 62). Second, he argues that SJU violated the policy because the provost failed to meet with him within three days of placing him on leave. (*Id.* at ¶ 68). Additionally, he argues that SJU violated the policy by discriminating against him based on his race and for violating SJU's commitment to academic freedom. (*Id.* at ¶¶ 96, 99).

SJU contends that under the policy, they were entitled to impose interim measures and that they complied with their contractual obligation to meet with Manco; SJU argues that Manco misunderstood the contract. (ECF No. 66, pp. 17-18). SJU also argues that "any attempt by Plaintiff to base his breach of contract claim on the aspiration statement contained in the policy must fail." (*Id.* at p. 16).

Here, while some of Manco's grounds for breach of contract are not valid—he has failed to state a claim for race discrimination and SJU was entitled to interim measures in the contract—he nonetheless states one potential breach of the contract. The Policy states that its "harassment provision" "shall not be construed or applied to restrict academic freedom at the University, nor shall it be construed to restrict constitutionally protected expression, even though such expression may be offensive, unpleasant, or even hateful." (Sec. Am. Compl., Ex D, p.5, fn 1). While Manco alleges that his tweets fall under academic freedom, this Court disagrees based on the definition in the contract. (*Id.* at p. 7) (stating that "[i]n an instructional context, wide latitude is required for professional judgment in determining appropriate content and presentation of academic material, provided this material is germane to the subject matter of the course."). Nonetheless, the statement on harassment appears to be broader and can plausibly be

read to suggest that the school shall not restrict "constitutionally protected expressions" including what some might categorize as hateful tweets.

In other words, while this Court doubts that these tweets fall under "academic freedom," the contract may provide broader protections and Manco has properly alleged that the school fired him (at least in part) because of this expression. As a result, he has plausibly stated a claim for breach of contract, and this claim shall be permitted to remain.

### E. **DEFAMATION**

In Manco's Second Amended Complaint, he brings a claim of defamation against SJU and McConnell, the student defendants (Colbert, Carman, Lopez, Fahey and McGrath), and Defendant Liebell. I will discuss each group of defendants and their alleged defamatory statements below.

#### 1. **SJU and McConnell**

Under Pennsylvania law, a plaintiff in a defamation case has the burden of proving: 1) the communication was defamatory; 2) publication by the defendant; 3) the communication applies to the plaintiff; 4) the recipient of the communication understands the communication's defamatory meaning; 5) the recipient understands the communication to be intended to apply to the plaintiff; 6) special harm resulting to the plaintiff from its publication; and 7) abuse of a conditionally privileged decision. 42 Pa. C.S.A. § 8343. Furthermore, "[a] complaint for defamation must, on its face, identify specifically what allegedly defamatory statement were made, and to whom they were made." *Monge v. University of Pennsylvania*, 2023 WL 2726042, at *2 (E.D. Pa. 2023) (*quoting Bank v. Cmty. Coll. of Phila.*, 2022 WL 2905243, at * 3 (E.D. Pa. 2022).

This Court must take multiple steps to determine whether Manco has adequately pled facts to support his defamation claim. The first step is to make a "threshold determination whether the challenged statements are capable of defamatory meaning." *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 767 (E.D. Pa. 2016) (citing *Gibney v. Fitzgibbon*, 547 Fed. Appx. 111, 113 (3d Cir. 2013); *see Tucker v. Philadelphia Daily News*, 577 Pa. 598, 614-15 (2005) (stating that in Pennsylvania, "[i]t is the function of the court to determine whether the challenged publication is capable of defamatory meaning.") "Courts can dismiss defamation claims at the motion to dismiss stage if the statements are not capable of defamatory meaning." *Monge*, 2023 WL 3692935, at *2 (gathering cases).

"To determine whether a statement is capable of defamatory meaning, the Court considers (1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character." *Id.* (internal quotations omitted) (citing *Pace v. Baker-White*, 432 D. Supp. 3d 405, 510 (E.D. Pa. 2020). A statement is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from association or dealing with him." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F. 2d 914, 923 (3d Cir. 1990). "Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). Defamation is a state law cause of action, and as such, what statements can be considered defamatory are subject to Pennsylvania law. In Pennsylvania, "a simple accusation of racism is not enough." *McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020) (cleaned up) (citing *MacElree v. Phila.*

*Newspapers, Inc.*, 544 Pa. 117, 126 (1996)). The accusation of racism must imply more, like suggesting "that the accused has personally broken the law in a racist manner." *Id.* In *MacElree*, for instance, there was an actionable accusation of racism because the defendant called the District Attorney "the David Duke of Chester County," a statement that "implied that he was unlawfully abusing his power as district attorney, an elected office, to further racism." *Id.*; *see MacElree*, 544 Pa. at 125; *see also Wolverton v. Padgett-Patterson,* 2022 WL 452405, at *4 (M.D. Pa. Feb. 14, 2022) (finding that plaintiff's allegations that defendant's Facebook post accused him of racism and singled him out in public as a racist are not actionable in a defamation action).

Second, this Court must determine whether the defamatory statement is a statement of fact or opinion. "Pure opinions cannot defame." *McCafferty*, 955 F.3d at 357. Opinions based on "disclosed facts are absolutely privileged, no matter how derogatory they are." *Id.* (cleaned up) (citing *Braig v. Field Commc'ns,* 456 A.2d 1366, 1373 (Pa. Super.1983)). This holds true "even when an opinion is extremely derogatory, like calling another person's statements 'anti-Semitic'." *Id.* (citing *Jones v. Philadelphia*, 893 A.2d 837, 845 (Pa. Commw. Ct. 2006)). But an opinion that can reasonably be understood to "imply undisclosed defamatory facts may support a cause of action based upon those unenumerated facts." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 512 (E.D. Pa. 2020) (quoting *Moore v. Cobb-Nettleton*, 880 A.2d 1262-1267 (Pa. Super. 2005)). "Whether a statement is a fact or an opinion is a question of law." *Id.* (citing *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 168 (3d Cir. 2014)).

The defamatory statement attributed to SJU states: "The potential outcomes of an investigation include a finding of more likely than not that a violation of policy occurred, a finding of more likely than not that a violation of policy did not occur, or no determination could

be made. <u>In this case, a definitive determination could not be made due to insufficient evidence</u>."
(Emphasis added) (Sec. Am. Compl., Ex E). Manco contends that SJU knew this statement was
false and that the statement had negative implications. Manco alleges that the statement was
"chock full of lies and false implications," but does not state what the negative implication is.
(Sec. Am. Compl. at ¶¶ 79-81).

To state a claim for relief, Manco must not only allege that the statement is false, but that
it is also of a defamatory character. *Monge*, 2023 WL 3692935, at *2. Manco has not alleged
specific facts or stated the negative implication of SJU's statement; he merely alleges that it was
false and hurt his employment prospects. (Second Amend. Compl. ¶¶ 79-81, 83; ECF No. 77,
Opp. Mot. Dismiss (SJU), p. 15). However, viewing the facts in a light most favorable to Manco,
SJU's statement might lead a reader to conclude that there is a chance, however small, that
Manco is a racist. In other words, a reader might conclude that because SJU's findings about
Manco appear to be inconclusive, there is a chance that he was racist toward students. But in
Pennsylvania, "a simple accusation of racism is not enough," there must be something more, like
the suggestion that "the accused has personally broken the law in a racist manner." *McCafferty*,
955 F.3d at 358.

Manco has not alleged that SJU's statement implied that "the accused has personally
broken the law in a racist manner." *Id.* In fact, Plaintiff never explicitly alleges what the
defamatory implication is, let alone that SJU implied that Manco was a racist *and* that he
unlawfully abused his position to further his racism. *See MacElree*, 544 Pa. at 125. Even in
reading the statement in a light most favorable to Plaintiff, his claim alleges, at most, that SJU
implied there is a chance that he is a racist. This Court will not go beyond what the
Commonwealth has recognized and extend claims for defamation to *mere implications* that

someone *might* be racist. As a result, the claim of defamation as to SJU must be dismissed because Plaintiff has not alleged facts that suggest SJU's statement is capable of a defamatory meaning or implication.

As to Dr. McConnell, Plaintiff alleges two defamatory statements attributable to her. (ECF No. 77, p. 16) ([Dr. McConnell defamed Plaintiff] "in her communications with Hargust and potentially countless others . . ."). The first allegation is a generalized complaint about "communications" between Dr. McConnell and Hargust. This communication is only alleged to be defamatory in the Opposition to the Motion to Dismiss and does not appear in the Complaint. (*See*, Sec. Am. Compl. at ¶¶ 60, 61, 67, 93, 141) (describing the alleged wrongdoing of Hargust, but absent any specific communication between Dr. McConnell and Hargust). Nor is any "communication" between the two parties attached as an exhibit to the complaint. (*See*, *id.*) Merely alleging that two people "communicated" in a way Manco might not have liked, without any evidence of what these alleged communications say, is a conclusory allegation. As a result, this statement cannot be the basis for a defamation claim.

The second defamatory statement alleges that "Dr. McConnell alleged in conclusory fashion that Dr. Manco had violated FERPA . . . SJU describes Dr. Manco's participation in protected activities as an egregious violation of FERPA. *See* a true and correct copy of the May 3, 2022, letter attached as Exhibit 'I'". (Sec. Am. Compl. at ¶ 145; *see also* ECF No. 77, p. 16) ("Dr. McConnell defamed Plaintiff . . . when she penned and disseminated her May 3 letter to Plaintiff, wrongly accusing him of violating federal law.").

Our first inquiry is whether Plaintiff has alleged that this statement is defamatory and whether the statement is capable of a defamatory meaning. *Mallory*, 168 F. Supp. 3d at 767. A statement is defamatory if it "tends to harm the reputation of another as to lower him in the

estimation of the community or to deter third persons from association or dealing with him." *U.S. Healthcare, Inc.*, 898 F. 2d at 923. Here, the statement attributed to Dr. McConnell is not defamatory because Plaintiff has not provided facts that the defamatory statement exists. The email Plaintiff cites does not accuse Manco of an "egregious" FERPA violation. The letter states, in the relevant part, that:

"This letter is to inform you of St. Joseph's University's determination that you violated certain University policies, the measures to address the violations, and to remind you of your obligation to comply with these policies . . . "The University has determined that the copying and publication of the student emails and their class participation, class performance, and health information likely violated both the University's Policy on Confidentiality of Student Records and the University's Policy Governing the Use of Computing and Network Resources." (Sec, Am. Compl., Ex I). The letter concludes by stating "[t]he University takes very seriously the commitments under its policies to maintain the privacy, and avoid unauthorized disclosure, of student information protected under FERPA and those policies." *Id.*

The rest of the email notes that violations "may lead" to disciplinary action, like "non-reappointment, discharge, dismissal, and legal action." *Id.* Absent from this email is any statement by McConnell that Manco committed an "egregious violation" or "the most serious FERPA violation I have ever encountered," as Plaintiff suggests (Sec. Am. Compl. at ¶ 145; Ex. B, EEOC Charge, p. 40). The email states that Manco violated a policy and needed to take a reeducation course. (Sec. Am. Compl., Ex I). The letter is not capable of a defamatory meaning.

Even assuming that the letter was defamatory, this claim still fails because McConnell did not publish this email. This email is an internal email between Manco and Hargust; McConnell is merely copied on the email. Not only is the language attributed to McConnell

absent from the email, but McConnell did not publish the email—she was *a recipient*. (Exhibit I). As such, Plaintiff cannot establish a *prima facie* case for defamation against Dr. McConnell.

Manco's defamation claim against the SJU Defendants must be dismissed because he has not pled facts that support a claim for relief.  As to the statements attributed to SJU, this statement is incapable of a defamatory meaning, and thus Plaintiff has not pled facts that entitle him to relief. As to the statement attributed to Dr. McConnell, Plaintiff has not pled facts that plausibly suggest Dr. McConnell published the phrase attributed to her. It is nowhere in Plaintiff's exhibits that another person published (sent) the email to Plaintiff (which only had two recipients, Manco and Dr. McConnell). As such, Plaintiff could not establish a *prima facie* case for either defamation claim. Count II as it pertains to the SJU defendants is therefore dismissed.

### 2. Hadassah Colbert

As discussed above, this Court must first make a threshold decision about whether Colbert's statements are capable of a defamatory meaning and whether the statement is one of fact or opinion. *Mallory*, 168 F. Supp. 3d at 767. For ease of analysis, I will group the allegations against Colbert into four categories: her January 2021 report to SJU, her February 2021 social media posts, her August 2021 Instagram story and her Twitter discussion with Dr. Liebell in August 2021.

In January 2021, Colbert reported Manco's tweets to SJU, stating that he was racist and transphobic, had discriminated against her in class and fostered a hostile learning environment. Colbert argues that her report to SJU is privileged under the judicial proceeding privilege. The judicial proceeding privilege provides immunity for communications: "(1) issued as a matter of regular course of the proceedings; or (2) pertinent and material to the proceedings." *Bochetto v. Gibson*, 580 Pa. 245, 252 (2004). "The privilege applies to judicial and quasi-judical

proceedings." *Fogel v. Univ. of the Arts,* 2019 WL 1384577, at *9 (E.D. Pa. Mar. 27, 2019).

"These two factors apply equally to communications made prior to the initiation of judicial

proceedings." *Schatzberg,* 877 F. Supp. 2d at 247 (citations omitted). "[T]he privilege is

absolute, meaning that, where it attaches, the declarant's intent is immaterial even if the

statement is false and made with malice." *Schanne v. Addis*, 121 A.3d 942, 947 (Pa. 2015).

Manco argues that government involvement is a necessary condition for according quasi-

judicial status to grievance procedures, and that since the instant matter involves

communications to a private university, judicial privilege does not apply. In support of this

argument, Manco relies on *Overall v. Univ. of Pa*., 412 F.3d 492, 498-99 (3d Cir. 2005), for the

proposition that the privilege does not apply to private grievance procedures at universities that

do not involve a state actor such as SJU. However, Plaintiff misconstrues *Overall v. Univ. of Pa.,*

as that case states that "Pennsylvania cases finding quasi-judicial privilege consistently involve

proceedings before federal, state, or local governmental bodies, or **proceedings held pursuant**

**to a statute or administrative regulation**." *Overall,* 412 F.3d at 497 (emphasis added). Because

Colbert's initial email to SJU went to its Title IX coordinator who commenced a Title IX

investigation, which is a "proceeding held pursuant to a statute," quasi-judicial immunity applies

here. The limitation set forth in *Overall* does not apply quasi-judicial immunity only to

communications to government actors, rather it also covers communications that commence

proceedings pursuant to Title IX or other federal statutes. *See also Fogel,* 2019 WL  1384577, at

*10 (finding that quasi-judicial immunity applied to an individual who reported misconduct to a

private university's Title IX coordinator initiating an investigation.) This privilege "has been

extended to statements made by private parties to officials for the purpose of initiating charges or

proceedings, even if those statements were allegedly false." *Weinik v. Temply Univ., et al*, 2020

WL 3892963, at *8 (E.D. Pa., Jul 10, 2020), *citing Greenberg v. McGraw*, 161 A.3d 976, 987-89

(Pa. Super. 2017).  Accordingly, Colbert is entitled to immunity for her January 2021 email to

SJU regarding Manco and Plaintiff's claim of defamation as to this communication is dismissed.

Next, on February 19, 2021, Colbert posted on her Instagram account a screenshot of

Manco's tweet with added commentary at the bottom. (Sec. Am. Compl. at ¶ 105). Manco had

retweeted a tweet that stated 56 percent of Americans say society is racist, while 44 percent

disagree. *Id.* When retweeting, Manco stated: "So if these numbers are true about peoples'

perceptions of racism, what does it say about all of the race/bias 'training' that has been going on

for some years now? Could it be that such training actually divides us and *worsens* race

relations?" *Id.* When Colbert shared Manco's retweet on Instagram she added the following

commentary: "When I took this man for stat I had a feeling he didnt (sic) like black people but

now reading his twitter I know that he doesn't like black people. *See id.* at ¶ 105.

Pennsylvania courts have held that if an opinion is joined with the facts that led someone

to form that opinion, that opinion is not actionable defamation. *See Balletta v. Spadoni*, 47 A.3d

183, 197 (Commw. Ct. 2012); Restatement (Second) of Torts § 566 comment (c) ("[a] simple

expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient

for an action of defamation, no matter how unjustified and unreasonable this opinion may be or

how derogatory it is . . . ."). Plaintiff posted his opinions and beliefs for public consumption on

Twitter; Colbert reposted Plaintiff's tweets and expressed her pure opinion about their content.

Because Colbert's February 19, 2021, post includes the facts behind Colbert's opinion, it is not

capable of defamatory meaning.

On February 21, 2021, Colbert tweeted that Manco "[allowed] his followers to send

literal death threats to college students" and that Manco "told a narcoleptic student that they had

to sit in the back of the classroom. Sec. Am. Compl. at ¶¶ 111, 117. As to Colbert's February 21, 2021, tweets Colbert argues that any defamation claim based upon these tweets must fail because they are both verifiably true. ECF 61, p. 11. Although it may be true that Colbert received a death threat, *see* ECF 61, Ex. A, it is not verifiably true from that threat that Manco had any knowledge said threat was being sent and/or allowed or encouraged it. Accordingly, this tweet is not verifiably true and is capable of defamatory meaning.

Colbert also argues that her second February 21, 2021, tweet that Manco told a narcoleptic student to sit in the back of the classroom was verifiably true based upon screenshots in the Complaint of emails between Manco and Carman in which Manco stated: "I need for you again to make a better effort to not fall asleep in class, again because you are right in front of me and it brings me down a little. I understand that it may be a medical condition but if you think it can or will happen again then I'd appreciate it if you could situate yourself in the back somewhere." (Sec. Am. Compl. at ¶ 119). Although this email makes clear that Manco had some discussions with Carman about her falling asleep in class and mentioned the possibility of a medical condition, it is not verifiably true from the email that Carman was narcoleptic, nor was it verifiably true that Manco **made** her sit in the back of the class; the email quoted in the complaint appears to set forth a request. Accordingly, Colbert's February 21, 2021, tweet about an alleged narcoleptic student is not verifiably true, is capable of defamatory meaning and is therefore actionable.

Further, at issue is also an article that appeared in the *Philadelphia Inquirer* in August of 2021 discussing the fact that Manco had been removed from his teaching and coaching positions. In response, Colbert posted a story to Instagram that Manco claims was her "revel[ing] in her accomplishment." *Id.* at ¶ 102. This story contained 5 images. In images 1 and 2, Colbert shares

the August 2021 *Inquirer* article, circles a protestor's sign that says "RE-HIRE MANCO AND FIRE THE WOKESTERS," and adds "Ooooops…Did I do that…"(Sec. Am. Compl. at ¶ 102). In image 2, Colbert shares more of the same article, underlines Manco's name and adds "I'm hollering." *Id*.

In image 3, Colbert shares a meme stating "Stay in yo lane, bitch" and adds: "That chrome dome Manco fucked with the wrong student and found out! As well as I told Saint Joseph's to fix the racism issue and they smiled in my face and didn't do it now yall (sic) missing money." She also adds "Let that shit burn and rot." *Id.* In image 4, Colbert shares a meme stating: "I'm praying for you though" and adds: "Too many fake ass black student didn't want to help me. Called me an angry black woman thought I was doing too much. And you sided with these white supremacist so you wouldn't look a certain way. And I'm not saying this to punch down but yall (sic) look even more dumb now. See what happens when you keep your foot on their neck?" *Id*. In image 5, Colbert shares another meme and adds: "Now all the white supremacist alumni is (sic) sick and showing their asses and proving my damn point. They don't really like black people, POC, or women at SJU." At the bottom of the image, Colbert also states: "Anyways, when you do coonery, coonery finna do you! That's the lesson to learn from today kids! And when a white MFer trying to put some Jim Crow on you, open your mouth! Bc now Gregory Manco fat head waiting in the unemployment line." (Sec. Am. Compl. at ¶102).

First, image 4 is clearly not defamatory because it is not directed to Manco and does not mention him by name. Therefore, Manco's defamation claim cannot proceed as to this image.

As to images 1 and 2, I find that they are not capable of a defamatory meaning. By sharing a newspaper article that discussed Manco, Colbert has not caused a "grievous[] fracture" in Manco's "standing in the community of respectable society." *Graboff v. Colleran Firm*, 744

F.3d 128, 136 (3d Cir. 2014). Even Colbert's added commentary on image 2 does not equate to a defamatory meaning. It may be embarrassing and annoying to Manco that Colbert shared the article in question, but these 2 images are not defamatory.

As to image 3, where Colbert shared a meme and added specific commentary that Manco "fucked with the wrong student and found out," and that she told SJU to "fix the racism issue," reading this image as a whole, it is capable of a defamatory meaning. A person reading this slide may well infer that Manco is a racist and treated his students in a racist manner. Accordingly, Manco's defamation claim is actionable at to image 3.

Lastly, regarding image 5 from Colbert's Instagram story, it clearly is capable of a defamatory meaning. A disinterested person viewing this image may well think that Manco was "trying to put some Jim Crow" on the students in his classroom, and now was unemployed because of it. Therefore, I will also allow Manco's defamation claim to proceed as to image 5 of Colbert's August 21, 2021, Instagram story.

Finally, also in August of 2021, Colbert tweeted out a copy of the *Inquirer* article discussing Manco's termination, to which Dr. Liebell commented. In response to Dr. Liebell's comment, Colbert stated: "I'm just still confused that people think it was just racism, ignoring the fact that white students also reported that he was a bully in the classroom and not tolerant of disabilities, i.e. making a narcoleptic student sit in the corner Bc they were a 'distraction.'" (Sec. Am. Compl. at ¶126). I find that this statement is capable of defamatory meaning; therefore, I will allow Manco's defamation claim to proceed as to this statement.

### 3.      Lynly Carman

As discussed above, Colbert tweeted that Manco told a narcoleptic student to sit in the back of the class. The Second Amended Complaint alleges that Colbert received this information

from Lopez, who had received it from Carman via a Direct Message ("DM") conversation. (Sec. Am. Compl. at ¶¶ 117-118). Carman argues that Plaintiff has not established that the communication between Carman and Lopez was defamatory. For the same reasons discussed above with regard to this statement as tweeted by Colbert, this statement is capable of defamatory meaning. Accordingly, Manco's defamation claim as to Carman will be permitted to proceed.

### 4.      Karleigh Lopez

According to the Second Amended Complaint, Lopez created and published a TikTok video with screenshots of Manco's tweets and a link to the SJU bias reporting form as well as a "plea to her followers to 'flood' the school with complaints" about Manco. (*Id*. at ¶ 56). Further, Lopez sent public tweets to SJU administrators with screenshots of Manco's tweets including Colbert's added commentary. Lopez also provided information to Colbert that she received from Carman regarding Manco allegedly forcing a narcoleptic student to sit in the back of the class, and then also forwarded this information to SJU. (*Id*. at ¶¶ 57, 118). Lastly, Lopez had a DM conversation with Fahey in which Fahey told Lopez that Manco thought "mental health is a joke," and that "his classroom is not a safe space," and that "he almost made her drop out of school." (*Id*. at ¶ 120). Lopez sent a screenshot of this DM conversation with Fahey to SJU. *Id.*

First, Lopez argues that all her alleged defamatory statements are entitled to privilege because they were part of a quasi-judicial proceeding. This privilege was discussed thoroughly above as to Colbert; it is applicable when a student conveys information that commences an investigation pursuant to federal statute or regulation. Lopez had two communications directly with SJU regarding Manco: the screenshot of the DM conversation that she had with Fahey and the screenshot of the DM conversation that she had with Carman. As both communications were

sent to SJU as part of a Title IX investigation, they are both entitled to immunity and Manco's defamation claims are dismissed as to these two screenshots.

As to Lopez's tweet to SJU with Manco's tweets and Colbert's commentary, as discussed above, Manco posted his opinions and beliefs for public consumption on Twitter; Lopez reposted Plaintiff's tweets and expressed her pure opinion about their content. Because Lopez's February 19, 2021, post includes the facts behind Colbert's opinion, it is not defamatory as a matter of law.

Regarding Lopez's TikTok with screenshots of Manco's tweets and a link to the SJU bias reporting form as well as a "plea to her followers to 'flood' the school with complaints" about Manco, this TikTok included Manco's tweets, then expressed Lopez's opinion as to the content of the tweets. Since the facts underlying Lopez's opinion were included in the TikTok and a viewer could make their own determinations as to the truth of Lopez's opinions, this TikTok video is not capable of a defamatory meaning.

Lastly, as to the information Lopez provided to Colbert regarding Manco allegedly forcing a narcoleptic student to sit in the back of the class, as discussed above, that communication is potentially defamatory. Therefore, all of Manco's defamation claims as to Lopez are dismissed except for the DM she sent to Colbert regarding an alleged narcoleptic student.

### 5.    Erin Fahey

Via DM, Fahey told Lopez that Manco thought "mental health is a joke," that "his classroom is not a safe space" and that "he almost made [her] drop out of school." (Sec. Am. Compl. at ¶ 120). Fahey also submitted a bias report to SJU. (*Id*. at ¶ 121). As discussed above regarding the bias reports submitted by other defendants in this matter, the bias report submitted

by Fahey to SJU is entitled to immunity and therefore not actionable in a defamation action. Regarding the DM that Fahey sent to Lopez, Fahey argues that it lacked defamatory meaning as Fahey was expressing opinions that Manco believed mental health is a joke and that his classroom is not a safe space. Fahey also argues that her statement that Manco almost made her drop out of school did not rise to the level of defamation because it did not fracture Manco's standing in society.

At this stage of the proceedings, I must find this statement is capable of defamatory meaning. Although Fahey's statements about Manco's thoughts on mental health and the safety of his classroom are her opinions, they are not based upon disclosed facts. Accordingly, Manco's defamation claim as to Fahey will be permitted to proceed.

### 6.    Corinne McGrath

As to McGrath, in response to the *Philadelphia Inquirer* article regarding Manco's termination, McGrath commented as follows on Facebook:

> I took his class as a senior math major . . . and not only was he obviously racist and sexist, he was just downright cruel. He took pride in failing and mocking kids who weren't going to study math anyway. Half the students would have to drop the course because he never actually helped his students. He was so mean spirited that regardless of his political opinions, SJU is so much better off without him.

(Sec. Am. Compl. at ¶¶ 128-29). McGrath argues that this statement is not capable of defamatory meaning and/or is a statement of opinion. She claims that her statement that Manco likes to fail student and half of his students would have to drop his course do not have a defamatory meaning, as they do not "fracture one's standing in society." McGrath also argues that describing Manco as cruel is a statement of opinion. At this stage of the proceedings, I must find McGrath's Facebook post is capable of defamatory meaning, as it discusses events that transpired in Manco's classroom and could be interpreted by a reader who was not present in the classroom as

having a defamatory meaning. *See Goldfarb v. Kalodimos*, 539 F. Supp.3d 435 (2021).

Therefore, Manco's defamation claim as to McGrath will be allowed to proceed.

### 7.    Dr. Susan Liebell

There are three tweets attributed to Dr. Liebell in response to an article in the *Inquirer*

regarding alumni who were withholding donations that form the basis of Manco's claim for

defamation as to Liebell:

> "Important is for alumni NOT in the photo to write to the provost/express support for a more egalitarian SJU. Also consider a small donation (even a few dollars) with a message that says you support a SJU that does not re-hire faculty who do not treat students with equal respect."

> "[W]hat I find rather odd is that @ssnyderinq [Reporter Susan Snyder] only interviewed these 6 white men. More rigorous reporting means asking other alumni whether they agree – so readers understand these 6 don't represent everyone? Some good quotes from the SJU representative though."

> "Any employment issue has a certain degree of privacy – so the alumni, students, faculty, etc. do not have the information. This is where we trust that there are processes in which info is shared and assessed."

(Sec. Am. Compl. at ¶¶125-126); (ECF No. 67, Liebell Mot. Dismiss, p. 6-7).

As to the first tweet, Manco argues that "Dr. Liebell tweeted that Dr. Manco was guilty

of professional misconduct, specifically that he does not treat his students with equal respect."

(Sec. Am. Compl. at ¶ 125). Plaintiff concedes in his response to Liebell's motion to dismiss that

"[t]he crux of Plaintiff's claims against Dr. Liebell arise out of a tweet from Defendant [Colbert]

hyperlinking to a *Philadelphia Inquirer* story that had been published about Dr. Manco that Dr.

Liebell republished on her personal Twitter account." (ECF. No. 80, p. 2).

Dr. Liebell's tweets do not mention Manco specifically, but even if they did, they are not

defamatory. These tweets are conjecture and speculation about disclosed facts and are therefore

an opinion that cannot be the basis for a defamation claim. In *McCafferty*, the Third Circuit

stated that "[i]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, that statement is not actionable." *McCafferty*, 955 F.3d at 359. (*quoting Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

Here, Dr. Liebell's tweets are in direct response to an *Inquirer* article about SJU alumni who withheld donations to the school, (ECF No. 67, p. 2) and also occurred after the University released a report that there was inconclusive evidence about Manco's behavior. Liebell does not claim to have facts that an undisclosed professor treated students unequally. A more accurate reading of the plain language of the tweet is that Dr. Liebell is stating an opinion about the quality of a news article and that SJU alumni who disagree with the article should show support by donating to the University. The article mentions that Manco was accused of treating students unequally; the article also mentions that there was inconclusive evidence about Manco's behavior. (ECF. No. 67). Thus, Dr. Liebell tweeting that alumni should support a SJU that does not "re-hire faculty who don't treat students with equal respect" is her interpretation and opinion about the article—an article that mentions that SJU did not come to a definite conclusion.

These pure opinions are absolutely privileged. As the Third Circuit stated in *McCafferty*, "[t]hat privilege makes sense. When an article discloses the underlying facts, readers can easily judge the facts for themselves." Dr. Liebell's first tweet was an opinion in response to a news article. The news article was linked, and readers were free to read the article and determine whether they agreed with Dr. Liebell's interpretation of the article. This is privileged activity.

The second and third tweets attributed to Dr. Liebell cannot be the basis for a defamation claim because the tweets are not directed at Manco. The second tweet is clearly directed at "@ssnyderinq," the reporter who wrote the *Inquirer* news article. The third tweet does not

mention Manco by name and a third-person reading that tweet would not know explicitly or implicitly that it was directed at him. Pennsylvania requires that "the communication applies to the plaintiff" and that "the recipient understands the communication to be intended to apply to the plaintiff." 42 Pa. C.S.A. § 8343.

Because Dr. Liebell's first tweet is a protected opinion and the second and third tweets do not apply to Manco nor would a third person understand the communication to be intended to apply to him, Manco's defamation claim against Dr. Liebell must be dismissed.

## F. <u>FALSE LIGHT</u>

Plaintiff's Second Amended Complaint contains false light claims addressed to SJU, McConnell, the student defendants, and Liebell. Plaintiff alleges that "Defendants' statements were false statements of fact, which Defendants knew and/or recklessly disregarded . . . placing Dr. Manco in a false light before the public." (Sec. Am. Compl. at ¶ 208). "Defendants acted with actual knowledge of the false and defamatory nature of their statements." (*Id.* at ¶ 211).

Under Pennsylvania law, to establish a false light claim, Plaintiff "must allege facts showing that the published material is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard for its falsity." *Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 776 (E.D. Pa. 2016) (*quoting Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014)) (cleaned up). "A plaintiff can establish falsity by showing that a defendant 'selectively printed or broadcast true statements or pictures in a manner which created a false impression.'" *Graboff*, 744 F.3d at 136 (*quoting Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1189 (Pa. Super. 1988)). Therefore, "even where a publication is literally true, 'discrete presentation of information in a fashion which renders the publication susceptible to inferences casting on in a false light entitles the grievant to recompense for the wrong committed.'" *Id.* at

136-37 (*quoting Larsen*, 543 A.2d at 1189). "[W]hether the communication is capable of bearing a particular meaning which is highly offensive to a reasonable person is a question for the Court." *Mallory*, 168 F. Supp. 3d at 766 (*quoting Savely v. MTV Music Television*, 2011 WL 2923691, at *5 (D.N.J. 2011) (internal quotations omitted).

The "publicity" requirement for false light in Pennsylvania requires that the "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Casselli v. City of Philadelphia*, 54 F. Supp. 3d 368, 380 (E.D. Pa. 2014) (*quoting Curran v. Children's Service Center of Wyoming County, Inc.*, 578 A. 2d 8, 12 (Pa. Super. 1990)) (internal quotations omitted).

### 1.    SJU and McConnell

Here, Manco contends that the "false light in which [he] has been placed due to the false and defamatory statements would be highly offensive to a reasonable person" and that Defendants "knew or recklessly disregarded" that the statements were false. (Sec. Am. Compl. at ¶¶ 210, 211). SJU argues that this Court should dismiss Plaintiff's claim because "[f]alsity cannot be established" and the statement lacks "whatever negative implication Plaintiff subjectively reads into it." (ECF No. 66, p. 23).

Whether these statements are false is contested. The parties also contest whether there is a negative implication to the statement. In a light most favorable to Manco, the statement can be read to imply that there is some chance that Manco is a racist. This is certainly a negative implication. While this statement is not capable of a defamatory meaning, "a true statement can constitute a claim of false light if it is broadcast in a way that creates a false impression." *Goldfarb v. Kalodimos*, 539 F. Supp.3d 435, 463 (E.D. Pa. 2021). In a light most favorable to

Manco, even if SJU's statements were true, a "discrete presentation" could plausibly cast Plaintiff in a false light. *See Graboff,* 744 F.3d at 136. Accordingly, this claim will be allowed to remain as to the University.

Plaintiff also alleges that Dr. McConnell placed Manco in a false light by alleging that he violated FERPA. (Sec. Am. Compl. at ¶ 145; see also ECF No. 66, p. 17). However, to state a claim for false light, a plaintiff must plead enough facts to support each element, including the "publicity" prong. Publicity requires that the "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Casselli*, 54 F. Supp. 3d at 380. Here, Manco does not adequately allege publicity by Dr. McConnell. The letter attached to support the false light and defamation claims is a letter between Hargust and Manco, with Dr. McConnell copied. (Sec. Am. Compl. Ex I). There are no facts alleged that support that this letter was made public, communicated to the public, or even published by Dr. McConnell (the author of the email is Hargust). (*Id*). Furthermore, this email was sent to two people. Including the sender, only three people saw it in total. Disclosure to so few people is insufficient for false light under Pennsylvania law. *Vogel v. W.T. Grant Co.*, 458 Pa. 124, 137 (1974) (holding that disclosure to four persons was insufficient for publicity).

Manco cannot point to facts that McConnell published, publicized, or even authorized the statement that allegedly placed Manco in false light. Furthermore, in Pennsylvania, disclosure to such few people would not count as publicity even if it was written by Dr. McConnell. Therefore, Plaintiff's false light claim is dismissed as to Dr. McConnell.

### 2.      Colbert

First, the Complaint in this matter fails to set forth explicitly which of Colbert's statements are actionable in a false light cause of action. I will assume Manco is referring to all the statements discussed above: Colbert's report to SJU, her February 19, 2021, Instagram post, her February 21, 2021, tweets, the five images contained in Colbert's Instagram story, and her Twitter discussion with Dr. Liebell.

As discussed above, Colbert's report to SJU is privileged. Also, there is not "publicity" as required by Pennsylvania law, because Manco cannot prove widespread dissemination. Colbert's remaining statements were all posted to social media; accordingly, they all meet the publicity standard. Further, whether these statements are false is contested, but taken in a light most favorable to Manco, they can be read to imply that there is some chance that Manco is a racist and treats disabled students poorly. This is certainly a negative implication. In a light most favorable to Manco, even if Colbert's statements were true, a "discrete presentation" could plausibly cast Plaintiff in a false light. *See Graboff,* 744 F.3d at 136. Accordingly, this claim will be allowed to remain.

### 3.      Carman

As discussed previously, Carman allegedly sent a DM to Lopez in which she stated Manco told her that she had to sit in the back of the class. Carman's single statement, made in a private DM to Lopez, cannot meet the standard for "publicity" in a false light case, as it was not "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Casselli*, 54 F. Supp. 3d at 380. Accordingly, Manco's false light claim as to Carman must be dismissed.

####     4.     Lopez

Karleigh Lopez made two bias reports to SJU where she repeated information shared with her by other students, published a TikTok video with screenshots of Manco's tweets and a link to the SJU bias reporting form, addressed public tweets to SJU administrators with screenshots of Manco's tweets including Colbert's added commentary, and provided information to Colbert that she received from Carman regarding Manco allegedly making Carman sit in the back of the class. First, Lopez's two reports to SJU are privileged and also lack publicity, as they were not widely disseminated, and Manco cannot sustain a false light claim as to those reports. As to Lopez's private DM with Colbert, that message also lacks publicity, as it was only sent to one person.

As to Lopez's TikTok video and her tweets to SJU with Manco's tweets and Colbert's added commentary, the falsity of the information contained therein is contested, and said information could be offensive to a reasonable person. Therefore, I will permit Manco's false light claim as to these two statements to proceed.

####     5.     Fahey

Via DM, Fahey told Lopez that Manco thought "mental health is a joke," that "his classroom is not a safe space" and that "he almost made [her] drop out of school." She also submitted a bias report to SJU. First, the bias report is privileged and Manco's false light claim cannot proceed as to it. Further, there is no publicity of Fahey's DM, as it was sent in a private message to Lopez only. Accordingly, Manco's false light claim against Fahey must be dismissed.

####     6.     McGrath

McGrath published a Facebook comment on the *Philadelphia Inquirer* article about Manco's discrimination claims. As it was posted to social media, it clearly satisfies the publicity

prong. Further, there is a dispute as to whether the information contained in McGrath's post is false. Accordingly, Manco's false light claim as to McGrath shall be permitted to remain.

### 7.    Susan Liebell

The only statements that Plaintiff alleges were published by Dr. Liebell are her tweets. This claim must be dismissed because Dr. Liebell's tweets are not capable of bearing a particular meaning that would be highly offensive to a reasonable person. (*Mallory*, 168 F. Supp. 3d at 766). Additionally, this claim must also be dismissed because Manco has not adequately alleged actual malice. Actual malice is a requirement for false light claims in Pennsylvania. *McCafferty*, 955 F.3d 352, 360 (noting that Pennsylvania follows the Second Restatement); Restatement (Second) of Torts § 652E (b) ("the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized manner and the false light in which the other would be placed."). The truth of the allegations is contested by the parties; stating an opinion about an ongoing news story is not evidence that Liebell "knew" or acted in "reckless disregard" for the truth of the statements. For these two reasons, Manco's claim for false light as to Liebell must be dismissed.

### H.   CIVIL CONSPIRACY

Plaintiff's Second Amended Complaint sets forth a count against all defendants (except for McGrath) for civil conspiracy. In Pennsylvania, a claim for civil conspiracy must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damages." *Meyer v. Deleware Valley Lift Truck, Inc.*, 392 F. Supp.3d 483, 496 (E.D. Pa. 2019). Proof of malice (an intent to injure) is "essential in proof on conspiracy" and "this unlawful intent must be absent justification." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211 (1979). "Bald assertions that certain actions were

malicious are insufficient; it must be alleged that the sole purpose of the conspiracy was to injure the plaintiffs." *North Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 713 (E.D. Pa. 2021) (gathering cases); (*quoting Morilus v. Countrywide Home Loans, Inc.*, 651 F. Supp 2d 292, 312 (E.D. Pa. 2008); see *Three Rivers Hydroponics, LLC v. Florists' Mut. Ins. Co.*, 2018 WL 701405, at *6 (E.D. Pa. 2018) ("Malicious intent requires that a defendant acted 'solely to injure' a plaintiff; injury that is incidental to another purpose, even if it appears 'selfish or unreasonable,' is not malicious."). Courts "routinely dismiss civil conspiracy claims where the plaintiff failed to allege that the defendants . . . acted with the sole intent to injure him or her." *North Penn Towns, LP*, 554 F. Supp. 3d at 713.

Manco alleges that the relevant defendants were parties to a civil conspiracy and "act[ed] with a common purpose of overt acts, collusion and malice, unlawfully planned and acted together to sabotage and destroy Dr. Manco's reputation, employment, career . . ." (Sec. Am. Compl. at ¶ 217). Specifically, the SJU Defendants allegedly conspired with students against him through the University's "consultation process." (Sec. Am. Compl. at ¶ 51-52). Manco alleges that "Morrison, in her official capacity as SJU Title XI coordinator . . . conspired with Colbert by providing her with advice regarding how she could strengthen her complaint, specifically by telling her to find others who would corroborate her claims . . ." (*Id.* at ¶ 52). Plaintiff alleges that this "consultation process" led to additional students filing complaints against him. (*Id.* at ¶¶ 54-56).

SJU argues that because Manco concedes that SJU's Title IX coordinator was working in her official capacity to corroborate student complaints, Manco has not adequately alleged malice. (ECF No. 66, p. 25). SJU contends that Dr. Manco's injuries are "[a]t best . . . incidental to

another purpose – namely, the Saint Joseph's University Defendants' obligations to investigate on-campus discrimination." (*Id*).

Courts in this district disagree as to whether "motivations of personal or professional gain negate malice for the purpose of establishing civil conspiracy." *Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp.3d 541, 557 (E.D. Pa. 2018)  (*compare e.g. North Penn Towns, LP*, 554 F. Supp. 3d at 713 ("Bald assertions that certain actions were malicious are insufficient; it must be alleged that the sole purpose of the conspiracy was to injure the plaintiffs.") and *Three Rivers Hydroponics, LLC*, 2018 WL 701405, at *6 ("Malicious intent requires that a defendant acted 'solely to injure' a plaintiff; injury that is incidental to another purpose, even if it appears 'selfish or unreasonable,' is not malicious.") *with Aenta Inc.*, 324 F. Supp.3d at 558 ("[*Thompson Coal*] does not hold that a defendant's interest in economic gain would, in itself, justify or negate specific intent to cause injury.")).

Here, taking Manco's well pleaded allegations as true, he has failed to establish that the **sole purpose** of SJU's actions was to injure him. While he alleges that SJU's Title IX coordinator "conspired" with students, this is a bare assertion with no factual support. Considering only his well pleaded allegations, Manco alleges that SJU informed a student that to strengthen a claim for a Title IX violation, the student should find other students who could corroborate this claim. Even if SJU's actions hurt Manco, he has not properly alleged that the sole purpose of this action was to harm him. His harm occurred, according to his own allegations, while SJU investigated his behavior—his injury is incidental to another purpose. *See Three Rivers Hydroponics, LLC*, 2018 WL 701405, at *6. A bare assertion, without more facts, that the Title IX coordinator "conspired" with students through the process is not enough to state a claim for conspiracy. Manco provided no facts to support his claim; he merely labels the

University's actions as a conspiracy without anything more. He has failed to allege facts that establish the requisite malice required by Pennsylvania law. As such, he has failed to state a claim upon which relief can be granted and this claim is dismissed as to SJU.

As to Colbert, as discussed above regarding the University, Plaintiff has failed to allege that the sole purpose of Colbert consulting with SJU's Title IX coordinator was to harm him. It is possible that Colbert's actions did in fact cause Manco harm, but that harm was incidental to Colbert's desire to fight alleged discrimination at SJU.

Further, as to all the remaining defendants, Manco has pled even less factual support for his civil conspiracy claim then he did as to SJU and Colbert. Manco has entirely failed to plead that any of the defendants acted with the sole intent to injure or harm him. Accordingly, this claim must be dismissed. As Manco has had three opportunities to provide sufficient factual detail and has not done so in either his Complaint, Amended Complaint or Second Amended Complaint, this claim will be dismissed with prejudice.

## I. <u>TORTIOUS INTERFERENCE</u>

Manco's complaint contains a cause of action against Liebell, Colbert, Lopez, Carman, Fahey and McGrath for tortious interference with his contractual relationship with SJU. To establish tortious interference, Plaintiff must allege: (1) existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relationship from occurring; (3) absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

First, as to the student defendants, accepting all allegations in the complaint as true, I find that Plaintiff has pled sufficient facts at this stage of the proceedings to allow his claim of tortious interference with contract as to Colbert, Carman, Lopez, Fahey and McGrath to proceed to discovery. Manco has pled that the student defendants "engaged in activities, . . . to have Dr. Manco suspended and his contract terminated." (Sec. Am. Compl. at ¶ 222). Plaintiff alleges that "[a]s a direct and proximate result . . . SJU suspended Dr. Manco and elected not to renew his contract." (*Id.* at ¶ 225). It could be argued that these student activities allegedly interfered with Manco's employment contract and were not justified. Clearly, some of the social media activity engaged in by the student Defendants shows an intent to act, at least in part, to cause harm to Manco and have him removed as a professor at SJU. Therefore, I will allow this claim to remain as to Colbert, Carman, Lopez, Fahey and McGrath.

However, as to Defendant Liebell, there are no facts set forth in Manco's complaint that would support "an intent on the part of the defendant to harm plaintiff." The intent element of tortious interference "is satisfied when the defendant acted, at least in part, for the purpose of accomplishing the interference and harming the plaintiff." *Newtek Small Business Finance, LLC, v. Texas First  Capital, Inc.,* 2022 WL 17486843 at *5 (E.D. Pa. Dec. 7, 2022). Here, not a single fact in the Complaint alleges that Dr. Liebell intended to interfere with Manco's contract through her tweets. As such, this claim must fail. *See Iqbal*, 556 U.S. at 678-79. ("Threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice."). Given that this Court could not find any facts to support this allegation, this claim must be dismissed as to Defendant Liebell for failure to state a claim, while it will be permitted to remain as to Defendants Colbert, Carman, Lopez, Fahey and McGrath.

**J.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Count XI of Plaintiff's Second Amended Complaint alleges that all parties intentionally inflicted emotional distress on Manco. Under Pennsylvania law, a plaintiff must show four elements to establish a claim for intentional infliction of emotional distress ("IIED"). The four elements are: (1) "the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Jordan v. Pennsylvania State University*, 276 A.3d 751, 755 (2022) (cleaned up) (quoting *Madreperla v. Willard Co.*, 606 F.Supp. 874, 879-80 (E.D. Pa. 1985)).  "For an IIED claim to survive a preliminary objection, a court must determine, as a matter of law, whether there is sufficient evidence for reasonable persons to find extreme or outrageous conduct." *Id.* (internal quotations omitted); *see Cox v. Keystone Carbon Co.*, 851 F.d2 390, 395 (M.D. Pa. 1988) ("it is for the court to determine if the defendant's conduct is so extreme as to permit recovery."). Extreme or outrageous conduct is conduct "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal quotations omitted) (quoting *Rinehimer v. Luzerne Cty. Cmty. Coll.*, 539 A.2d 1298, 1305 (1988)); *see Smith v. RB Distribution, Inc.*, 515 F.Supp.3d 311, 315 (E.D. Pa. 2021).

More specifically, "it must be recognized that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery." *Cox*, 851 F.d2 at 395 (citing *Rinehimer supra* at 1305). "While loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot be a basis for recovery for intentional infliction of emotional distress." *Id.* (internal quotations omitted) (citing *Brieck v. Harbison-Walker Refractories*, 624 F.Supp. 363, 367 (W.D. Pa. 1985),

aff'd. *in relevant part* 822 F.2d 52 (3d Cir. 1987)). "The only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Id.*; *see Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 311 (M.D. Pa. 1988).

Here, Manco broadly alleges that all the parties to this lawsuit participated in "extreme and outrageous conduct" but does not specify what conduct was extreme or outrageous. (Sec. Am. Compl. at ¶ 227). This alleged outrageous conduct includes the University's investigation into the allegations of racism and bigotry, placing Plaintiff on administrative leave, not renewing his contract, disciplining Plaintiff for alleged FERPA violations, and a tweet from the University regarding the internal investigation. (*Id.* at ¶¶ 60, 79, 88, 145).

The allegations against Dr. McConnell specifically are her failure to meet with Plaintiff within three days of placing him on administrative leave, Dr. McConnell's meeting with an HR representative, and Manco's subsequent loss of employment due to his alleged violations of university policies and FERPA, and McConnell's failure to notify Plaintiff of his alleged FERPA violations for three months. (*Id.* at ¶¶ 68, 143-45, 148, 152).

Upon review of Manco's intentional infliction of emotional distress allegations, the conduct alleged as to the SJU Defendants is not "outrageous or extreme" as to be "regarded as atrocious, and utterly intolerable in a civilized society." On February 19, 2021, Manco was placed on "administrative leave effective immediately pending the outcome of an investigation." (*Id.* at ¶ 60). Plaintiff alleges that SJU and Dr. McConnell violated University policies in this process. (*Id.* at ¶ 62-68). Placing an employee on administrative leave pending the results of an internal investigation into racism and bigotry is not outrageous or extreme. Even if it is true that the SJU Defendants violated internal policies in the process, this conduct is not "utterly

intolerable in a civilized society." This conduct might have annoyed and frustrated Manco, but it is not intolerable.

Loss of employment cannot be a basis for IIED, and even if the SJU Defendants "conspired" to "cancel" Plaintiff, this Court held in *Madreperla v. Willard Co.*, 606 F.Supp. 874, 880 (E.D. Pa. 1985), that even a "premeditated plan" intended to make employment conditions more difficult and force an employee to resign was not outrageous conduct. (Sec. Am. Compl. at ¶ 9). Finally, a tweet by the University about the results of their investigation is not "extreme" or "outrageous" conduct. (*Id.* at ¶ 76-77; ECF No. 66, p. 20 "the University's statement that a definitive determination could not be made . . . is . . . literally true . . ."). Tweeting about this disagreement is not "utterly intolerable in a civilized society."

As to Dr. Liebell, the "extreme and outrageous" conduct attributed to her is not specified, but this Court assumes that Manco is referring to Dr. Liebell's tweets. The conduct attributed to Dr. Liebell is not "outrageous or extreme" as to be "regarded as atrocious, and utterly intolerable in a civilized society." Dr. Liebell authored three tweets, none of which mentioned Plaintiff by name. One was a criticism of another person who ironically has not filed a lawsuit for defamation. One can be read to suggest that students and alumni be patient—they, like everyone else, do not have all the information about the situation. None of this conduct is extreme or outrageous. If tweeting generalities or commentary about news articles was extreme or outrageous conduct, most of society would be sued, which ironically, would be the "cancel culture" Plaintiff seems to fear.

As to the student Defendants, it is doubtful that any of their conduct could be considered "extreme and outrageous." Even assuming Plaintiff had pled extreme and outrageous conduct as to the student defendants, his intentional infliction of emotional distress claim must still be

dismissed because Manco has not pled facts that support his assertion that all defendants'
conduct caused severe emotional distress with any "competent medical evidence," as required by
Pennsylvania law. *Paith v. County of Washington*, 394 Fed. Appx. 858, 861 (3d Cir. 2010)
(affirming summary judgment on an IIED claim for failure to meet this requirement) (citing
*Kazatsky v. King David Mem'l Park, Inc.*, 515 Pa. 183, 197 (1987)). Nowhere in his Second
Amended Complaint has Manco pled facts that suggest that he has suffered from let alone has
any medical evidence of the "severe" distress he alleges. Rather, he merely alleges in conclusory
fashion that he suffered from "pain and suffering, embarrassment, humiliation, loss of self-
esteem, mental anguish, and loss of life's pleasures." (Sec. Am. Compl. at ¶¶ 159, 169, 177, 205,
215). As such, this is separate grounds for dismissal of Manco's IIED claim against all
defendants, as it has been held that things like agitation, loss of sleep, anxiety, fear, and pain and
suffering do not amount to physical injury sufficient to sustain an IIED claim. See *Selig v.
Sloyer*, 2014 WL 3907131, * 3-4 (Pa. Commw. Ct. Aug. 12, 2014); *Rolla v. Westmoreland
Health System,* 651 A.2d 160 (Pa. Super. 1994) (sustaining demurrer to intentional infliction of
emotional distress claim because plaintiff failed to allege physical injury resulting from his
alleged humiliation, embarrassment, and mental anguish).

In short, Plaintiff's intentional infliction of emotional distress claim against all defendants
must be dismissed because he has not pled facts that would support every element of such a
claim as required by Pennsylvania law. Specifically, Plaintiff has not pled facts that support a
finding that the alleged conduct was extreme or outrageous, nor has he pled facts that suggest
medical evidence exists of his alleged emotional distress because of Defendants' conduct.
Accordingly, Manco's claim of intentional infliction of emotional distress is dismissed.

IV.    **CONCLUSION**

For all the reasons set forth above, the motions to dismiss of defendants are granted in part and denied in part. Specifically, Plaintiff's claim for wrongful termination in Count I is dismissed, the claim for defamation found in Count II is dismissed in its entirety as to Defendants SJU, McConnell, and Liebell and dismissed in part as to Defendants Colbert and Lopez as discussed above. Plaintiff's claim for defamation as to Defendants Carman, Fahey and McGrath will be permitted to remain. Plaintiff's claim in Count III for reverse race discrimination is dismissed and the claims contained in claims IV, V, and VI are dismissed as they pertain to racial discrimination under § 1981, PHRA, and PFPO. Plaintiff's claims for retaliation as found in Counts IV, V and VI are permitted to remain.

Further, Plaintiff's claim for breach of contract as set forth in Count VII will be permitted to proceed, and his claim for false light as set forth in Count VIII will be dismissed as to Defendants Carman, Fahey, Liebell and McConnell and permitted to remain as to Defendants SJU, Colbert, Lopez, and McGrath. Plaintiff's civil conspiracy claim found in Count IX will be dismissed as to all defendants and the tortious interference with contract claim found in Count X will be permitted to proceed as to Colbert, Carman, Lopez, Fahey and McGrath and dismissed as to Liebell. Lastly, Plaintiff's intentional infliction of emotional distress contained in Count XI is dismissed in its entirety.